**SHEREE D. WRIGHT**
IBF Law Group, PLLC
3101 N. Central Ave, Suite 1250
Phoenix, Arizona 85012
Telephone: (602) 833-1110
Facsimile: (602) 878-3294
E-Mail: sheree@ibflaw.com
**(**AZ SBN# 035265)
(NM SBN# 151522)

**CORTNEY E. WALTERS** (*pro hac vice* pending)
The Law Office of Cortney E. Walters, PLLC
2719 Hollywood Blvd., Suite A-1969
Hollywood, FL 33020
Telephone: (954) 874-8022
Facsimile: (954) 889-3747
E-Mail: cwalters@cewlawoffice.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Jane Doe, an individual,<br><br>           Plaintiff,<br><br>vs.<br><br>Suns Legacy Partners, LLC, an Arizona Limited Liability Company; John Doe 1-5; Jane Does 1-5; Black Corporations 1-5; and White Partnerships 1-5,<br><br><br>           Defendant, | Case No.:<br><br>**COMPLAINT**<br><br>**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE** |

Plaintiff Jane Doe (hereinafter "Plaintiff"), by and through her undersigned counsels,

for her complaint alleges as follows:

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 1

## JURISDICTION AND VENUE

1. This Court possesses jurisdiction over the present action pursuant to 28 U.S.C. §§ 1331 and 1343. Specifically, this action raises federal questions concerning the deprivation of Plaintiff's rights under 42 U.S.C. § 1981, which addresses issues related to discrimination and the denial of equal rights.

2. Additionally, this action includes a claim under the Equal Pay Act (EPA), 29 U.S.C. § 206(d), which prohibits wage discrimination on the basis of sex. Therefore, the claims presented herein fall within the scope of this Court's subject matter jurisdiction.

3. Further, the Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a). These state and local law claims are so closely related to the federal claims that they form part of the same case or controversy. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as Defendant Suns is subject to personal jurisdiction in this district, given that Arizona serves as both its state of incorporation and its principal place of business. Additionally, venue is appropriate under 28 U.S.C. § 1391, as the events giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

4. Plaintiff is an individual domiciled in Maricopa County, Arizona and at all times material to this action, was an employee of Suns Legacy Partners, LLC.

5. Defendant Suns Legacy Partners, LLC (hereinafter "Defendant Suns"), is a

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 2

corporation engaged in business operations in Maricopa County, Arizona, and was Plaintiff's employer as defined under 29 U.S.C. § 203(e)(1) of the Fair Labor Standards Act (FLSA).

6. Defendant Suns, John Does 1-5, Jane Does 1-5, Black Corporations 1-5, and White Partnerships 1-5 (hereinafter "fictitious defendants") were, at all times material herein, principals and/or employers of one another and were acting as agents, servants, or employees within the scope of their agency or employment. As soon as their true names become known, Plaintiff will amend this Complaint accordingly. Said fictitious defendants should be held liable to Plaintiff for their actions and the actions of any affiliated or subsidiary entity under their control under the theories of respondeat superior, agency, equitable estoppel, and other applicable law.

## ADMINISTRATIVE PROCEDURES

7. Prior to the filing of this Complaint, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), asserting violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII").

8. Plaintiff's EEOC charge arises out of many of the same underlying facts as those alleged in this complaint, which pertain to her retaliation claim under Section 1981.

9. Upon completion of the EEOC's investigation and issuance of the Notice of Right to Sue, Plaintiff will seek leave to amend this Complaint to include claims that Defendant Suns violated Title VII.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 3

10.    All prerequisites to the filing of this action have been satisfied.

## FACTUAL ALLEGATIONS

11. Plaintiff, a Hispanic female, held a prominent position within Defendant Suns' organization and was the highest-ranking Hispanic member of its corporate staff which consisted of approximately ten Hispanic individuals overall.

12.    Plaintiff's role was critical, particularly in the development and execution of significant initiatives, including "The Campaign," a high-profile cultural project designed to honor the contributions of the Hispanic community to Defendant Suns' mission and success.

13.    "The Campaign" was of particular significance, as it sought to acknowledge and celebrate the deep cultural influence and longstanding support the Hispanic community had provided to the Defendant Suns' brand and outreach efforts.

14.    Over the course of more than two and a half years, Plaintiff led the development, management, and execution of the campaign, drawing on her extensive knowledge and cultural sensitivity to navigate its complex demands.

15. However, between July and September 2023, Plaintiff began to endure an increasingly hostile work environment marked by unwelcome verbal and physical conduct of a sexual nature. The toxic atmosphere, fueled by inappropriate comments, unwanted advances, and suggestive behavior from male colleagues and executives, severely compromised Plaintiff's ability to perform her professional duties.

16.    Plaintiff's repeated concerns about the harassment were dismissed or ignored, leaving her in a constant state of discomfort, fear, and emotional distress.

17.    Defendant Suns' organization fostered a hostile culture which was not isolated but systemic – rooted in an organizational environment where high-ranking male executives routinely used their influence and power to make sexual advances toward female subordinates. Despite a change in ownership under Mat Ishbia, the misconduct persisted. Executives including CEO Josh Bartlestein, former Senior Vice President and General Counsel Melissa Goldenberg, and Senior Vice President of People & Culture Kim Corbitt were fully aware of this behavior but chose to conceal it rather than intervene.

18.    Among those engaging in such misconduct was Kyle Pottinger, the former Senior Vice President of Ticket Sales and Services. Pottinger repeatedly abused his authority by making inappropriate advances toward Plaintiff under the guise of professional meetings. For example, Pottinger scheduled lunch meetings under the pretense of discussing work but instead steered the conversation toward personal and inappropriate topics.

19.    During these encounters, Pottinger frequently referenced that "he and his wife were getting a divorce," strongly implying that a romantic or sexual relationship with Plaintiff would be welcome and appropriate.

20.    Pottinger further insinuated that a romantic or sexual relationship with him could result in career advancement, placing Plaintiff in an untenable position.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 5

21.    After Plaintiff rejected Pottinger's sexual advances, she experienced a clear decline in professional support – not only from him, but from other senior executives whose treatment of her also began to shift.

22.    Defendant Suns failed to investigate or correct Pottinger's misconduct, instead allowing him to remain in his role, thereby condoning his behavior and subjecting Plaintiff to ongoing retaliation and discrimination.

23.    Despite effectively fulfilling the responsibilities of a director for "The Campaign," Plaintiff was never officially promoted to this role nor provided a corresponding salary adjustment, despite the considerable duties involved.

24.    While managing a highly visible and complex initiative, Plaintiff continued to receive compensation and a title that did not reflect the scope or impact of her work.

25.    Plaintiff was subjected to clear an ongoing pay and promotion disparities based on her gender. Male colleagues, in similar positions were promoted or compensated in a manner commensurate with their responsibilities, while Plaintiff was denied equal treatment.

26.    These disparities were not isolated. Plaintiff faced ongoing pay and promotion inequities based on her gender. For instance, in the previous year, a male employee with the title of Senior Director of Live Presentation, Shawn Martinez, had led a campaign nearly identical in scope. Although Plaintiff successfully executed the same responsibilities, she received neither a comparable title nor compensation.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 6

27.    This inequitable treatment further exemplified the discriminatory practices Plaintiff encountered as a woman in the organization.

28.    During the course of "The Campaign," Plaintiff's authority was frequently undermined by male colleagues who openly challenged her leadership without consequence.

29.    Despite being designated as the campaign leader, Plaintiff received little support from senior leadership. This lack of institutional backing allowed male colleagues to consistently belittle and override her contributions, impairing her ability to lead effectively.

30.    Two male collaborators, and agents of Defendant Suns, engaged in a blatantly discriminatory and demeaning conversation with Plaintiff, centering on the sexual objectification of women in the Hispanic community.

31.    Defendant agents not only forced Plaintiff to view a sexually inappropriate image but pressured her into discussing it, violating her personal boundaries and demonstrating the organization's disregard for cultural respect.

32.    Plaintiff reported this conduct to her supervisor, Graham Wincott, who dismissed her concerns and failed to take corrective action—further isolating Plaintiff and reinforcing the culture of impunity.

33.    In another incident, while Plaintiff and Wincott were discussing ideas for a Pride Night halftime show, Senior Director of Live Presentation Shawn Martinez entered the room and joined the conversation.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 7

34.    Martinez expressed strong opposition to the concept and made blatantly homophobic comments. When Plaintiff defended the LGBTQIA community and voiced her disagreement with Martinez's remarks, Martinez abruptly turned his attention to her, inappropriately questioning her sexuality and asking why she cared so much, even going so far as to ask whether she was a lesbian. Plaintiff was stunned by these invasive and offensive questions.

35.    Instead of addressing Martinez's misconduct, Wincott downplayed the incident, describing Martinez as "from a different generation" and suggesting that Plaintiff not take offense. Wincott's response was not only dismissive but emblematic of his broader pattern of protecting male colleagues rather than supporting those who experience misconduct.

36.    The incident left Plaintiff deeply shaken and added to her growing sense that her concerns were never taken seriously within the organization.

37.    As a result of these compounding incidents and the mounting stress and workplace hostility, Plaintiff began recording voice messages on her phone in which she privately aired her frustrations and reflected on the emotional toll the workplace had taken on her. These voice messages were intended for her fiancé and included statements regarding how she felt unsupported by her supervisor and how Wincott routinely protected other executives while neglecting the needs and safety of his own team.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 8

38.     In one message, Plaintiff expressed her belief that Wincott was an ineffective leader, citing his repeated failures to address misconduct directed at her. However, one of these voice messages was inadvertently sent to Wincott himself.

39.     Despite the message being a private and accidental communication, Defendant Suns disciplined Plaintiff, labeling her behavior as "rude" and "unprofessional."

40.     The decision to write up Plaintiff for this private and accidental communication— while ignoring the substance of her grievances and the extensive mistreatment she endured—was emblematic of the hostile and retaliatory work environment perpetuated by Defendant Suns.

41.     In an overtly discriminatory manner, Defendant Suns, particularly Stacy Mitch, the Senior Vice President of Communication, restricted Plaintiff to a single interview on a Spanish-speaking network, preventing her from engaging with broader, English-speaking media outlets.

42.     In contrast, Plaintiff's colleagues were regularly featured in English-language media and publicly recognized for similar work. Plaintiff's exclusion starkly illustrated the racial and national origin bias she faced as she was denied the same opportunities for visibility, despite her instrumental role in the success of "The Campaign."

43.     Defendant Suns' executives perpetuated an environment in which high-level staff engaged in discriminatory behavior without consequence, leaving minority employees especially vulnerable.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 9

44.    Mitch was widely regarded within the organization as a key participant in maintaining these discriminatory practices.

45.    Mitch repeatedly demonstrated that she would abuse her position and authority to protect Defendant Suns over leading with integrity.

46.    For example, Mitch falsely claimed that Plaintiff had confided she didn't believe Wincott should be an executive. No such conversation occurred; in fact, this was the first time Mitch and Plaintiff had ever spoken. The fabricated nature of Mitch's statement is further underscored by the fact that Mitch had never created an environment in which Plaintiff would have felt comfortable – or inclined – to express such a personal or critical opinion.

47.    When confronted by Wincott, Plaintiff immediately denied the fabricated statement and requested a meeting with both Mitch and Wincott to resolve the issue. Mitch avoided accountability, and the conversation never took place.

48.    Furthermore, in or around early 2023-2024 Wincott informed Plaintiff that when a high-profile media opportunity came down to a decision between a qualified Hispanic female and a Caucasian female, Mitch stated that she would not select the Hispanic candidate because "she wasn't polished enough."

49.    This racially coded language reflected the biased and subjective standards used to suppress the advancement of Hispanic professionals.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 10

50. This incident, coupled with Plaintiff's own exclusion from promotions, press opportunities, and award recognition, contributed to her belief that the organization systematically devalued Hispanic women. It further reinforced her conclusion that she had no future within the organization and ultimately contributed to her decision to resign.

51. Plaintiff made repeated efforts to raise her concerns about discriminatory conduct and the hostile work environment to Defendant Suns' Human Resources Department.

52. However, her complaints were met with indifference, and no corrective action was taken, perpetuating a toxic work environment. Defendant Suns' failure to address Plaintiff's grievances emboldened the perpetrators of harassment and reinforced the hostile and retaliatory atmosphere she was subjected to.

53. Despite Plaintiff's significant contributions to "The Campaign," she was informed that she would not receive recognition for her contributions.

54. This decision stood in stark contrast to the treatment of male employees who had directed similar campaigns in prior years. Those individuals received extensive media attention and public acknowledgment for their work.

55. The exclusion of Plaintiff from such recognition was a clear manifestation of the discrimination she faced on the basis of her gender and national origin.

56. In February 2024, Defendant Suns issued a disciplinary action against Plaintiff for sharing a social media post from her personal account that highlighted her involvement in the campaign.

57.     This disciplinary action was retaliatory in nature, aimed at punishing Plaintiff for asserting her contributions and silencing her from seeking professional recognition. It had the effect of suppressing Plaintiff's career advancement and eliminating future professional opportunities within the organization.

58.     On February 5, 2024, Plaintiff was forced to resign due to the intolerable working conditions created by Defendant Suns' ongoing discriminatory and retaliatory conduct.

59.     The persistent harassment, marginalization, and lack of support made it impossible for Plaintiff to continue working in such a hostile environment.

60.     Plaintiff's resignation was not voluntary, but a direct result of Defendant Suns' unlawful treatment, and amounted to constructive discharge.

61.     Defendant Suns' actions were designed to drive Plaintiff out of the organization on the basis of her sex and national origin, in violation of her rights under 42 U.S.C. § 1981, which prohibits discrimination and retaliation in the workplace.

62.     During her exit interview with Joy Harper, the Human Resources Business Partner, Plaintiff was asked how the organization could help make her feel "special" before her departure. Plaintiff responded that she wished to receive public recognition for her role in "The Campaign," similar to the recognition received by male executives Shawn Martinez and Graham Wincott the prior year. Harper assured Plaintiff that she would pass the request to Jeff Chieng, the Chief Marketing Officer, and to Wincott

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 12

63.    Prior to her departure, Plaintiff followed up with Harper regarding her request. Harper informed her that her request had been denied. This denial reinforced Plaintiff's belief that she was being systematically excluded from recognition due to her gender and Hispanic background.

64.    On September 9, 2024, Plaintiff learned that the campaign team – comprised of male and non-Hispanic female employees – had been nominated for the prestigious Rocky Mountain Emmy for the very campaign Plaintiff had worked tirelessly to develop and lead. Despite dedicating over two and a half years to this high-profile initiative, Plaintiff was excluded from the nomination and public acknowledgment.

65.    This final indignity further exemplified the ongoing discrimination Plaintiff faced throughout her tenure with Defendant Suns. While her colleagues received accolades, she was systematically denied credit, reinforcing the hostile and unequal environment she endured.

66.    Defendant Suns' actions constituted a willful and systemic pattern of discrimination, retaliation, and failure to take corrective action, resulting in Plaintiff's constructive discharge. These actions violated Plaintiff's rights under federal and state laws prohibiting workplace discrimination and retaliation, including but not limited to 42 U.S.C. § 1981

## CLAIMS FOR RELIEF

### Count I: Race/National Origin Discrimination

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 13

## 4S U.S.C. § 1981

67. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

68. 42 U.S.C. § 1981 guarantees all persons within the United States the same right to make and enforce contracts as is enjoyed by white citizens, including the right to equal treatment in the terms, conditions, and privileges of employment

69.    At all times relevant, Plaintiff was a Hispanic woman of Mexican-American descent. Her race and national origin placed her within a class of persons protected by Section 1981.

70.    Defendant engaged in racially discriminatory practices that interfered with Plaintiff's contractual rights by treating her less favorably than her similarly situated non-Hispanic colleagues in the terms and conditions of her employment.

71.    Specifically, Defendant denied Plaintiff access to English-language media platforms and instead relegated her to Spanish-only opportunities, limiting her visibility and professional advancement. Plaintiff was denied meaningful participation in public-facing campaigns and removed from high-profile opportunities offered to her white and non-Hispanic colleagues.

72. Plaintiff was excluded from recognition and award nominations for campaigns she spearheaded—most notably, an Emmy-nominated project where her contributions were deliberately omitted from public materials and team acknowledgments, while white colleagues received visible praise.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 14

73.     Defendant Suns' senior decisionmakers, which included Stacy Mitch, expressed discriminatory views that influenced employment decisions. Plaintiff was informed that in a media hiring decision, Mitch rejected a qualified Hispanic female candidate because "she wasn't polished enough," opting instead to select a white candidate. Plaintiff understood this to be coded language reflecting bias against Hispanic professionals and consistent with how she herself had been treated in the organization.

74.     Plaintiff's comparator, Graham Wincott, who is non-Hispanic, was granted media access, public recognition, and remained in good standing despite internal complaints about his behavior. Plaintiff, by contrast, was disciplined and excluded for engaging in similar conduct.

75.     Defendant Suns' actions were intentional, willful, and motivated by Plaintiff's race and national origin. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered lost wages, reputational harm, emotional distress, and ultimately was forced to resign her position.

76.     In simplest terms, non-Hispanic employees were granted opportunities to engage with English-language media, further demonstrating racial and national origin-based discrimination.

77.     Defendant's conduct constitutes unlawful race and national origin discrimination in violation of 42 U.S.C. § 1981.

**Count II: Retaliation**
(42 U.S.C. § 1981)

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 15

78. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

79. Defendant Suns engaged in retaliatory conduct in violation of 42 U.S.C. § 1981 after Plaintiff rejected the sexual advances of Kyle Pottinger, a high-ranking male executive, and raised concerns regarding the discriminatory and hostile work environment she was subjected to.

80. Specifically, Defendant Suns retaliated against Plaintiff by issuing disciplinary action related to a social media post, where Plaintiff shared her involvement in "The Campaign."

81. This post was a legitimate expression of Plaintiff's professional accomplishments.

82. The disciplinary action was retaliatory, aimed at punishing Plaintiff for speaking out and drawing attention to the discrimination she faced.

83. Moreover, Defendant Suns permitted the high-ranking executive, Kyle Pottinger who had continuously harassed Plaintiff, to continue engaging in retaliatory behavior without consequence. This failure to take corrective action further exacerbated the hostile work environment Plaintiff was subjected to, thereby reinforcing the retaliatory atmosphere.

84. Plaintiff, a Hispanic woman, was treated less favorably than her similarly situated non-Hispanic male colleague, Graham Wincott, in the application of workplace discipline and access to high-visibility professional opportunities. Plaintiff was issued a formal disciplinary warning for a neutral and professional social-media post recognizing her Emmy-nominated campaign, whereas Mr. Wincott received visibility and public praise by management.

85. Although Plaintiff did not formally report Wincott's discriminatory conduct to Human Resources, HR became aware of his behavior through the same voice recordings for which they reprimanded and formally wrote up Plaintiff. Despite being privy to the substance of Wincott's conduct, no investigation was conducted and no meaningful disciplinary action was taken against him. He was not written up, only Plaintiff was.

86. The stark difference in how Plaintiff and Mr. Wincott were treated—despite HR having access to the same recordings—demonstrates the discriminatory application of workplace policies and underscores the organization's systemic marginalization of Hispanic professionals.

87. Defendant Suns also ignored Plaintiff's repeated complaints regarding discriminatory treatment, harassment, and retaliation, failing to take meaningful action or provide a reasonable remedy for the harm Plaintiff endured.

88. This deliberate indifference to Plaintiff's rights reflects Defendant Suns' tacit approval of the discriminatory conduct and further fueled the retaliatory environment.

89. Ultimately, Defendant Suns forced Plaintiff to resign from her position due to the intolerable working conditions created by the ongoing harassment, discrimination, and retaliation. The conditions Plaintiff faced were so egregious that her resignation constitutes a constructive discharge under 42 U.S.C. § 1981.

90. Defendant Suns' actions were specifically designed to force Plaintiff to resign due to her attempts to address the inequitable work environment.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 17

91. As a result of Defendant Suns' retaliatory actions, Plaintiff has suffered significant damages, including emotional distress, reputational harm, loss of professional advancement opportunities, and financial harm resulting from the forced resignation.

92. Plaintiff is entitled to all available legal and equitable relief under 42 U.S.C. § 1981.

### Count III: Constructive Discharge
42 U.S.C. § 1981

93. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

94. Defendant Suns' unlawful actions, including the discriminatory and retaliatory conduct Plaintiff endured, created an intolerable work environment that effectively forced Plaintiff to resign.

95. Specifically, Plaintiff was subjected to a hostile work environment involving unwelcome sexual advances, discriminatory treatment based on her gender and national origin, and retaliatory conduct from male colleagues and executives.

96. By early 2024, Plaintiff's workplace had become intolerable to a degree that no reasonable employee in Plaintiff's position would have felt compelled could endure. After enduring repeated discriminatory treatment, being objectified and excluded based on her gender and race, and subjected to retaliatory discipline, Plaintiff's mental and emotional health began to deteriorate.

97. The failure of Defendant Suns to address her grievances exacerbated the toxic work environment.

98. Plaintiff made internal attempts to resolve these issues by speaking with senior

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 18

leadership and Human Resources. She reported discriminatory conduct and professional exclusion to high-ranking executives like Kim Corbitt. However, her concerns were either dismissed outright or met with hostility.

99. Defendant Suns basically told Plaintiff to "stay in her lane" and that her role was to "serve Spanish-speaking media only," and when she raised concerns about being denied access to mainstream English-language press opportunities, she was told "those are not your lanes."

100.   Following her good-faith concerns about harassment and public humiliation, Plaintiff was issued a retaliatory disciplinary action form for a neutral, professional Instagram post celebrating her Emmy-nominated campaign. Other similarly situated male or non-Hispanic employees were not disciplined for far more personal or self-promotional content.

101.   The issuance of disciplinary action for sharing information about her professional role, further isolated Plaintiff and punished her for raising valid concerns.

102.   Plaintiff attempted to continue working under these conditions but ultimately began experiencing significant emotional distress, including anxiety, insomnia, and loss of appetite. The cumulative impact of the hostile work environment caused Plaintiff to develop Bell's Palsy, a stress-related neurological condition resulting in temporary facial paralysis.

103.   She sought counseling from a licensed therapist and began treatment under the care

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 19

of a psychiatrist, who determined that the ongoing workplace conditions were directly contributing to her deteriorating health. As a result, the psychiatrist placed Plaintiff on medical leave through her employer's short-term disability program, effectively removing her from the toxic environment in order to protect her physical and emotional well-being.

104.  No corrective action was taken by Defendant, and no viable internal resolution was offered. Given the escalating retaliation, public marginalization, and the organization's refusal to address discriminatory conditions, Plaintiff was forced to resign on February 5, 2024. This resignation was not voluntary—it was a direct result of Defendant's creation of a workplace so intolerable that continued employment was no longer possible.

105.  Given the totality of the circumstances, no reasonable person in Plaintiff's position would have remained employed under such conditions.[1]

106.  Plaintiff's constructive discharge was a direct result of unlawful discrimination and retaliation in violation of 42 U.S.C. § 1981.

## **Count IV: Violation of the Equal Pay Act (EPA)**
### 29 U.S.C. § 206(d)

---

[1] *See* Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004) (holding that a constructive discharge occurs when "a reasonable person in the employee's position would have felt compelled to resign" due to intolerable working conditions. The standard requires showing that the employer's discriminatory or retaliatory behavior created an environment so objectively hostile or degrading that continued employment was not viable). Arizona courts apply this federal standard in both Title VII and ACRA constructive discharge claims.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 20

107.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

108.   Plaintiff asserts that Defendant Suns' actions constitute a violation of the Equal Pay Act (EPA), 29 U.S.C. § 206(d), by paying Plaintiff less than her male counterparts for performing substantially similar duties and substantially equal work.

109.   Plaintiff was assigned similar responsibilities to her male counterparts in leading "The Campaign" but was denied equal pay or any salary adjustments commensurate with the duties and responsibilities she assumed.

110.   Specifically, Plaintiff replaced Shawn Martinez, a male employee, as the lead on "The Campaign." In the prior year, Martinez had worked to oversee the campaign's execution. When Plaintiff assumed leadership the following year, she was tasked with the same core responsibilities—including campaign management and oversight of high-profile initiatives—yet was compensated at a significantly lower rate.

111.   There was no legitimate business reason for the disparity: Plaintiff's experience, tenure, and success—including her leadership of the Emmy-nominated Campaign—equaled or exceeded that of her male predecessor.[2] Despite performing substantially

---

[2] Plaintiff's duties required the same level of skill, effort, and responsibility, and were performed under similar working conditions. The wage disparity was not due to merit, seniority, or business necessity. *See* E.E.O.C. v. Maricopa County Cmty. Coll. Dist., No. CV-20-01788-PHX-JJT, 2021 WL 3081160, at *4 (D. Ariz. July 21, 2021) (denying motion to dismiss Equal Pay Act claim where plaintiff alleged that female employees performed substantially equal work under similar conditions and received lower pay than male employees, despite differences in job titles and descriptions; court held that "factual

similar work and delivering exceptional results, Plaintiff was not afforded equal pay or recognition.

112.    As a result of Defendant Suns' violation of the EPA, Plaintiff has suffered economic damages in the form of lost wages, benefits, and other financial losses.

### Count V: Discrimination Under the Arizona Civil Rights Act (ACRA)
### A.R.S. § 41-1463

113.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

114.    The Arizona Civil Rights Act (ACRA), A.R.S. § 41-1463(B), makes it an unlawful employment practice for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, national origin, or sex.

115.    Plaintiff is a Hispanic woman of Mexican-American descent, and thus belongs to multiple protected classes under the ACRA.

116.    Defendant, through its executives and decisionmakers, engaged in a pattern of discriminatory conduct toward Plaintiff based on both her sex and her race/national origin.

117.    Plaintiff was repeatedly denied equal compensation and promotional opportunities. Despite replacing her male predecessor, Shawn Martinez, and carrying out equivalent or greater responsibilities in campaign oversight, community relations, and media strategy,

---

plausibility" under Twombly was satisfied by identifying comparators and alleging disparity based on sex).

Plaintiff was paid significantly less than Martinez. This disparity was not based on merit or performance.

118.  Plaintiff was also excluded from award recognition, promotional materials, and public-facing opportunities that were routinely extended to male colleagues, including Graham Wincott. These omissions occurred despite Plaintiff's leadership of an Emmy-nominated campaign and reflected an institutional effort to limit her visibility within the organization.

119.  Defendant's executive decisionmakers reinforced a workplace culture that devalued female leadership. For example, when a high-level media position came down to a choice between a Hispanic woman and a white woman, Stacy Mitch declined to hire the Hispanic candidate, stating she "wasn't polished enough." This statement reflected a subjective and discriminatory bias that mirrored the treatment Plaintiff experienced within the organization.

120.  Plaintiff was also disciplined for a neutral, professional social-media post recognizing her Emmy-nominated work. Male colleagues engaged in comparable conduct but were not disciplined; some were even publicly praised. This was evident through their LinkedIn posts which also constitutes a social media post, but since they were male, they were not unfairly disciplined.

121.  The cumulative effect of Defendant's discriminatory conduct created an

environment in which Plaintiff was denied equal opportunity, systematically devalued, and ultimately forced to resign due to a lack of viable recourse.

122.   As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered loss of income, loss of career advancement, reputational harm, emotional distress, and other compensable injuries.

123.   Defendant's conduct constitutes unlawful discrimination based on sex and national origin in violation of the Arizona Civil Rights Act, A.R.S. § 41-1463(B).[3]

### Count VI: Violation of the Arizona Equal Pay Law
(A.R.S. § 23-341)

124.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

125.   Defendant Suns violated the Arizona Equal Pay Law by paying Plaintiff less than male employees who performed equal or similar work.

126.   Specifically, despite Plaintiff's critical role in "The Campaign," Defendant Suns

---

[3] *See* A.R.S. § 41-1463(B) ("It is an unlawful employment practice for an employer... to discriminate against any individual with respect to the individual's compensation, terms, conditions or privileges of employment because of the individual's race, color, religion, sex, age or national origin."). This statute mirrors Title VII of the Civil Rights Act of 1964 and provides for concurrent claims under Arizona law for discriminatory employment practices based on sex and national origin.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 24

paid her less than her male counterparts performing comparable duties, violating A.R.S. § 23-341, which mandates equal pay for equal work regardless of sex.[4]

### Count VII: Intentional Infliction of Emotional Distress (IIED)

127.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

128.   Defendant Suns, through its officers, executives, and employees, engaged in extreme and outrageous conduct by subjecting Plaintiff to repeated and pervasive discrimination, harassment, retaliation, and mistreatment in the workplace.

129.   This conduct included, but was not limited to:

    a.   Persistent and unwelcome sexual advances and inappropriate comments from male executives and colleagues;

    b.   Repeated derogatory remarks and exclusion based on Plaintiff's Hispanic heritage;

    c.   Defendant Suns' failure to address Plaintiff's reports of harassment and discrimination, despite being made aware of the misconduct;

    d.   Retaliatory actions against Plaintiff after she rejected the sexual advances of Kyle Pottinger, a high-ranking male executive;

---

[4] *See* A.R.S. § 23-341(A) ("No employer shall pay any person in his employ at wage rates less than the rates paid to employees of the opposite sex for the same quantity and quality of the same classification of work."). The Arizona Equal Pay Law is interpreted in a manner consistent with the federal Equal Pay Act, and applies to cases involving wage disparities between male and female employees performing substantially similar work.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 25

e.  Publicly reprimanding Plaintiff for minor infractions as a means of punishing her for reporting discrimination; and

f.  Creating a work environment so intolerable that Plaintiff was forced to resign, resulting in constructive discharge.

130.  Defendant Suns' conduct was intentional or, at a minimum, reckless, as Defendant Suns knew or should have known that such conduct would cause severe emotional distress to Plaintiff.

131.  As a direct and proximate result of Defendant Suns' actions, Plaintiff suffered severe emotional distress, including anxiety, depression, humiliation, loss of self-esteem, mental anguish, and physical symptoms such as insomnia and stress-related health issues.

132.  Defendant Suns' conduct was so extreme and outrageous as to exceed all bounds of decency in a civilized society, warranting liability for intentional infliction of emotional distress under Arizona law. As a result of Defendant Suns' wrongful conduct, Plaintiff has suffered economic damages, emotional distress, and other non-economic damages, entitling her to compensatory and punitive damages.

**Count VIII: Sexual Harassment – Hostile Work Environment and Quid Pro Quo**
(Arizona Civil Rights Act, A.R.S § 41-1463(B)

133.  Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

134.  At all relevant times, Plaintiff was employed by Defendant Phoenix Suns and was an "employee" within the meaning of A.R.S. § 41-1461(3).

135.  Defendant Phoenix Suns is an "employer" within the meaning of A.R.S. § 41-

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 26

1461(4), employing more than fifteen employees at all relevant times.

136. Plaintiff is a Hispanic female who was subjected to unwelcome sexual conduct and gender-based hostility in the workplace.

137. Between July and September 2023, and on multiple other occasions, Plaintiff was subjected to inappropriate and unwelcome comments and behavior by senior male employees, including but not limited to Senior Vice President Kyle Pottinger.

138. Mr. Pottinger repeatedly made suggestive comments to Plaintiff during one-on-one meetings, shared personal details about his divorce, and made statements implying that Plaintiff's career advancement could be tied to a personal or romantic relationship with him.

139. Plaintiff rejected these advances, and thereafter experienced professional marginalization, exclusion from opportunities, and retaliatory conduct by Mr. Pottinger and other male leaders.

140. Pottinger's behavior constituted sexual harassment, as defined by A.R.S. § 41-1463(B), which prohibits an employer from discriminating against an individual based on sex and includes creating a hostile or offensive work environment.

141. Mr. Pottinger's statements and conduct also constituted quid pro quo sexual harassment, as he implied that Plaintiff's career advancement was contingent on her acceptance of a romantic relationship with him.

142. Plaintiff was also subjected to sexually explicit and inappropriate behavior from

An agent or agents of Defendant, including an incident in which an agent or agents of Defendant, displayed a sexually explicit image and pressured Plaintiff to comment on it.

143.  These incidents were part of a broader pattern in which female employees, especially women of color, were objectified, demeaned, and excluded from leadership decisions, creating a hostile work environment based on sex and gender.

144.  Plaintiff complained to her supervisor, to Human Resources, and to leadership including CEO Josh Bartlestein and General Counsel Melissa Goldenberg, but no prompt or meaningful corrective action was taken.

145.  Following her complaints, Plaintiff was stripped of responsibilities, undermined in meetings, and disciplined under pretextual justifications, all in retaliation for her attempts to report the harassment and protect her rights.

146.  The harassment Plaintiff endured was unwelcome, severe, and pervasive, and had the purpose and effect of unreasonably interfering with her work performance and creating an intimidating, hostile, and abusive work environment.

147.  Defendant knew or should have known about the harassment and failed to take prompt, effective remedial measures as required under A.R.S. § 41-1463(B).

148.  As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer emotional distress, anxiety, embarrassment, harm to reputation, and other non-economic damages, as well as economic losses including lost wages and career advancement opportunities.

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 28

149.   Defendant's actions were knowing, intentional, and carried out with reckless disregard for Plaintiff's rights under Arizona law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and award the following relief:

A.  Compensatory Damages: An award of compensatory damages for all economic and non-economic harm caused by Defendant's unlawful conduct, including but not limited to lost wages, lost benefits, diminished earning potential, and other forms of remuneration that Plaintiff would have received absent Defendant's discrimination and retaliation. Plaintiff further seeks compensation for emotional distress, mental anguish, humiliation, anxiety, depression, and loss of enjoyment of life stemming from the harassment, exclusion, and retaliatory treatment she endured during her employment.

B.  Punitive Damages: An award of punitive damages sufficient to punish Defendant for its willful, malicious, and reckless violations of Plaintiff's civil rights, and to deter similar unlawful conduct in the future. Defendant's actions were taken with deliberate indifference to Plaintiff's rights and with wanton disregard for the harm inflicted.

C.  Back Pay: An award of back pay, including all wages, bonuses, benefits, and other compensation that Plaintiff would have received from the time of her constructive discharge through the present, as well as any missed promotions, performance-based

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 29

increases, or career advancement opportunities denied as a result of Defendant's unlawful conduct.

D. Front Pay: An award of front pay to compensate for future loss of earnings and benefits that Plaintiff is reasonably certain to incur due to the damage to her career trajectory and professional standing caused by Defendant's discriminatory and retaliatory actions.

E. Attorney's Fees and Costs: An award of Plaintiff's reasonable attorneys' fees, expert witness fees, and litigation costs pursuant to 42 U.S.C. § 1981, the Equal Pay Act, and any other applicable federal or state statute. This includes reimbursement for all out-of-pocket expenses incurred in enforcing Plaintiff's rights.

F. Declaratory Relief: A declaration that Defendant's conduct—including but not limited to sex and national origin discrimination, retaliation, harassment, and constructive discharge—violated Plaintiff's rights under 42 U.S.C. § 1981, the Equal Pay Act, and the Arizona Civil Rights Act. Plaintiff further seeks a judicial declaration that such conduct is unlawful and that Defendant's internal justification for its adverse treatment was pretextual.

G. Injunctive Relief: An order requiring Defendant to implement and maintain effective policies, procedures, and practices to prevent and address unlawful discrimination, harassment, and retaliation. This includes but is not limited to:

    a. Comprehensive anti-discrimination and anti-harassment training for all employees, including executives and decisionmakers;

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 30

    b.  Mechanisms for prompt, impartial investigation of internal complaints;

    c.  Oversight procedures to ensure compliance with federal and state civil rights laws; and

    d.  Remedial measures addressing any ongoing hostile work environments.

H.  Pre- and Post-Judgment Interest: An award of pre-judgment interest on all amounts due from the date such damages were incurred through the date of judgment, and post-judgment interest as permitted by law, to ensure Plaintiff is made whole.

I.  Any Other Relief the Court Deems Just and Proper: Any other relief the Court deems appropriate and necessary to fully redress the injuries sustained by Plaintiff, including additional equitable remedies, policy changes, or measures required to restore Plaintiff's rights and prevent future violations.

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury on all issues.

**EXECUTED** this 18th day of April 2025.

**IBF LAW GROUP, PLLC**

By: */s/ Sheree D. Wright*
3101 N. Central Ave, Suite 1250
Phoenix, Arizona 85012
Telephone: (602) 833-1110
Facsimile: (602) 800-5701
e-Mail: sheree@ibflaw.com

COMPLAINT PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE - 31

**THE LAW OFFICE OF
CORTNEY E. WALTERS, PLLC**

Cortney E. Walters
By: */s/ Cortney E. Walters*
2719 Hollywood Blvd., Suite A-1969
Hollywood, FL 33020
Telephone: (954) 874-8022
Facsimile: (954) 889-3747
cwalters@cewlawoffice.com

*Attorneys for Plaintiff(s)*