**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Chelsea Montes, | No. CV-25-01295-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Suns Legacy Partners LLC, | |
| Defendant. | |

Pending before the Court are Defendant's Motion to Dismiss (Doc. 16), Motion to Strike (Doc. 18), and Motion for Sanctions (Doc. 49). For the reasons below, the Motion to Dismiss (Doc. 16) is granted in part and denied in part; the Motion to Strike (Doc. 18) is denied; and the Motion for Sanctions (Doc. 49) is granted.[1]

## BACKGROUND

Plaintiff Chelsea Montes,[2] a Hispanic female, is a former employee of Defendant Suns Legacy Partners LLC ("SLP"). (Doc. 54 ¶¶ 4, 10).[3] Plaintiff was the "highest-ranking Hispanic member" of Defendant's corporate staff, which consisted of ten Hispanic individuals total, among other employees. (*Id.* ¶ 10). As a part of her role, for over two

---

[1]    Defendant's request for oral argument is denied because the parties have had an adequate opportunity to discuss the law and evidence, and oral argument will not aid the Court's decision. *See Lake at L.V. Invs. Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

[2]    Montes initially brought her complaint under the "Jane Doe" pseudonym (Doc. 1) and sought leave to proceed anonymously (Doc. 6). The Court denied Plaintiff's request on August 25, 2025. (Doc. 46). Plaintiff filed an amended complaint revealing her identity on September 9, 2025. (Doc. 54).

[3]    The facts alleged in the complaint (Doc. 54) are presumed true and construed in the light most favorable to the Plaintiff.

years, Plaintiff led the development, management, and execution of "The Campaign"—"a high-profile cultural project designed to honor the contributions of the Hispanic community to [Defendant's] mission and success." (*Id.* ¶¶ 11-13).

Plaintiff avers that, despite her high level of responsibility, she did not receive compensation or a title that reflected "the scope or impact of her work." (*Id.* ¶¶ 22-23). For reference, Plaintiff identifies a male employee—Shawn Martinez—who held the title of "Senior Director of Live Presentation" and led a separate initiative "nearly identical in scope" to The Campaign. (*Id.* ¶ 25). Plaintiff does not state what her title was when she was employed by Defendant, only pleading that she "held a prominent position" within the organization. (*Id.* ¶ 10). Plaintiff claims that while other male employees who had directed similar campaigns in the past had "received extensive media attention and public acknowledgment for their work," Plaintiff was informed by Defendant that "she would not receive recognition for her contributions" to The Campaign. (*Id.* ¶¶ 52-53).

Moreover, Plaintiff alleges that Defendant—specifically Stacy Mitch, the Senior Vice President of Communication—denied her work opportunities based on her race and national origin. (*Id.* ¶ 41). While Plaintiff's colleagues "were regularly featured in English-language media and publicly recognized" for their work,[4] Plaintiff was restricted "to a single interview on a Spanish-speaking network," despite her role in the success of The Campaign. (*Id.* ¶¶ 40-41). Plaintiff and Mitch were frequently at odds with one another during Plaintiff's tenure at SLP.

For example, Plaintiff avers that Mitch falsely told Graham Wincott, Plaintiff's supervisor, that Plaintiff had confided that she did not believe Wincott should be an executive. (*Id.* ¶ 45). When confronted by Wincott, Plaintiff denied making such a remark. (*Id.* ¶ 46). Though Plaintiff sought a meeting with both Mitch and Wincott to resolve the issue, no such meeting ever took place. (*Id.*). Additionally, on a different occasion, Wincott informed Plaintiff that Mitch had previously stated that when a "high-profile media opportunity" came down to a selection between a qualified Hispanic female

---

[4]  Plaintiff alludes that such opportunities were "offered to her white and non-Hispanic colleagues." (*See* Doc. 54 ¶ 70).

candidate and a Caucasian female candidate, Mitch would not choose the Hispanic candidate because "she wasn't polished enough." (*Id.* ¶ 47).

Plaintiff further describes her experience at SLP as one marred by a hostile work environment. (*Id.* ¶ 14). She highlights three events to support this assertion.

First, Plaintiff claims that Kyle Pottinger, the former Senior Vice President of Ticket Sales and Services, "repeatedly abused his authority by making inappropriate advances towards Plaintiff under the guise of professional meetings." (*Id.* ¶ 17). During these meetings, Pottinger frequently mentioned that "he and his wife were getting a divorce." (*Id.* ¶ 18). Pottinger "insinuated" to Plaintiff "that a romantic or sexual relationship with him could result in career advancement." (*Id.* ¶ 19). Plaintiff rejected Pottinger's advances, which she says led to a "clear decline in professional support" from senior executives at SLP. (*Id.* ¶ 20). Defendant purportedly failed to investigate or discipline Pottinger for his misconduct. (*Id.* ¶ 21).

Second, Plaintiff, during a meeting, was forced by two of Defendant's male "agents"[5] to "view a sexually inappropriate image." (*Id.* ¶¶ 29-30). The "agents" pressured Plaintiff into discussing the photo. (*Id.*). Plaintiff characterizes their discussion as "discriminatory," "demeaning," "centering on the sexual objectification of women in the Hispanic community," "violating [Plaintiff's] personal boundaries," and "demonstrating [SLP]'s disregard for cultural respect." (*Id.*). Plaintiff reported the incident to Wincott, but her concerns were dismissed, and no corrective action was taken against the "agents." (*Id.* ¶ 31).

Third, in separate meeting where Plaintiff and Wincott were "discussing ideas for a Pride Night halftime show," Martinez entered the room and "expressed strong opposition to the concept and made blatantly homophobic comments." (*Id.* ¶¶ 32-33). After Plaintiff voiced her disagreement with Martinez's comments, Martinez questioned her sexuality, asking "why she cared so much" and inquiring into whether Plaintiff "was a lesbian." (*Id.* ¶ 33). Martinez was not disciplined for his remarks: Wincott "downplayed the incident,"

---

[5]    Plaintiff only describes these "agents" as "collaborators." (Doc. 54 ¶ 29).

described Martinez as "from a different generation," and suggested that Plaintiff not take offense. (*Id.* ¶ 34).

As a result of these incidents and "the mounting stress and workplace hostility," Plaintiff recorded voice messages on her phone to document her frustrations with SLP's workplace. (*Id.* ¶ 36). Though Plaintiff meant to send these messages only to her fiancé in private, Plaintiff inadvertently sent one message to Wincott. (*Id.* ¶ 37). In that message, Plaintiff "expressed her belief that Wincott was an ineffective leader, citing his repeated failures to address misconduct directed at her." (*Id.*). Defendant disciplined Plaintiff for this incident, describing her behavior as "rude" and "unprofessional." (*Id.* ¶ 38).

Though Plaintiff repeatedly raised her concerns with Defendant's "discriminatory conduct and the hostile work environment" to the organization's human resources department, no corrective action was taken. (*Id.* ¶¶ 50-51). But in February 2024, after Plaintiff shared a social media post from her personal account highlighting her involvement with The Campaign, Defendant "issued a disciplinary action against Plaintiff." (*Id.* ¶¶ 55-56). Plaintiff does not describe the disciplinary action that was taken against her, and instead conclusorily alleges that the action "had the effect of suppressing [her] career advancement and eliminating future professional opportunities within the organization." (*Id.* ¶ 56).

Plaintiff subsequently resigned on February 5, 2024. (*Id.* ¶ 57). During her exit interview, Plaintiff requested to receive public recognition for her role in The Campaign. (*Id.* ¶ 61). The request was denied. (*Id.* ¶ 62). Plaintiff later learned in September 2024 that The Campaign team—"comprised of male and non-Hispanic female employees"—had been nominated for the Rocky Mountain Emmy.[6] (*Id.* ¶ 63).

Plaintiff initially brought eight claims against Defendant:

- Count I: Race and national origination discrimination under 42 U.S.C. § 1981;

- Count II: Retaliation under § 1981;

- Count III: Constructive discharge under § 1981;

---

[6] *See generally About Us*, Nat'l Acad. of Television Arts & Scis.: Rocky Mountain Sw. Chapter, https://rockymountainemmy.org/about-us/ (last visited Mar. 14, 2026).

- Count IV:  Violation of the Equal Pay Act, 26 U.S.C. § 206(d);

- Count V:  Discrimination under the Arizona Civil Rights Act ("ACRA"), A.R.S. § 41-1463;

- Count VI:  Violation of the Arizona Equal Pay Law, A.R.S. § 23-341;

- Count VII:  Inflection infliction of emotional distress ("IIED");

- Count VIII:  Sexual harassment, hostile work environment, and quid pro quo under ACRA, A.R.S. § 41-1463(B).

(Doc. 54).  Plaintiff moved to voluntarily dismiss Count V and Count VI.  (Doc. 56).  The Court dismissed the two claims, with prejudice, on September 23, 2025.  (Doc. 58).

Defendant makes three motions.  First, Defendant moves to dismiss Count III and Count VII for failure to state a claim.  (Doc. 16).  Second, Defendant asks the Court to strike Plaintiff's allegations under Count II and Count III that do not pertain to race-based discrimination. (Doc. 18).  And third, Defendant seeks the imposition of Rule 11 sanctions on Plaintiff's counsel—Sheree Wright and Cortney Walters—for citing to fabricated cases generated by artificial intelligence ("AI") in multiple pleadings filed with the Court.  (Doc. 49).  The Court will discuss each motion in turn.

## DISCUSSION

I.    **Defendant's Motion to Dismiss (Doc. 16)**

a.  **Legal Standard**

The Court must dismiss an action where a plaintiff "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While the Court must "construe the pleadings in the light most favorable to the nonmoving party," *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005), a complaint may still be dismissed as a matter of law "for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim." *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984); *Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). The Court need not accept the legal conclusions contained in a complaint as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" as factual content. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

### b. Analysis

#### i. Count III: Constructive Discharge

In Count III, Plaintiff alleges that her resignation from SLP constituted a "constructive discharge" because she was "effectively forced [] to resign" due to Defendant's "intolerable work environment." (Doc. 54 ¶ 93). A plaintiff alleging that a resignation in response to a hostile work environment constitutes a constructive discharge "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). Defendant contends that Count III must be dismissed as a matter of law because, "[w]hile constructive discharge may be alleged as a component of Plaintiff's Section 1981 claim, it is not an independent cause of action." (Doc. 16 at 11).

Plaintiff brings her claim for constructive discharge under 42 U.S.C. § 1981. The statute guarantees "[a]ll persons" the same right to "make and enforce contracts"[7] as that "enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 claims are limited to and require proof of intentional racial discrimination. *Gay v. Waiters' & Dairy Lunchmen's Union, Loc. No. 30*, 694 F.2d 531, 536-37 (9th Cir. 1982). "To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). Section 1981 reaches both state action and "purely private acts of racial discrimination." *Runyon v. McCrary*, 427 U.S. 160, 170 (1976).

A different but overlapping statute—Title VII—"prohibits employment

---

[7] The statute defines the term "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

discrimination on account of race, sex, religion, and national origin." *Gay*, 694 F.2d at 536 (citing 42 U.S.C. § 2000e-2(a)).  The Ninth Circuit has recognized that the "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action."[8]  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003) (citing string of cases); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004).  And in the Title VII context, the Supreme Court has held that "constructive discharge is a claim distinct from the underlying discriminatory act."  *Green v. Brennan*, 578 U.S. 547, 559 (2016); *Suders*, 542 U.S. at 142, 149 (holding that "a claim for constructive discharge lies under Title VII" and noting that a hostile-work-environment claim is a "lesser included component" of the "*graver* claim of hostile-environment constructive discharge").

Given the unambiguity of the Supreme Court's holdings in *Green* and *Suders*, those principles "apply with equal force in a § 1981 action," and Plaintiff is thus permitted to bring a claim for constructive discharge under § 1981.  *See Manatt*, 339 F.3d at 797; *Wallace v. City of San Diego*, 479 F.3d 616, 625 n.3 (9th Cir. 2007) ("Where a plaintiff alleges constructive discharge in violation of a federal statute, constructive discharge is governed by a federal standard." (citing *Suders*, 542 U.S. at 141)).  To succeed on her claim of constructive discharge, Plaintiff must ultimately prove  (1) that she "was discriminated against by [SLP] to the point where a reasonable person in [her] position would have felt compelled to resign" and (2) that she "actually resigned."  *Green*, 578 U.S. at 555.

District courts within the Ninth Circuit have similarly allowed plaintiffs to bring such claims under § 1981.  *See, e.g.*, *Small v. Feather River Coll.*, 2011 WL 1670236 (E.D. Cal. May 3, 2011) (permitting a claim for constructive discharge under § 1981 to proceed past the pleading stage); *Stewart v. Salt River Project Agric. Improvement & Power Dist.*, 2022 WL 558261, at *2-4 (D. Ariz. Feb. 24, 2022) (treating constructive discharge claim under § 1981 as its own claim at summary judgment stage); *Garcia v. PSI Env't Sys.*, 2012 WL 914829, at *3-5 (D. Idaho Mar. 16, 2012) (granting defendant's motion for summary

---

[8]     "Title VII, however, requires the plaintiff to exhaust administrative remedies, such as filing a claim with the EEOC, before seeking a private action for damages, whereas § 1981 has no such requirement."  *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) (citation modified).

judgment for a Title VII constructive discharge claim where plaintiff failed to exhaust administrative remedies, but considering plaintiff's § 1981 claim for constructive discharge on the merits).

Defendant's caselaw cited in support of its assertion that Plaintiff cannot bring an individual claim for constructive discharge under § 1981 is all inapposite. (Doc. 16 at 11).

First, in *Wood v. University Physicians Healthcare*, the district court, citing the Supreme Court in *Suders*, stated that "the federal law doctrine of constructive discharge is not a cause of action in its own right." 2013 WL 6170604, at *4 (D. Ariz. Nov. 21, 2013) (citing *Suders*, 542 U.S. at 141). But the district court there was addressing whether an action for constructive discharge could be brought separately from a wrongful termination action under Arizona law, and cited to *Suders* to demonstrate that, in the federal context, a claim for constructive discharge involves the same *remedies* as an action for wrongful discharge. *Id.* at *3-5 (noting that the relevant state statute did "not specify any remedy for constructive discharge" and looking at federal law "for comparison"); *Suders*, 542 U.S. at 141 ("Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for *remedial purposes*." (emphasis added)); *id.* at 147 n.8 ("[A] prevailing constructive discharge plaintiff is entitled to all *damages* available for formal discharge." (emphasis added)). And even if the court in *Wood* did hold that a plaintiff cannot bring a separate claim for constructive discharge under Title VII, such a holding would have later been abrogated by the Supreme Court's decision in *Green*. *See* 578 U.S. at 559.

Second, in *Anderson v. Arizona*, the district court also stated that "constructive discharge is not a cause of action in its own right." 2007 WL 1461623, at *16 (D. Ariz. May 16, 2007). But there, the district court did not hold that a plaintiff never can bring an individual claim for constructive discharge. Instead, the district court held that a "prima facie case for constructive discharge requires 'something more' than actionable discrimination." *Id.* (quoting *Suders* 542 U.S. at 147). *Anderson* merely stands for the proposition that, for a plaintiff to succeed on a constructive discharge claim, they must

demonstrate "actionable discrimination" *and* "conditions so intolerable that a reasonable person would leave the job." *Id.* (citation omitted); *see also Suders*, 542 U.S. at 146-47, 149. Thus, like in *Anderson*, failure to prove the existence of actionable discrimination or a hostile work environment will lead to the dismissal of a claim for constructive discharge, but that does not foreclose Plaintiff from bringing the claim in the first instance. 2007 WL 1461623, at *16; *Green*, 578 U.S. at 559 ("a hostile-work-environment claim is a lesser included component of the *graver* claim of hostile-environment constructive discharge" (citation modified)).

Third, while the Fifth Circuit in an unpublished opinion in *Wells v. City of Alexandria* stated that "constructive discharge is not itself a cause of action," 2004 WL 909735, at *3 (5th Cir. Apr. 29, 2004), the court's decision was issued pre-*Suders* (June 2004) and pre-*Green* (May 2016). It thus lacks persuasive value here.

And fourth, Defendant cites three cases that discuss constructive discharge in the context of state law. *See Cohn v. Guaranteed Rate Inc.*, 130 F. Supp. 3d 1198, 1209-10 (N.D. Ill. 2015) (plaintiff adequately pleaded breach of contract under Illinois law by pleading constructive discharge); *Arnold v. X Corp.*, 2024 WL 4987032, at *10-11 (D. Del. Dec. 5, 2024) (plaintiffs sufficiently pleaded constructive discharge under California law with regard to breach of contract and promissory estoppel claims); *Lenk v. Monolithic Power Sys., Inc.*, 2016 WL 1258862, at *1-2 (N.D. Cal. Mar. 31, 2016) (dismissing claim under California Labor Code § 2802(a) where constructive discharge was an element of the cause of action). These cited cases, however, have no bearing on whether Plaintiff can bring a claim for constructive discharge in the *federal* context.

The Court notes that Plaintiff also brought additional claims under § 1981 for racial discrimination (Count I) and retaliation (Count II). (Doc. 54 at 13-18); *see Surrell*, 518 F.3d at 1105-06 (discussing the elements of a § 1981 racial discrimination claim); *id.* at 1107-08 (discussing the elements of a § 1981 retaliation claim). Whether Count III can exist as a "standalone" claim—i.e., even if the racial discrimination or retaliation claims are dismissed—is a question that the Court need not address at this stage. Defendant did

not move to dismiss Count I or Count II.

Defendant's motion to dismiss Count III is denied.

### ii.    Count VII:  IIED

Defendant next moves to dismiss Count VII, in which Plaintiff alleges that Defendant, "through its officers, executives, and employees, engaged in extreme and outrageous conduct by subjecting Plaintiff to repeated and pervasive discrimination, harassment, retaliation, and mistreatment in the workplace."  (Doc. 54 ¶ 127; Doc. 16 at 13-17).  Defendant argues that Plaintiff fails to (1) allege "outrageous" conduct and (2) adequately plead intent to cause emotional distress.  (Doc. 16 at 13, 16).

An IIED claim under Arizona law has three elements:  (1) "the conduct by the defendant must be 'extreme' and 'outrageous'"; (2) "the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct"; and (3) "severe emotional distress must indeed occur as a result of defendant's conduct."  *Cox v. Glob. Tool Supply LLC*, 629 F. Supp. 3d 963, 972 (D. Ariz. 2022) (quoting *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987)).

### 1.    "Outrageous" Conduct

To prevail on an IIED claim, a "plaintiff must show that the defendant's acts were so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 183 Ariz. 550, 554, 905 P.2d 559, 563 (Ct. App. 1995) (citations omitted).  "It is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Id.* (citation modified).  At the pleading stage, the Court "determines whether the acts at issue are sufficiently outrageous to state a claim for relief," but "if reasonable minds could differ about whether the conduct is sufficiently outrageous, the issue should be decided by a jury." *Johnson v. McDonald*, 197 Ariz. 155, 160, 3 P.3d 1075, 1080 (Ct. App. 1999).

Plaintiff relies primarily on the following conduct for her IIED claim:

- Pottinger, a former executive, repeatedly scheduled "professional meetings" with Plaintiff, in which he mentioned that "he and his wife were getting a divorce." After rejecting Pottinger's advances, Plaintiff suffered a "clear decline in professional support." (Doc. 54 ¶¶ 17-21).

- Two of SLP's "agents" forced Plaintiff to view a sexually inappropriate image and pressured her into discussing the photo. Plaintiff reported the incident, but no corrective action was taken by Defendant. (*Id.* ¶¶ 29-31).

- Defendant disciplined Plaintiff on two occasions: first, for inadvertently sending a voice memo to Wincott in which she called him an "ineffective leader," and second, for sharing a social media post from her personal account highlighting her involvement with The Campaign. (*Id.* ¶¶ 36-38, 55-56).

- Defendant limited Plaintiff's public recognition for her work on The Campaign. Plaintiff was allowed only a single interview on a Spanish-speaking network, whereas her colleagues were regularly featured in English-language media. Defendant denied Plaintiff's request from her exit interview to receive public recognition for her work on The Campaign. (*Id.* ¶¶ 40-41, 61-62).

(Doc. 20 at 18; Doc. 16 at 14-15). Taken together, these incidents are not indicative of the type of conduct that a reasonable person would find to be sufficiently outrageous to state an IIED claim.

Plaintiff identifies only one case—*Ford v. Revlon, Inc.*—to support her allegation that Defendant's behavior was outrageous. (Doc. 20 at 19 (citing 153 Ariz. at 45, 734 P.2d at 587)). But that case involved a materially different set of facts from the ones at hand. There, plaintiff's supervisor sexually harassed and assaulted her on multiple occasions:

- The supervisor first invited plaintiff to a dinner to purportedly discuss business matters. When plaintiff tried to leave, her supervisor told her to sit down "because he planned to spend the night with her." After plaintiff rejected his advances, the supervisor told plaintiff, "you will regret this." 153 Ariz. at 39-40, 734 P.2d at 581-82.

- One month later, at a company picnic, the supervisor followed plaintiff for most of the day and, at one point, approached plaintiff and said, "I want to f*** you." When plaintiff again spurned his advances, the supervisor continued, "I am going to f*** you if it takes me ten years." 153 Ariz. at 40, 734 P.2d at 582.

- Later that afternoon, as plaintiff was leaving the restroom, the supervisor grabbed her and "restrained her in a chokehold." He then "ran his left hand over [plaintiff's] breasts, stomach, and between her legs" and stated, "I want to f*** you. I am going to f*** you." *Id.*

The plaintiff in *Ford* repeatedly reported her supervisor's conduct to the company's management and human resources staff, yet no action was taken until "a full year and one month after [the supervisor's] initial act of harassment." 153 Ariz. at 40-41, 734 P.2d at 582-83. The Arizona Supreme Court affirmed the jury's determination of IIED liability, stating that defendant-employer's conduct was "outrageous" because (1) plaintiff "made numerous [company] managers aware of [supervisor's] activities"; (2) plaintiff "did everything that could be done . . . to bring this matter to [company's] attention"; and (3) defendant-employer "ignored [plaintiff] and the situation she faced, dragging the matter out for months and leaving [plaintiff] without redress." 153 Ariz. at 43, 734 P.2d at 585.

In contrast, SLP's conduct falls well short of the "level of outrageousness necessary" to state a claim for IIED. *See Mintz*, 183 Ariz. at 554, 905 P.2d at 563 (citation modified). First, Pottinger's conduct—though certainly not appropriate—cannot reasonably be viewed as "threatening to shatter the frame upon which one's emotional fabric is hung." *See Christakis v. Deitsch*, 250 Ariz. 246, 250, 478 P.3d 241, 245 (Ct. App. 2020) (citation omitted). Though Pottinger insinuated that he was open to a romantic relationship with Plaintiff by mentioning that he was divorcing his wife (Doc. 54 ¶¶ 17-21), such conduct is not analogous to the way that the supervisor in *Ford* behaved. *Mintz*, 183 Ariz. at 554, 905 P.2d at 563 (citations omitted); *Ford*, 153 Ariz. at 39-40, 734 P.2d at 581-82.

Next, the conduct of Defendant's two "agents" is a closer call, but it too fails to meet the high bar for outrageousness under IIED. *See, e.g.*, *Loos v. Lowe's HIW, Inc.*, 796 F. Supp. 2d 1013, 1023 (D. Ariz. 2011) (dismissing IIED claim against supervisor at pleading stage where plaintiff alleged that the supervisor "engaged in sexual talk and made sexual gestures in her presence and attempted to involve her in some conversations with sexual topics"). *Loos* is particularly instructive here. While the agents' behavior here, like the supervisor's in *Loos*, "certainly was inappropriate, it does not rise to the level of extreme and outrageous." *Id.* And though Plaintiff alleges that no corrective action was taken against the agents (Doc. 54 ¶ 31), Plaintiff does not allege facts sufficient to demonstrate

that any "failure to investigate" "constitute[d] atrocious and utterly intolerable behavior." 796 F. Supp. 2d at 1025.

Finally, neither Defendant's discipline of Plaintiff for sending the inadvertent voice memo to Wincott and sharing a social media post from her private account about The Campaign (Doc. 54 ¶¶ 36-38, 55-56), nor Defendant's limitation on Plaintiff's public recognition for her work on The Campaign (*id.* ¶¶ 40-41, 61-62), can reasonably be considered "outrageous." Outrageous conduct under IIED "does not include mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Christakis*, 250 Ariz. at 250, 478 P.3d at 245 (citation modified). Plaintiff thus has not alleged any acts by Defendant sufficiently outrageous to state a claim for relief under IIED.

### 2. Intent

Additionally, Plaintiff fails to include any "plausible" allegations demonstrating that Defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from its conduct. *See Iqbal*, 556 U.S. at 678. Instead, Plaintiff only includes a mere threadbare recital of the intent element, conclusorily stating that Defendant's "conduct was intentional or, at a minimum, reckless, as Defendant [] knew or should have known that such conduct would cause severe emotional distress." (Doc. 54 ¶ 129). Such a bare assertion is insufficient under the pleading standards set forth in *Twombly* and *Iqbal*. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Plaintiff argues that intent "may be alleged generally and inferred from conduct." (Doc. 20 at 20 (first citing Fed. R. Civ. P. 9(b); then citing *Watkins v. Arpaio*, 239 Ariz. 168, 170-71, 367 P.3d 72, 74-75 (Ct. App. 2016)). But neither of Plaintiff's cited authorities support her position. While Rule 9(b) only requires a party to allege intent "generally" when pleading fraud or mistake (which is not the case here), *see* Fed. R. Civ. P. 9(b), that "merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give h[er] license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 556 U.S. at 686-87 (citation omitted) ("Rule 8 does not empower [Plaintiff] to plead the bare elements of h[er] cause of action, affix the label

'general allegation,' and expect h[er] complaint to survive a motion to dismiss."). And *Watkins* contains no discussion on the appropriate pleading standard for IIED claims. *See* 239 Ariz. at 170-71, 367 P.3d at 74-75 (listing the elements for an IIED claim).

Plaintiff next claims that "[c]ourts routinely uphold IIED claims at the pleading stage where plaintiffs allege a consistent pattern of conduct from which intent or recklessness may reasonably be inferred." (Doc. 20 at 20 (citing only *Ford*, 153 Ariz. at 45, 734 P.2d at 587)). But *Ford* was not a case at the pleading stage. *See* 153 Ariz. at 42, 734 P.2d at 584 (reviewing the intermediate appellate court's reversal of a jury verdict finding defendant-corporation liable for IIED). And Plaintiff identifies no other case in support of this assertion.

Defendant's motion to dismiss Count VII is granted.

## II.    Defendant's Motion to Strike (Doc. 18)

### a.    Legal Standard

Under Rule 12(f), the Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). Striking part of a pleading is a "drastic remedy" that is "often sought by the movant simply as a dilatory or harassing tactic." *Ocean Garden Prods. Inc. v. Blessings Inc.*, 2019 WL 396873, at *1 (D. Ariz. Jan. 29, 2019) (internal quotation marks omitted) (citing 5C Wright & Miller's Federal Practice & Procedure §§ 1380, 1382 (3d ed. 2018)). Such motions are thus generally "viewed with disfavor by the federal courts and are infrequently granted." *Id.* (citation omitted).

To succeed, the movant must demonstrate that the challenged allegations (1) "have no possible relation or logical connection to the subject matter of the controversy" and (2) "may cause some form of significant prejudice to one or more of the parties to the action." *Id.* (citation omitted). The Court "views the pleadings in the light most favorable to the non-moving party and resolves any doubt as to the relevance of the challenged allegations

- 14 -

in favor of plaintiff." *Gaines v. AT&T Mobility Servs., LLC*, 424 F. Supp. 3d 1004, 1014 (S.D. Cal. 2019) (citation omitted). "Any doubt concerning the import of the allegations to be stricken weighs in favor of denying the motion to strike." *Id.* (citations omitted). "Rule 12(f) motions can and should be adjudicated with relative dispatch." 5C Wright & Miller's Federal Practice & Procedure § 1382 (3d ed. 2025).

### b. Analysis

Defendant asks the Court to strike Plaintiff's allegations regarding "non-race-based discrimination under Counts II and III." (Doc. 18 at 7). The request is denied on both counts.

In Count II, Plaintiff brings a claim for retaliation under § 1981, alleging that she was treated less favorably than her non-Hispanic colleagues through "workplace discipline" and loss of "access to high-visibility professional opportunities" after "speaking out and drawing attention to the discrimination she faced" at SLP. (Doc. 54 ¶¶ 81, 83). Defendant identifies five allegations of discriminatory conduct in Count II that have "no connection to Plaintiff's race." (Doc. 18 at 8). In these paragraphs, Plaintiff includes allegations that SLP retaliated against her after she turned down Pottinger's advances and shared a social media post highlighting her involvement with the Campaign. (Doc. 54 ¶¶ 78, 79, 82, 86, 87). Defendant avers that these allegations "are not actionable under Section 1981, which only protects against discrimination on the basis of race," and are "therefore irrelevant to Count II." (Doc. 18 at 9).

In Count III, Plaintiff brings a claim for constructive discharge under § 1981, alleging that she was subjected to a hostile work environment stemming from "discriminatory treatment" on the basis of her "gender and race." (Doc. 54 ¶¶ 93-95). She claims that she continued working under these conditions but ultimately began experiencing significant emotional distress, anxiety, insomnia, loss of appetite, and Bell's Palsy. (*Id.* ¶ 101). After seeking counseling and taking short-term disability leave, Plaintiff resigned from SLP in February 2024, citing "Defendant's creation of a workplace so intolerable that continued employment was no longer possible." (*Id.* ¶¶ 102-03).

- 15 -

Defendant contends that allegations of a hostile work environment stemming from gender discrimination (*e.g.*, *id.* ¶¶ 94, 95, 99) should be stricken as well. (Doc. 18 at 9).

Defendant fails to meet its high burden of demonstrating that these allegations "have no possible relation or logical connection to the subject matter of the controversy." *See Ocean Garden Prods. Inc.*, 2019 WL 396873, at *1. While Defendant correctly identifies that § 1981 only protects against intentional racial discrimination—a point that Plaintiff does not dispute (Doc. 19 at 3)—these facts could be used to "illustrate the broader discriminatory environment" at SLP. (*Id.*). *Gaines* is on all fours here. In that case, a group of former employees brought a claim under § 1981 against their employer and manager. 424 F. Supp. 3d at 1007-09. In their cause of action, plaintiffs included sexual harassment allegations against the manager and another employee. *Id.* at 1013-14. The district court denied defendant-employer's motion to strike the allegations related to sexual harassment, reasoning that the allegations were "relevant to [d]efendants' conduct and culpability," "relevant for understanding the nature of [manager's] termination," and "related to [manager's] alleged racial discrimination." *Id.* at 1014. Similarly, here, Plaintiff's allegations of sex or gender discrimination—some of which were brought to the attention of SLP management (*e.g.*, Doc. 54 ¶¶ 31, 50-51, 143)—could be relevant to Defendant's purported decision to take retaliatory action against Plaintiff and otherwise maintain a hostile working environment based on Plaintiff's race.

Moreover, though Defendant cites to a host of district court opinions dismissing § 1981 claims where plaintiffs brought claims for sex discrimination or national origin discrimination (Doc. 18 at 10),[9] this line of argumentation improperly wades into the merits of the dispute. *See, e.g.*, *Zhou v. Fu*, 2025 WL 3677415, at *4 (D. Or. Dec. 18, 2025) ("Unlike a Rule 12(b)(6) motion to dismiss, a Rule 12(f) motion does not test the sufficiency of the complaint." (citing *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970,

[9] In the one case that Defendant cites where the district court struck allegations of gender discrimination under § 1981, the plaintiff sought to "pursue gender discrimination claims pursuant to § 1981," and the district court ultimately dismissed the claim. *Naylor v. Streamwood Behav. Health Sys.*, 2012 WL 5499441, at *3 (N.D. Ill. Nov. 13, 2012). In contrast, Plaintiff here "does not assert gender discrimination or harassment under § 1981." (Doc. 19 at 5).

974 (9th Cir. 2010)).  Because Defendant has not moved to dismiss Counts II or III on the basis that Plaintiff has failed to plead intentional racial discrimination, the Court finds that summary judgment is the more apt forum for Defendant to challenge the sufficiency of the evidence for Plaintiff's allegations of racial discrimination.[10]

Defendant's motion to strike is thus denied.

### III.   Defendant's Motion for Sanctions (Doc. 49)

#### a.   Background

Plaintiff is represented in this action by Sheree Wright, a member of the State Bar of Arizona and the State Bar of New Mexico, and Cortney Walters, a member of the Florida Bar who is appearing in this action pro hac vice.  (Doc. 49 at 3).  On April 18, 2025, Plaintiff's counsel signed and filed the initial complaint in this action and cited to a fabricated case: "*E.E.O.C. v. Maricopa County Cmty. Coll. Dist.*, No. CV-20-01788-PHX-JJT, 2021 WL 3081160, at *4 (D. Ariz. July 21, 2021)."  (Doc. 1 at 21 n.2).  Even though this case does not exist,[11] Plaintiff's counsel included the following detailed parenthetical describing the purported "holding" in the "case":

> (denying motion to dismiss Equal Pay Act claim where plaintiff alleged that female employees performed substantially equal work under similar conditions and received lower pay than male employees, despite differences in job titles and descriptions; court held that "factual plausibility" under Twombly was satisfied by identifying comparators and alleging disparity based on sex)

(*Id.* at 21-22 n.2).

On June 12, 2025, Plaintiff's counsel signed and filed the response to Defendant's

---

[10]   Defendant also urges the Court to deny Plaintiff's allegations of national origin discrimination.  (Doc. 24 at 4-5).  For instance, Plaintiff in one sentence alleges that she was subject to "discriminatory treatment based on her gender and national origin," (Doc. 54 ¶ 94), but in the next paragraph states that she was discriminated on the basis of "gender and race" (*id.* ¶ 95).  While it is true that "national origin discrimination is not within the ambit of § 1981," the Ninth Circuit has observed that "race has been defined broadly to cover immigrant ethnic groups." *Fonseca*, 374 F.3d at 850 (citation omitted).  Plaintiff here—like the plaintiff in *Fonseca* (*id.*)—alleges discrimination on the basis that she is Hispanic. (*E.g.*, Doc. 54 ¶¶ 83, 99).  The Court thus will not strike the allegation.
[11]   The Court considers a case fictitious in the scenario where the Court inputs Plaintiff's provided reporter number into a legal database and either (1) no result is found or (2) the given reporter number corresponds to a different case or authority.

Motion to Dismiss. (Doc. 20). In the reply, counsel again cited purported holdings from fictitious cases:

| No. | Pleading | Purported "Citation" | Purported "Holding" |
|---|---|---|---|
| 2 | Doc. 20 at 12 | *Pizzo v. City of Chandler*, No. CV-20-02309-PHX-MTL, 2021 WL 7540814, at *3 (D. Ariz. Sept. 21, 2021) | Cited in support of Plaintiff's assertion that "courts in the District of Arizona have consistently held that civil rights plaintiffs are not required to allege facts that eliminate every alternative inference or prove discriminatory animus outright at the pleading stage." |
| 3 | Doc. 20 at 15 | *Pizzo v. City of Chandler*, No. CV-20-02309-PHX-MTL, 2021 WL 7540814, at *6 (D. Ariz. Sept. 21, 2021) | Cited in support of Plaintiff's assertion that "Courts in this District routinely recognize that EEOC charges, when cross-filed, satisfy the ACRA's administrative prerequisites." |
| 4 | Doc. 20 at 15 | *McIntyre v. Phx. Newspapers, Inc.*, No. CV-06-02903-PHX-JAT, 2007 WL 9702526, at *3 (D. Ariz. May 24, 2007). | Cited in support of Plaintiff's assertion that "Courts in this District routinely recognize that EEOC charges, when cross-filed, satisfy the ACRA's administrative prerequisites." |

On the same date, Plaintiff's counsel signed and filed a reply in support of Plaintiff's Motion to Proceed Anonymously. (Doc. 21). That pleading, too, contained multiple fictitious citations:

| No. | Pleading | Purported "Citation" | Purported "Holding" |
|---|---|---|---|
| 5 | Doc. 21 at 9 | *Doe v. Amazon.com, Inc.*, No. 22-cv-1231, 2023 WL 3568691, at *3 (W.D. Wash. May 19, 2023) | Plaintiff claims that, in that "case," "the court granted anonymity to protect a plaintiff who feared career-ending retaliation after harassment in a competitive industry." |
| 6 | Doc. 21 at 11 | *Doe v. Amazon.com, Inc.*, 2023 WL 3568691, at *2–3 (W.D. Wash. May 19, 2023) | Cited in support of Plaintiff's assertion that "Courts routinely hold that the illegal conduct factor is case-specific and non-dispositive." |

| 7 | Doc. 21 at 12 | *Doe v. Amazon.com*, 2023 WL 3568691, at *2. | Cited to support "Plaintiff's genuine fears of retaliation and professional harm as a woman of color confronting institutional power are well-recognized grounds for anonymity, especially where the defendant knows the plaintiff's identity." |
|---|---|---|---|
| 8 | Doc. 21 at 14 | *Doe v. Maricopa County Community College District*, 2017 WL 4460441, at *2 (D. Ariz. Oct. 5, 2017) | Cited to support Plaintiff's assertion that she "has made a particularized showing of well-founded fears of retaliation, reputational damage, and professional harm in a male-dominated industry where silence is the norm." |
| 9 | Doc. 21 at 15 | *Doe v. Maricopa County Community College District*, 2017 WL 4460441, at *2 | Cited in support of Plaintiff's assertion that "Arizona courts similarly grant pseudonymity in discrimination and harassment cases where disclosure risks harm." |
| 10 | Doc. 21 at 14 | *Doe v. Northrop Grumman Sys. Corp.*, 2022 WL 3447983, at *4 (E.D. Va. Aug. 17, 2022) | Cited in support of Plaintiff's assertion that "The public's interest is satisfied so long as the proceedings remain open and accessible, with all substantive pleadings, testimony, and arguments publicly available." |
| 11 | Doc. 21 at 14 | *Doe v. Hobart & William Smith Colleges*, 2021 WL 392929, at *3 (W.D.N.Y. Feb. 4, 2021) | Cited in support of Plaintiff's assertion that "The public's interest is satisfied so long as the proceedings remain open and accessible, with all substantive pleadings, testimony, and arguments publicly available." |
| 12 | Doc. 21 at 11 | *Doe v. Superior Court*, 5 Cal. App. 5th 1069, 1091 (2016) | Cited in support of Plaintiff's assertion that "Courts consistently reject prejudice claims where defendants know the plaintiff's identity and enjoy full discovery access." |

Defendant brought these fabricated citations to the attention of Plaintiff's counsel through responsive filings. (Doc. 23 at 2, 4-5; Doc. 25 at 2, 4 & nn.1-2). Plaintiff's counsel subsequently signed and filed a Notice of Errata (Doc. 27) to amend the fictitious citations in the reply in support of Plaintiff's Motion to Proceed Anonymously (Doc. 21) but did not simultaneously file any similar notice for the fictitious cases in the initial complaint (Doc. 1) or the response to Defendant's Motion to Dismiss (Doc. 20).

On June 24, 2025, Plaintiff's counsel signed and filed a reply in support of Plaintiff's Motion for Leave to File a Reply Out of Time. (Doc. 26). In this filing, Plaintiff's counsel cited real cases, but included several fictitious quotes that do not appear in the opinions:

| No. | Pleading | Citation | Purported "Quote" |
|---|---|---|---|
| 13 | Doc. 26 at 5 | *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010) | "we disapprove the overly rigid application of the *Pioneer/Bateman* standard in cases such as *Kyle*," |
| 14 | Doc. 26 at 5 | *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010) | "with a spirit of cooperation and civility" |
| 15 | Doc. 26 at 7 | *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010) | "failed to show any prejudice" |
| 16 | Doc. 26 at 5 | *Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 381 (9th Cir. 1997) | "[n]eglect encompasses both simple, faultless omissions and omissions caused by carelessness." |
| 17 | Doc. 26 at 8 | *Sibley v. Choice Hotels Int'l, Inc.*, 304 F.R.D. 125, 129 (E.D.N.Y. 2015) | "Baseless and speculative attacks on opposing counsel's conduct do not substitute for legal argument." |
| 18 | Doc. 26 at 11 | *Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998) | "[d]ispositive sanctions for violations of procedural rules should be reserved for cases of willfulness, bad faith, or fault." |

Defendant's counsel served Plaintiff's counsel with a Rule 11 motion for sanctions on July 30, 2025. (Doc. 49 at 7; Doc. 50-1). Under the rule, such motion should not be filed with the Court if the "challenged paper" is "withdrawn or appropriately corrected within 21 days after service." Fed. R. Civ. P. 11(c)(2). On August 5, 2025, Plaintiff's

- 20 -

counsel signed and filed a second Notice of Errata (Doc. 39), this time amending the fictitious citations in the initial complaint (Doc. 1) and the response to Defendant's Motion to Dismiss (Doc. 20), as well as amending the fictitious quotations in the reply in support of Plaintiff's Motion for Leave to File a Reply Out of Time (Doc. 26).

Plaintiff's counsel's amendments to their fictitious citations and quotations, per their Notices of Errata, are summarized in the table below (Doc. 27; Doc. 39):

| No. | Pleading | Plaintiff's Citation/Quote | Plaintiff's Corrected Authority |
|---|---|---|---|
| 1 | Doc. 1 at 21 n.2 | *E.E.O.C. v. Maricopa County Cmty. Coll. Dist.*, No. CV-20-01788-PHX-JJT, 2021 WL 3081160, at *4 (D. Ariz. July 21, 2021) | *E.E.O.C. v. Maricopa County Cmty. Coll. Dist.*, 736 F.2d 510 (9th Cir. 1984) |
| 2 | Doc. 20 at 12 | *Pizzo v. City of Chandler*, No. CV-20-02309-PHX-MTL, 2021 WL 7540814, at *3 (D. Ariz. Sept. 21, 2021) | *Madden-Tyler v. Maricopa County*, 189 Ariz. 462 (App. 1997) |
| 3 | Doc. 20 at 15 | *Pizzo v. City of Chandler*, No. CV-20-02309-PHX-MTL, 2021 WL 7540814, at *6 (D. Ariz. Sept. 21, 2021) | *Madden-Tyler v. Maricopa County*, 189 Ariz. 462 (App. 1997) |
| 4 | Doc. 20 at 15 | *McIntyre v. Phx. Newspapers, Inc.*, No. CV-06-02903-PHX-JAT, 2007 WL 9702526, at *3 (D. Ariz. May 24, 2007). | *Madden-Tyler v. Maricopa County*, 189 Ariz. 462 (App. 1997) |
| 5 | Doc. 21 at 9 | *Doe v. Amazon.com, Inc.*, No. 22-cv-1231, 2023 WL 3568691, at *3 (W.D. Wash. May 19, 2023) | *Doe v. UNUM Life Ins. Co. of Am.*, 164 F. Supp. 3d 1140, 1144–45 (N.D. Cal. 2016) |
| 6 | Doc. 21 at 11 | *Doe v. Amazon.com, Inc.*, 2023 WL 3568691, at *2–3 (W.D. Wash. May 19, 2023) | Citation removed. |
| 7 | Doc. 21 at 12 | *Doe v. Amazon.com*, 2023 WL 3568691, at *2. | Citation removed. |
| 8 | Doc. 21 at 14 | *Doe v. Maricopa County Community College District*, 2017 WL 4460441, at *2 (D. Ariz. Oct. 5, 2017) | Citation removed. |
| 9 | Doc. 21 at 15 | *Doe v. Maricopa County Community College District*, 2017 WL 4460441, at *2 | Citation removed. |

| 10 | Doc. 21 at 14 | *Doe v. Northrop Grumman Sys. Corp.*, 2022 WL 3447983, at *4 (E.D. Va. Aug. 17, 2022) | *Doe v. Penzato*, No. CV10-05105 MEJ, 2011 WL 1833007, at *3 (N.D. Cal. May 13, 2011) |
|---|---|---|---|
| 11 | Doc. 21 at 14 | *Doe v. Hobart & William Smith Colleges*, 2021 WL 392929, at *3 (W.D.N.Y. Feb. 4, 2021) | *Doe v. Hobart & William Smith Colleges*, No. 6:20-cv-06338EAW-MJP, 2021 WL 1062707 (W.D.N.Y. Mar. 19, 2021) |
| 12 | Doc. 21 at 11 | *Doe v. Superior Court*, 5 Cal. App. 5th 1069, 1091 (2016) | Citation removed. |
| 13 | Doc. 26 at 5 | *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010): "we disapprove the overly rigid application of the *Pioneer/Bateman* standard in cases such as *Kyle*," | Clarification that the "sentence was intended as a paraphrased reference to general principles derived from case law." |
| 14 | Doc. 26 at 5 | *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010): "with a spirit of cooperation and civility" | Clarification that the "phrase was a paraphrased summary, not a direct quotation." |
| 15 | Doc. 26 at 7 | *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010): "failed to show any prejudice" | Clarification that the "phrase was a paraphrased summary, not a direct quotation." |
| 16 | Doc. 26 at 5 | *Briones v. Riviera Hotel & Casino,* 116 F.3d 379, 381 (9th Cir. 1997): "[n]eglect encompasses both simple, faultless omissions and omissions caused by carelessness." | Clarification that "the statement was a paraphrase of the Ninth Circuit's discussion of the Supreme Court's definition of 'neglect'" in another case. |
| 17 | Doc. 26 at 8 | *Sibley v. Choice Hotels Int'l*, Inc., 304 F.R.D. 125, 129 (E.D.N.Y. 2015): "Baseless and speculative attacks on opposing counsel's conduct do not substitute for legal argument." | Clarification that "sentence is therefore not a direct quotation, but rather a paraphrased summary of the court's reasoning." |
| 18 | Doc. 26 at 11 | *Valley Eng'rs Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998): "[d]ispositive sanctions for violations of procedural rules should be reserved for cases of willfulness, bad faith, or fault." | "Plaintiff withdraws the quotation marks and acknowledges that the sentence should not have been presented as a direct quotation." |

- 22 -

During the 21-day safe harbor period, Plaintiff's counsel also signed and filed a Motion for Leave to Substitute a Reply Brief. (Doc. 36). In this motion, counsel attempted to explain the appearance of fictitious citations in Doc. 21, claiming that what was filed on June 12 was an "older working draft containing multiple citation placeholders and quotation formatting issues." (Doc. 36 at 3). Counsel blamed a law clerk for uploading the "earlier draft," averring that a version that was "reviewed, finalized, and distributed" by counsel on June 11 should have been filed instead. (*Id.* at 3-4). The Court permitted counsel to file their substituted reply brief[12]—which removed all fictitious citations in Doc. 21 and even removed some of the corrected authorities in the first Notice of Errata (Doc. 27)[13]—but made clear that the substituted filing did not "resolve[] any concerns about" Doc. 21. (Doc. 46 at 1 n.1).

Plaintiff's counsel also flagged that Ms. Wright was on bereavement leave[14] from June 9 through June 15, but that she was still participating in virtual team meetings to get Doc. 21 submitted on file. (Doc. 36 at 3-4). But counsel confusingly claimed that "[u]pon returning to the office and receiving Defendant['s] Rule 11 letter, counsel promptly initiated an internal audit, verified each citation, and located the correct draft." (*Id.* at 3; *see also* Doc. 50 at 5 (Plaintiff's counsel claim that the "inadvertent filing mistake" in Doc. 21 "went unnoticed until Defendant served its Rule 11 motion on July 30, 2025.")). Counsel made *no* mention of their first Notice of Errata (Doc. 27)—filed on June 24, *nine days after* the end of Ms. Wright's bereavement leave, and more than *one month before*

---

[12] The substituted reply brief, lodged at Doc. 38 and filed at Doc. 47, is quite different from the initially filed reply brief. For example, the substituted brief lowers the number of cited cases, reduces the amount of substantive content by about one page, and simultaneously raises new arguments while modifying or abandoning others. (*Compare* Doc. 47 *with* Doc. 21).

[13] Plaintiff's counsel, in their substituted reply brief (Doc. 47), removed any citations to *Doe v. UNUM Life Ins. Co. of Am.*, 164 F. Supp. 3d 1140 (N.D. Cal. 2016) and *Doe v. Hobart & William Smith Colleges*, No. 6:20-cv-06338EAW-MJP, 2021 WL 1062707 (W.D.N.Y. Mar. 19, 2021). These two real cases were added as "Corrected Authority" by Plaintiff's counsel in the first Notice of Errata (Doc. 27), filed on June 24. (*Compare* Doc. 27-1 at 9, 14 *with* Doc. 47).

[14] Counsel state that "Sheree Wright experienced the unexpected death of a close family member while at work and immediately left the office" on June 9. (Doc. 36 at 2). In Ms. Wright's affidavit, she notes that she was "on bereavement leave due to the sudden death of [her] beloved dog." (Doc. 36-10 at 2).

- 23 -

Defendant served its Rule 11 motion—that purportedly already fixed the so-called "clerical or formatting errors" in Doc. 21.  (*See* Doc. 27 at 1).

Plaintiff's counsel also boldly asserted in their Motion for Leave to Substitute a Reply Brief that the fictitious cases cited in Doc. 21 "do exist," and instead avowed that the fictitious citations were "typographical or formatting errors."  (Doc. 36 at 6).  Counsel noted that citations with the same case names (but with different case numbers, reporter, date, and in some instances, court) were either "properly located in LexisNexis" or were "real decision[s]," "albeit misdated."[15]  (*Id.*).  The cases that "do exist" are identified in the table below (Doc. 36):

| No. | Pleading | Plaintiff's Fictitious Case | Plaintiff's Corresponding "Real" Case |
|---|---|---|---|
| 5-7 | Doc. 21 at 9, 11-12 | *Doe v. Amazon.com, Inc.*, No. 22-cv-1231, 2023 WL 3568691 (W.D. Wash. May 19, 2023) | *Doe v. Amazon.com, Inc.*, No. C11-1709MJP, 2011 U.S. Dist. LEXIS 159053 (W.D. Wash. Dec. 23, 2011) |
| 8-9 | Doc. 21 at 14-15 | *Doe v. Maricopa County Community College District*, 2017 WL 4460441 (D. Ariz. Oct. 5, 2017) | Counsel does not identify a corresponding "real" case, instead stating that the fictitious case "had been flagged for revision or removal before filing." |
| 10 | Doc. 21 at 14 | *Doe v. Northrop Grumman Sys. Corp.*, 2022 WL 3447983 (E.D. Va. Aug. 17, 2022) | *Doe v. Northrop Grumman Sys. Corp.*, No. 5:19-CV-00991-CLS, 2019 U.S. Dist. LEXIS 182435 (N.D. Ala. Oct. 22, 2019) |
| 11 | Doc. 21 at 14 | *Doe v. Hobart & William Smith Colleges*, 2021 WL 392929 (W.D.N.Y. Feb. 4, 2021) | *Doe v. Hobart & William Smith Colls.*, No. 6:20-CV-06338 EAW, 2021 WL 1062707 (W.D.N.Y. Mar. 19, 2021) |
| 12 | Doc. 21 at 11 | *Doe v. Superior Court*, 5 Cal. App. 5th 1069 (2016) | *Doe v. Superior Court*, 3 Cal. App. 5th 915 (2016) |

Plaintiff's counsel did not cite to any of the fictitious cases, or the corresponding "real" cases, in the substituted reply brief (Doc. 47), and Ms. Wright declared under penalty of

---

[15]    Plaintiff's counsel neglected to mention that their fictious citation to a "misdated" case—"*Doe v. Hobart & William Smith Colleges*, 2021 WL 392929 (W.D.N.Y. Feb. 4, 2021)"—also included a fictitious Westlaw reporter number.  Inputting "fi: 2021 WL 392929" into Westlaw results in the following message:  **"We were unable to find the document you're looking for."**

- 24 -

perjury that the "placeholder citations challenged by Defendant[] are verifiable cases"[16] that were "verified using LexisNexis, not AI tools." (Doc. 36-10 at 2-3). Counsel did not explain why, despite having apparently used LexisNexis to conduct "all legal research" (Doc. 36 at 3), nearly all the fictitious citations contained Westlaw reporter numbers. Nor did counsel explain how mere "placeholders during the drafting process" (*id.*) so strikingly mimicked the *form* of actual case citations without any commensurate *accuracy*.

Defendant ultimately filed its motion for sanctions under Rule 11 on August 26, 2025—more than 21 days after it served the motion on Plaintiff's counsel. (Doc. 49). Defendant avers that sanctions are appropriate because Plaintiff's counsel's explanations for the fictious citations and quotations were "implausible," and that the Notices of Errata (Docs. 27, 39) and the Motion for Leave to Substitute a Reply Brief (Doc. 36) did not "withdraw or appropriately correct the full set of issues identified" by Defendant. (Doc. 49 at 9 (citation modified)). Defendant contends that "[t]he only plausible explanation for these recurring issues is that Plaintiff's counsel used artificial intelligence tools without verifying their outputs." (*Id.* at 2).

### b. Legal Standard

Under Rule 11, an attorney presenting a pleading to the Court "certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). Failure to comply with this provision "gives grounds for monetary sanctions." *Lake v. Gates*, 130 F.4th 1064, 1068 (9th Cir. 2025) (citing Fed. R. Civ. P. 11(c)). The inquiry into whether a pleading is sanctionable under Rule 11 is an "objective standard of reasonableness." *Id.* (citation omitted). "[T]he district court must determine that a pleading is both baseless and made

---

[16] However, Ms. Wright omitted any discussion of "*Doe v. Maricopa County Community College District*, 2017 WL 4460441 (D. Ariz. Oct. 5, 2017)"—a fake citation in Doc. 21 for which Plaintiff's counsel did not identify any corresponding "real" case—thus casting doubt on Ms. Wright's blanket assertion that the placeholder citations are verifiable cases. (*See* Doc. 36-10).

without a reasonable and competent inquiry." *Id.* (citation modified).

### c. Analysis

The conduct of Ms. Wright and Ms. Walters is sanctionable. The Court has identified at least 18 instances where Plaintiff's counsel included either a fictitious citation or a fictitious quotation. Counsel thus violated their obligation to present "claims, defenses, and other legal contentions" that are "warranted by existing law." Fed. R. Civ. P. 11(b)(2) (emphasis added).

Federal courts across the country have increasingly grappled with the issue of "hallucinated content" appearing in court filings.[17] Such content, which is generated by AI large language models ("LLMs"), may "read[] like real legal authority."[18] A hallucinated case generated by an LLM (1) "looks like a real case with a case name"; (2) includes "a citation . . . to a reporter that publishes opinions from federal district courts"; and (3) "identifi[es] [] a district court" and "the year for that decision." *United States v. Hayes*, 763 F. Supp. 3d 1054, 1065 (E.D. Cal. 2025), *reconsideration denied*, 2025 WL 1067323 (E.D. Cal. Apr. 9, 2025). In their filings with the Court, Ms. Wright and Ms. Walters included citations that had "all the markings of a hallucinated case created by generative artificial intelligence (AI) tools." *Id.* Yet at no point did Plaintiff's counsel ever take responsibility for submitting filings that contained hallucinated cases and fabricated quotations. Instead, counsel resorted to a blame game: blaming a law clerk for preparing and filing the wrong version of a pleading (Doc. 50 at 11); blaming the same law clerk for drafting fabricated quotations in another pleading[19] (*id.* at 16); blaming a LexisNexis tool

---

[17] *See, e.g.*, Evan Ochsner, *AI-Faked Cases Become Core Issue Irritating Overworked Judges*, Bloomberg L. (Dec. 29, 2025, at 03:00 MST), https://news.bloomberglaw.com/legal-ops-and-tech/ai-faked-cases-become-core-issue-irritating-overworked-judges.

[18] Mark H. Francis & Ashwini Jarral, *A Legal Practitioner's Guide to AI and Hallucinations*, Nat'l Ctr. for State Cts. 5-6 (Jan. 2026), https://nationalcenterforstatecourts.app.box.com/v/Legal-practitioner-guide-AI (noting that "LLMs develop working models of how legal language and reasoning fit together," but that LLMs "may invent" cases or "distort information from" actual cases since they "are essentially a predictive text function").

[19] Ms. Wright states in her affidavit that she terminated the law clerk after the law clerk declined to "prepare a declaration explaining her role in the incorrect filings." (Doc. 50-5 at 14).

- 26 -

for not catching fictitious cases and quotations (*id.* at 14-16); and even blaming Defendant's counsel for a "profound lack of diligence" in failing to find "the existence of the cited authorities" (*id.* at 24).

Nowhere do counsel address their actual obligations under Rule 11—to read the cases they cite, make arguments they know are legitimate, and review the work of law clerks and paralegals before filing it with the Court.  Counsel violated these ethical obligations.  The imposition of appropriate sanctions is warranted.

### i.    Safe Harbor Period

As a threshold matter, Plaintiff's counsel raise a procedural defense to Defendant's motion, arguing that the motion filed by Defendant was not the same as the motion served on Plaintiff's counsel during the Rule 11 safe harbor period.  (Doc. 50 at 7-10).  Plaintiff's counsel primarily contend that, in the motion served (Doc. 50-1), Defendant claimed that Plaintiff's fictitious cases "do[] not exist," but in the motion filed (Doc. 49), Defendant instead alleged that the "case[s] do[] not exist *as cited*."  (Doc. 50 at 8 (emphasis added)).  Plaintiff's counsel claim, without citing any authority, that under Rule 11, a "party seeking sanctions must first serve the exact motion it intends to file."  (*Id.* at 7).

But "[t]he Ninth Circuit has never imposed a requirement that a served Rule 11 motion be identical to the filed motion."  *Richter v. Oracle Am., Inc.*, 2023 WL 8586690, at *6 (N.D. Cal. Dec. 8, 2023).  Instead, district courts within the Ninth Circuit "have found that a served motion that rests on substantially the same grounds as a filed motion complies with Rule 11's safe harbor provision."  *Id.* (citing string of cases).  Still, the filed motion "cannot raise any new arguments," *Beaver v. Wells Fargo Bank*, 2024 WL 4979792, at *4 (W.D. Wash. Dec. 4, 2024) (citations omitted), and "any difference" between the served and filed motions should "cause[] no prejudice to" Plaintiff and her counsel, *Hodgson v. Roper*, 2022 WL 297089, at *12 (E.D. Cal. Feb. 1, 2022).

Defendant's filed motion (Doc. 49) rests on substantially the same grounds as the served motion (Doc. 50-1), does not raise any new arguments, and caused no prejudice to Plaintiff and her counsel.  Both the served motion and the filed motion seek sanctions on

the same set of fabricated cases and quotations. (*Compare* Doc. 49 at 6-7 *with* Doc. 50-1 at 9-10). Plaintiff's counsel's arguments that Defendant somehow "abandoned the core theory of its served motion" (Doc. 50 at 8), or that Defendant "acknowledg[ed] the cases exist" (*id.*), are without merit. During the safe harbor period, Plaintiff's counsel asserted that that the fictious cases in Doc. 21 "do exist," implying that the cases were legitimate simply because some *other* case existed that had the same name as the hallucinated one.[20] (Doc. 36 at 6). Plaintiff's counsel make this argument throughout their response brief for this motion. (Doc. 50 at 4, 8, 14-16, 22, 24-25). The Court rejects this argument as legally insufficient and factually unsupported.

Just because a hallucinated case adopts the same name as a real case, does not mean that the hallucinated case "exists." In fact, this occurrence is to be expected on occasion. Because LLMs are "train[ed] on enormous volumes of text," which include caselaw, an LLM "may . . . distort information from an *actual case*" that "looks correct." Francis & Jarral, *supra*, at 5-6; *see also Hayes*, 763 F. Supp. 3d at 1065 ("fictitious case citations created by generative AI tools" can "look[] like a real case with a case name"). Thus, Defendant's adjustment of language in the filed motion, by noting that some of the fictitious "case[s] do[] not exist *as cited*," does not substantially alter the grounds of Defendant's served motion. (Doc. 50 at 8 (emphasis added)). The contention is still the same argument: Plaintiff's counsel included fabricated cases and quotations that bear the characteristics of AI-hallucinated content.[21]

---

[20] Defendant notes that it "adjusted certain language from 'Case does not exist' in the served version of the motion to 'Case does not exist as cited' in the filed motion to distinguish two forms of fake citations found in the offending filings: (1) fake citations where there is not even a case with the same name, and (2) fake citations that include the name of a real case, but which are otherwise fabricated—with made-up dates, courts, or Westlaw or reporter numbers—and where the real case with the same name generally does not support, and sometimes even directly contradicts, the proposition for which Plaintiff's counsel relied on the fabricated citation." (Doc. 55 at 10).

[21] Plaintiff's counsel further argue that the "Ninth Circuit has repeatedly held that such deviations are fatal." (Doc. 50 at 9 (first citing *Barber v. Miller*, 146 F.3d 707, 710-11 (9th Cir. 1998); then citing *Radcliffe v. Rainbow Construction Co.*, 254 F.3d 772, 789 (9th Cir. 2001))). These cases say nothing to that effect. In *Barber*, the movant served its motion for sanctions at the same time it filed the motion. 146 F.3d at 709. Because Rule 11 requires the movant to serve the motion 21 days before filing it, the Ninth Circuit reversed the district court's award of sanctions. *Id.* at 711. *Barber* contains no discussion on whether the served motion and the filed motion must be identical. The same is true in

Plaintiff's counsel also claim that they were prejudiced by Defendant's addition of exhibits in the filed motion (Docs. 49-7 through 49-16) that detailed prior state bar disciplinary records and emails between Plaintiff's and Defendant's counsel. (Doc. 50 at 24). But Defendant described these exhibits in the background section of the served motion. (Doc. 50-1 at 2-3). Moreover, the disciplinary records are public, and Plaintiff's counsel had all exhibit documents in their possession. *See, e.g.*, *Shared Med. Res., LLC v. Histologics, LLC*, 2013 WL 12138991, at *4 (C.D. Cal. May 23, 2013) (finding that a motion for sanctions satisfied Rule 11's procedural requirements, even where the served motion did not include the exhibits referenced in that motion, because the movant "describe[d] each of the documents," and the non-movant had the documents "in its possession or were publicly available"). And, in any event, the Court does not consider these exhibits in resolving this motion. Thus, Plaintiff's counsel fails to demonstrate any prejudice to Plaintiff's counsel through Defendant's inclusion of exhibits in the filed motion.

The Court finds that Defendant complied with Rule 11's procedural requirements. *See* Fed. R. Civ. P. 11(c)(2). The Court will turn to the merits of Defendant's motion.

**ii.    Plaintiff's Fictitious Citations and Quotations are Baseless**

The Court has little difficulty determining that the fabricated citations and quotations present in Doc. 1, Doc. 20, Doc. 21, and Doc. 26 are "baseless." *See Lake*, 130 F.4th at 1068 (citation omitted). "A fake opinion is not 'existing law' and citation to a fake opinion does not provide a non-frivolous ground for extending, modifying, or reversing existing law, or for establishing new law." *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 461 (S.D.N.Y. 2023). This applies to fake quotations as well. *See Safe Choice, LLC v. City of Cleveland*, 2025 WL 2958211, at *4 (N.D. Ohio Oct. 17, 2025) ("[A]s it always has, misrepresenting the holdings of case law violates Rule 11." (citing string of cases)). Plaintiff's counsel's use of fake cases and quotations violated Rule 11(b)(2).

//

*Radcliffe*. 254 F.3d at 789 (similarly reversing an award of sanctions where the movant "did not follow the mandatory service procedure" of Rule 11).

###### iii.    Counsel Did Not Conduct a Reasonable and Competent Inquiry

For each of the offending pleadings signed and filed by Ms. Wright and Ms. Walters—Doc. 1, Doc. 20, Doc. 21, and Doc. 26—Plaintiff's counsel also failed to make a "reasonable and competent inquiry" into the existence of the fabricated citations and quotations. *See Lake*, 130 F.4th at 1068 (citation omitted). The Court addresses each offending document in turn.

##### 1. Initial Complaint (Doc. 1)

The initial complaint contains one fictitious case: "*E.E.O.C. v. Maricopa County Cmty. Coll. Dist.*, No. CV-20-01788-PHX-JJT, 2021 WL 3081160, at \*4 (D. Ariz. July 21, 2021)." (Doc. 1 at 21 n.2). Plaintiff's counsel state that a non-attorney law clerk, who had been a member of Ms. Wright's firm for almost a year and whose bar examination results were pending, "prepared the initial draft" of the complaint and "conducted legal research under the supervision of senior attorneys." (Doc. 50 at 4-5, 14). Before filing the initial complaint, Plaintiff's counsel "used LexisNexis's Document Analysis Tool to verify the accuracy of all case law citations," but the fictitious citation was not flagged. (*Id.* at 14). Counsel contend that the fictitious case was a "formatting" error, and that it was intended to reference a Ninth Circuit case with the same name. (*Id.*). Counsel's explanation is either insufficient or highly problematic for at least three reasons.

First, counsel seek to pass the buck to their law clerk. But an attorney's Rule 11 duties cannot be delegated. *See Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 125 (1989) ("The signing attorney cannot leave it to some trusted subordinate . . . to satisfy himself that the filed paper is factually and legally responsible; by signing he represents not merely the fact that it is so, but also the fact that he personally has applied his own judgment."); *see also Davis v. Marion Cnty. Superior Ct. Juv. Det. Ctr.*, 2025 WL 2502308, at \*1-4 (S.D. Ind. Sept. 2, 2025) (recommending Rule 11 sanctions on attorney where a paralegal drafted a brief, the attorney did not have time to review the paralegal's draft before filing, and the brief contained hallucinated citations). As Defendant correctly notes, "Plaintiff's counsel cannot avoid sanctions by blaming someone else." (Doc. 55 at 6).

Second, counsel readily admit that they did not actually read the cases cited in the initial complaint. When an attorney submits a court filing, she "certifies to the court that [she] has read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991). As the Second Circuit has observed, "the duties imposed by Rule 11 require that attorneys read, and thereby confirm the existence and validity of, the legal authorities on which they rely." *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024). By failing to actually check the cases and citations contained in the complaint, counsel failed to conduct any reasonable inquiry into whether the fictitious case existed.

Third, counsel's explanation attributing the fictitious citation to a "formatting" error does not withstand even basic scrutiny. In the initial complaint, counsel included a parenthetical for the fictitious case that stated that the "court" there "held that 'factual plausibility' under *Twombly* was satisfied by identifying comparators and alleging disparity based on sex." (Doc. 1 at 21 n.2 (emphasis added)). Counsel now attribute that parenthetical to a different Ninth Circuit case published in 1984, stating that the "substance" of the parenthetical "was accurate and drawn directly from applicable legal standards." (Doc. 50 at 14-15). This contention is not possible. Plaintiff's "corrected" authority—*E.E.O.C. v. Maricopa County Cmty. Coll. Dist.*, 736 F.2d 510 (9th Cir. 1984)— was published 23 years before the Supreme Court's decision in *Twombly*. The Court struggles to see how "formatting" errors—with the reporter number, page number, court, and year—could also explain the inclusion of a parenthetical referencing a case from the future.

It is apparent that an LLM was used to conduct legal research, or even generate the initial complaint, thus leading to the inclusion of a fictitious case with a hallucinated parenthetical. Plaintiff's counsel offer no other plausible explanation. But even if the case and parenthetical were not generated by AI, Plaintiff's counsel still "failed to take even th[e] most basic of actions"—actually reviewing the complaint, reading the cases cited,

and not simply running it through a legal cite checking tool and calling it a day—"and therefore did not catch the fact that the [complaint] contained [a] citation[] that did not exist." *Davis*, 2025 WL 2502308, at *2; *see also Hayes*, 763 F. Supp. 3d at 1067 ("Citing nonexistent case law or misrepresenting the holdings of a case is making a false statement to a court. It does not matter if generative AI told you so." (citation modified)). Plaintiff's counsel thus did not make a "reasonable and competent inquiry" into the existence of the fictitious citation in the initial complaint.

### 2. Plaintiff's Response to Defendant's Motion to Dismiss (Doc. 20)

The same holds for Plaintiff's response to Defendant's Motion to Dismiss (Doc. 20). Plaintiff's counsel again attribute the inclusion of two fictitious cases—"*Pizzo v. City of Chandler*, No. CV-20-02309-PHX-MTL, 2021 WL 7540814 (D. Ariz. Sept. 21, 2021)" and "*McIntyre v. Phx. Newspapers, Inc.*, No. CV-06-02903-PHX-JAT, 2007 WL 9702526 (D. Ariz. May 24, 2007)"—to their non-attorney law clerk, who prepared a "draft" of the brief. (Doc. 50 at 19). While counsel aver that they "did not invent those authorities, nor did they rely on generative AI for case generation" (*id.* at 20), they again fail to give any plausible explanation as to how such realistic looking cases ended up in their submitted filing. And counsel again try to excuse this mistake by claiming that the "LexisNexis database" did not catch the errors. (*Id.*). The Court finds, as it did for Doc. 1, that Plaintiff's counsel did not make a "reasonable and competent inquiry" into the existence of fictitious citations in Doc. 20.

### 3. Plaintiff's Reply in Support of Her Motion to Proceed Anonymously (Doc. 21)

Plaintiff's counsel present a convoluted tale about the inclusion of multiple fictitious citations in Plaintiff's reply in support of her Motion to Proceed Anonymously (Doc. 21). Counsel describe a situation where the litigation team prepared a final version of the brief on June 11, the law clerk inadvertently filed an earlier version of the brief on June 12 (that contained fictitious citations) while Ms. Wright was out of office, and counsel did not realize that an erroneous brief was submitted until July 30 (when Defendant served its

motion for sanctions).  (Doc. 50 at 4-5).  When counsel realized this mistake, they sought to correct the record by filing the June 11 brief, as confirmed by "metadata."  (*Id.* at 11).

The Court finds that Plaintiff's counsel's narrative regarding Doc. 21 is invention. The idea that the filing of an erroneous brief "went unnoticed" (Doc. 50 at 5) from June 12 through July 30 is demonstrably false.  Defendant brought these fictitious citations to Plaintiff's attention on June 17 and June 20—*after* Ms. Wright's bereavement leave had ended. (Doc. 23 at 2, 4-5; Doc. 25 at 2, 4 & nn. 1-2).  Plaintiff's counsel—both Ms. Wright and Ms. Walters—then signed and filed a Notice of Errata on *June 24* (Doc. 27), purporting to fix "clerical or formatting errors" present in Doc. 21.  Yet Plaintiff's counsel make no mention of this Notice of Errata in their response to Defendant's motion for sanctions.  (*See* Doc. 50).  Because counsel completely omit any discussion of this key event, the Court determines that Plaintiff's counsel did not make a "reasonable and competent inquiry" into the existence of fictitious citations in Doc. 21.

Moreover, the Court can give no credence to counsel's regurgitated defense of "formatting" or "clerical" errors.  Errors are to be expected—on occasion.  But when the same issue appears one time in Doc. 1, three times in Doc. 20, and eight times in Doc. 21, it can no longer be attributed to mere oversight.  Though counsel admit that the fictitious citations "turned out not to exist,"[22] they still cling to their claim that "[t]here was a good-faith filing based on real legal research."  (Doc. 50 at 21).  Both cannot be true.

### 4. Plaintiff's Reply in Support of Her Motion for Leave to File Reply Out of Time (Doc. 26)

Finally, the Court also finds that Plaintiff's counsel did not make a "reasonable and competent inquiry" into the existence of fictitious quotations in Doc. 26.  Plaintiff's counsel give the same song and dance here:  the law clerk "handled" the drafting process of the

---

[22]    Plaintiff's counsel's supposedly "real and citable authorities" (Doc. 50 at 22) generally do not support the propositions advanced by the corresponding fictitious citations.  For example, counsel cite a fictitious case—"*Doe v. Amazon.com, Inc.*, No. 22-cv-1231, 2023 WL 3568691, at *3 (W.D. Wash. May 19, 2023)"—and state that the court there granted a motion to proceed anonymously.  (Doc. 21 at 9).  But the "real" case later identified by Plaintiff's counsel—*Doe v. Amazon.com, Inc.*, No. C11-1709MJP, 2011 U.S. Dist. LEXIS 159053, at *1 (W.D. Wash. Dec. 23, 2011)—*denied* leave to proceed anonymously.  (Doc. 36-8 at 2).

brief, counsel ran the brief through the LexisNexis cite checking tool, and no fake quotes were flagged. (Doc. 50 at 16-17). Counsel could have caught the fabrications by reading the cases cited in their brief. *See Park*, 91 F.4th at 615. They failed to do that.

### iv.    Sanctions

Counsel's conduct was not objectively reasonable under Rule 11. *See Lake*, 130 F.4th at 1068 (9th Cir. 2025). The Court will thus impose sanctions on Ms. Wright and Ms. Walters.

The Court "may impose an appropriate sanction on any attorney" that violates Rule 11(b), and the Court "must" hold the attorney's law firm "jointly responsible" for the violation. Fed. R. Civ. P. 11(c)(1). Rule 11 sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by other similarly situated." Fed. R. Civ. P. 11(c)(4). The Court may impose "nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.*

Having carefully considered the conduct of counsel, the Court will order Ms. Wright and Ms. Walters—and their respective law firms, IBF Law Group, PLLC and The Law Office of Cortney E. Walters, PLLC—to pay Defendant's reasonable attorneys' fees incurred in discovering the non-existent citations and quotations and briefing the Rule 11 motion for sanctions. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 & n.5 (2017) (holding that when district courts award attorneys' fees pursuant to civil procedures, the award "must be compensatory" in nature); Fed. R. Civ. P. 11(c)(2). This endeavor has ultimately resulted in a great deal of wasted time and judicial resources. By being more forthcoming with the Court, Plaintiff's counsel could have avoided sanctions altogether. The Court thus finds that the payment of attorneys' fees is an appropriate award to compensate Defendant for "wast[ing] time and money in exposing the deception." *Mata*, 678 F. Supp. 3d at 448; *see also* Fed. R. Civ. P. 11(c)(4). It will also serve as an effective deterrent to Ms. Wright, Ms. Walters, and other attorneys practicing in the District of

Arizona. *See Mata*, 678 F. Supp. 3d at 461 ("An attempt to persuade a court or oppose an adversary by relying on fake opinions is an abuse of the adversary system." (citation omitted)).

Furthermore, like other district courts have similarly done, the Court will require that: (1) Plaintiff's counsel serve a copy of this order on their client; (2) Plaintiff's counsel participate in a Continuing Legal Education course of at least one hour regarding the ethical use of AI in the practice of law; (3) the Clerk of the Court serve a copy of this order on the various state bars for which Ms. Wright and Ms. Walters are members; and (4) the Clerk of the Court serve a copy of this order on all the district judges and magistrate judges in this district. *See, e.g.*, *Oneto v. Watson*, 808 F. Supp. 3d 97, 980-814 (N.D. Cal. 2025); *Hayes*, 763 F. Supp. 3d at 1073; *Mata*, 678 F. Supp. 3d at 466. These sanctions are intended help cure the "[m]any harms" in this case that "flow from the submission of fake opinions." *Mata*, 678 F. Supp. 3d at 448.

## CONCLUSION

For the reasons stated above,

**IT IS THEREFORE ORDERED** that the Defendant's Partial Motion to Dismiss (Doc. 16) is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that Count VII is **DISMISSED** without prejudice.

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike (Doc. 18) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Sanctions (Doc. 49) is **GRANTED**. The Court issues the following sanctions:

1. Defendant shall file, within **two weeks** from the date of this order, its request for reasonable attorneys' fees incurred in discovering the non-existent citations and quotations and briefing the Rule 11 motion for sanctions. Defendant shall not seek to recover expenses incurred in filing those aspects of its motion papers that did not relate to the non-existent citations or quotations. Any responsive and reply memoranda must be filed in accordance with the deadlines set forth in LRCiv. 7.2.

- 35 -

The Court will then issue its award—holding Ms. Wright, Ms. Walters, IBF Law Group, PLLC, and The Law Office of Cortney E. Walters, PLLC jointly liable— once it has Defendant's cost figures.

2. Within seven (7) days of the date of this order, Plaintiff's counsel shall serve a copy of this order on Plaintiff and file a Notice of Proof.

3. Within sixty (60) days of the date of this order, Plaintiff's counsel shall file on the docket a declaration identifying and certifying their participation in a Continuing Legal Education course of at least one hour regarding the ethical use of artificial intelligence in the practice of law.[23]

4. The Clerk of Court shall serve a copy of this order on the State Bar of Arizona, of which Ms. Wright is a member, the State Bar of New Mexico, of which Ms. Wright is a member, and the Florida Bar, of which Ms. Walters is a member.

5. The Clerk of Court shall serve a copy of this order on all the district judges and magistrate judges in this district.

Dated this 31st day of March, 2026.

_____
G. Murray Snow
Senior United States District Judge

---

[23]    *See, e.g.*, https://learningcenter.americanbar.org/courses/112401.

- 36 -