Malcolm A. Heinicke* (CA Bar No. 194174)
Taylor L. Benninger* (CA Bar No. 344825)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:   (415) 512-4000
Malcolm.Heinicke@mto.com
Taylor.Benninger@mto.com

Craig Jennings Lavoie* (CA Bar No. 293079)
Jennifer L. Bryant* (CA Bar No. 293371)
Jin Niu* (CA Bar No. 362447)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Craig.Lavoie@mto.com
Jennifer.Bryant@mto.com
Jin.Niu@mto.com

Leah S. Freed (State Bar No. 021332)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Esplanade Center III, Suite 800
2415 East Camelback Road
Phoenix, AZ 85016
Telephone:   (602) 778-3700
Leah.Freed@ogletree.com

Attorneys for Defendant
Suns Legacy Partners, L.L.C.
* Admitted *pro hac vice*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Chelsea Montes, | No. CV-25-01295-PHX-GMS |
| Plaintiff, | **DEFENDANT SUNS LEGACY PARTNERS, L.L.C.'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| Suns Legacy Partners, L.L.C., | |
| Defendant. | **(Oral Argument Requested)** |

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant Suns Legacy Partners, L.L.C. ("SLP") operates the Phoenix Suns NBA team and Mercury WNBA team.  Plaintiff Chelsea Montes, a Hispanic and Latina woman, worked in SLP's Brand Marketing team prior to quitting in 2024.  Statement of Facts ("SOF") ¶¶ 1, 11, 83.  In 2023, she coordinated the Suns' 2023-24 season City Edition Jersey marketing campaign, "El Valle."  *Id.* ¶¶ 30, 40.  When the campaign was announced to the public, Plaintiff was upset because she felt she did not receive the same public recognition that Shawn Martinez, SLP's Senior Director of Live Presentation, received for his work on the "ORIGINATIV" jersey campaign the prior season.  This is the core of her lawsuit: Plaintiff claims that, if she had received the same public recognition and press opportunities as Mr. Martinez, that would have "literally launch[ed] [her] career."  *Id.* ¶ 49.

The reason for the differing approaches to press and public relations on the two campaigns was simple:  SLP underwent an ownership and leadership change, and its new Communications Policy designated a limited set of SLP executives as the public face of the teams.  *Id.* ¶¶ 60, 62, Ex. 16 (Communications Policy).  When Plaintiff found out that, as a result, SLP's CEO would be quoted in the El Valle press release and she would not, SOF ¶ 63, she reacted unprofessionally.  She recorded a series of voice notes in which she yelled about not being quoted and called her supervisor, Graham Wincott, a "weak f***ing leader"; she then accidentally sent those disrespectful voice notes to Mr. Wincott himself.  *Id.* ¶¶ 64–68, Exs. 18–20 (voice notes).  She also took to social media, stating that she was the sole leader of the El Valle campaign and posting Suns content in violation of SLP's Social Media Policy.  SOF ¶¶ 69–71, Ex. 9 (Social Media Policy), Ex. 21 (Plaintiff's Instagram post).  Her actions resulted in a final written warning, which did not alter her compensation, title, or job responsibilities.  SOF ¶¶ 78–79; *see also id.* Ex. 26 at SLP-MONT-00001764–67 (written warning).  Nonetheless, four days after receiving the warning, Plaintiff submitted her resignation to SLP and immediately took a higher-salary job with Tino Cochino, a well-known and popular radio personality whom she had just married.  SOF ¶¶ 83, 90–93, Ex. 34 (Plaintiff's first pay stub at Tino Cochino Radio, LLC).

More than a year later, after her marriage failed and her employment with Tino Cochino Radio ended, Plaintiff filed this lawsuit. Five claims remain: race discrimination, retaliation, and constructive discharge under 42 U.S.C. § 1981 (Counts 1–3); an Equal Pay Act ("EPA") claim under 29 U.S.C. § 206(d) (Count 4); and a state-law sex discrimination claim based on Plaintiff's brief, unreported, and apparently consensual relationship with another SLP employee (Count 8). Each of her claims fails as a matter of law.

*First*, Plaintiff's race discrimination claim fails for several, independently sufficient reasons. Plaintiff never suffered an actionable adverse employment action. *See* SOF ¶ 9. Plaintiff's comparator—Shawn Martinez, who Plaintiff claims played a similar role in the Native American-focused ORIGINATIV campaign as she did on El Valle—is not only Native American, but *also* Hispanic and Latino. *Id.* ¶ 32. As such, any differences between Mr. Martinez and Plaintiff cannot be the result of discrimination against Hispanics or Latinos. And the differing public relations approach between the El Valle and ORIGINATIV campaigns was the result of a legitimate policy change. *Id.* ¶¶ 59, 62.

*Second*, Plaintiff's retaliation claim also fails on several grounds. Not only did Plaintiff not suffer an adverse action, but she also did not engage in protected activity. The profanity-laced voice notes that she mistakenly sent to Mr. Wincott never mentioned race discrimination against her; instead, they expressed Plaintiff's frustration with SLP's communications strategy and attacked Mr. Wincott's leadership. *Id.* ¶¶ 67–68, Exs. 18–20. Also, Plaintiff cannot demonstrate causation between her written warning and her alleged "protected activity," because the warning stemmed from her multiple policy violations and was not a pretext for retaliation for any race-based complaints.

*Third*, the circumstances that motivated Plaintiff's resignation fall far short of constructive discharge. Again, race discrimination could not have been the but-for cause of Plaintiff's decision to quit: she resigned because she felt that she was not getting as much public recognition and visibility as Mr. Martinez, but Mr. Martinez and Plaintiff are members of the same race. SOF ¶¶ 1, 32, 87–89. And, as this Court's dismissal of Plaintiff's IIED claim recognized, the alleged denial of sufficient public recognition also is not close

to the sort of intolerable conditions that a plaintiff must show for constructive discharge—especially where, as here, Plaintiff immediately took a higher salary position elsewhere.

***Fourth***, Plaintiff's EPA claim fails for the very simple reason that Plaintiff, a Marketing Manager, and Mr. Martinez, the Senior Director of Live Presentation, had very different jobs in different departments. Mr. Martinez oversees in-arena presentations for all events and oversees the entire Live Presentation Department of ten people. *Id.* ¶¶ 37–38. Plaintiff did not perform those functions and at most supervised one other full-time employee. *Id.* ¶¶ 11–16. Further, Plaintiff's position with SLP was her first professional sports job and only her second job out of college, whereas Mr. Martinez joined SLP with nearly two decades of live presentation experience at other NBA teams. *Id.* ¶¶ 3–4, 33.

***Finally***, Plaintiff's sex harassment claim fails because Plaintiff did not exhaust her administrative remedies. And even if this Court could reach the merits, Plaintiff's own flirtatious text messages show that her relationship with alleged harasser Kyle Pottinger was far from unwelcome. *See id.* ¶ 51, Ex. 15 (text messages). This is surely why she never reported such alleged "harassment" to SLP, SOF ¶ 53, a fact that also dooms her claim as a matter of law under the *Faragher-Ellerth* doctrine.

For these reasons, SLP respectfully requests summary judgment in its favor.

## II.   LEGAL STANDARD

"Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates 'that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Kunz v. Smith's Food & Drug Ctrs., Inc.*, No. CV-09-1645-PHX-GMS, 2011 WL 995895, at *2 (D. Ariz. Mar. 21, 2011) (quoting Fed. R. Civ. P. 56(c)(2)), *aff'd,* 497 F. App'x 746 (9th Cir. 2012). "When the nonmoving party 'bear[s] the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate.'" *Id.* (quoting *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir. 1987)).

## III.    ARGUMENT

### A.    Count 1:  Plaintiff's Section 1981 Race Discrimination Claim Fails.

To prevail on her § 1981 race discrimination claim, Plaintiff must "ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).  To do so, she must first make a *prima facie* showing that, among other things, "[s]he was subject to an adverse employment action" and "similarly situated persons outside h[er] protected class were treated more favorably."  *Crowe v. Wormuth*, 74 F.4th 1011, 1035 (9th Cir. 2023).[1]  If Plaintiff makes that showing, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action," after which the burden shifts back to the plaintiff to provide evidence substantial enough to raise a "genuine issue of material fact" as to whether "the employer's asserted nondiscriminatory reason is pretextual."  *Id.* at 1036.  Plaintiff's claim fails independently at all three steps.

### 1.    *Plaintiff Did Not Suffer an Adverse Employment Action.*

"For the purposes of a discrimination claim, an adverse employment action is one which 'materially affects the compensation, terms, conditions, or privileges of employment.'"  *Moore v. Marriott Int'l, Inc.*, No. CV-12-00770-PHX-BSB, 2014 WL 5581046, at *8 (D. Ariz. Oct. 31, 2014).  Plaintiff suffered no such actions.  SOF ¶ 9.  She "was not demoted, was not stripped of work responsibilities, was not handed different or more burdensome work responsibilities, was not fired or suspended, was not denied any raises, and was not reduced in salary or in any other benefit."  *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000); *accord Tanooryan v. Pima Cnty.*, No. CV 18-00293-TUC-JR, 2020 WL 10224734, at *7 (D. Ariz. Nov. 6, 2020).

Plaintiff also cannot establish that her written warning was an adverse employment action sufficient to support her race discrimination claim.  "Several courts within the Ninth

---

[1] Because both § 1981 claims and Title VII claims "apply the familiar *McDonnell Douglas* burden shifting framework," *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008), SLP cites *Crowe* and other Title VII caselaw in this motion.

Circuit have held that a warning letter is not an adverse employment action" provided that it does "not implement any material adverse change in the terms or conditions of Plaintiff's employment." *Moore*, 2014 WL 5581046, at *10–11; *accord Losa v. Salt River Project Agric. Improvement & Power Dist.*, No. CV-18-04424-PHX-MTL, 2020 WL 3574592, at *4 (D. Ariz. July 1, 2020) ("Written warnings . . . are not adverse actions where they do not materially affect the terms and conditions of employment." (quoting *Cozzi v. Cty. of Marin*, 787 F. Supp. 2d 1047, 1061 (N.D. Cal. 2011)). That is true here: Plaintiff's warning did not affect her title, compensation, job responsibilities, or conditions of employment. SOF ¶ 79.

At its core, Plaintiff's claim is that Mr. Martinez received more press opportunities and public recognition for the ORIGINATIV campaign than she did for El Valle, and that similar publicity would have "literally launch[ed] [Plaintiff's] career.*" Id.* ¶ 49. But this is insufficient to constitute an adverse employment action. Only actions that "materially affect[] the compensation, terms, conditions, or privileges of employment" qualify; "actions that are trivial or have no tangible job consequence" do not. *Span v. Pinal Cnty. Cmty. Coll. Dist.*, No. CV-23-02233-PHX-JJT, 2025 WL 3228220, at *5 (D. Ariz. Nov. 19, 2025). As this Court aptly concluded in dismissing Plaintiff's IIED claims, a "limitation on Plaintiff's public recognition" is akin to unactionable "insults, indignities, . . . or other trivialities." Doc. 73 at 13 (quoting *Christakis v. Deitsch*, 250 Ariz. 246, 250 (Ct. App. 2020)). Moreover, an employment action cannot be "materially adverse if it is within the employer's discretion to grant or deny and is not a component of the employee's salary." *Munene v. Mayorkas*, No. CV-19-00220-TUC-RM (JR), 2024 WL 4200381, at *8 (D. Ariz. June 28, 2024) (citing *Johnson-Carter v. B.D.O. Seidman, LLP*, 169 F. Supp. 2d 924, 938 (N.D. Ill. 2001)), *report and recommendation adopted,* 2024 WL 3755439 (D. Ariz. Aug. 12, 2024), *aff'd sub nom. Munene v. Mullin*, No. 24-5559, 2026 WL 1758180 (9th Cir. May 29, 2026). That is the case with the discretionary, non-monetary recognition at issue here; SLP's choice of a press strategy is not an adverse action.

Because Plaintiff did not experience any legally sufficient adverse employment actions, her claim fails as a matter of law. *Moore*, 2014 WL 5581046, at *8.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### 2.    *Plaintiff Cannot Show Race-Based Disparate Treatment.*

Plaintiff's race discrimination claim fails for an independent reason:  Her comparator, Mr. Martinez, in addition to being Native American, is also a member of Plaintiff's same protected race.  To establish causation at the *prima facie* stage of her case, "Plaintiff must present evidence that similarly situated individuals who were not members of [her] claimed, protected class, were treated more favorably than [she]." *Collins v. McDonald*, No. LA CV-14-04861 JAK (FFMx), 2017 WL 11646869, at *7 (C.D. Cal. Feb. 23, 2017).  But Mr. Martinez is Hispanic and Latino, and identified as such to SLP, just like Plaintiff.  SOF ¶¶ 1, 32.  As such, Plaintiff's race cannot be a cause—much less a but-for cause—of any differential treatment that allegedly stymied the launch of her career.  For this reason, too, summary judgment is appropriate.  *See, e.g.*, *Ardalan v. Monterey Inst. of Int'l Stud.*, 141 F. App'x 536, 538 (9th Cir. 2005) (affirming summary judgment on Title VII national origin discrimination claim where "it was undisputed that all of the curriculum developer positions were filled by Iranian-Americans from the same protected class as [plaintiff]"); *Murillo v. Ridge on Sedona Golf Resort*, No. CV 04-0901-PCT-JAT, 2006 WL 8440334, at *2 (D. Ariz. Feb. 21, 2006) (finding that plaintiff's argument "that another supervisor, Rodriguez, was treated better than Plaintiff" "does nothing to prove that Plaintiff was discriminated against because of his national origin because Rodriguez is also Hispanic").[2]

### 3.    *Plaintiff Ignores SLP's Non-Discriminatory Communications Policy.*

Finally, even if Plaintiff were not two elements short of a *prima facie* case, SLP had a legitimate reason for the differing media strategies during the ORIGINATIV and El Valle campaigns: its new Communications Policy.  "A neutral company policy is a legitimate non-discriminatory reason to take an employment action." *Johnson v. Donahoe*, 642 F. App'x 599, 610 (6th Cir. 2016); *accord Marinacci v. United States Postal Serv.*, 403 F. Supp. 3d

---

[2] Even setting aside the fact that Plaintiff and Mr. Martinez are members of the same race, Plaintiff has not shown, and cannot show, that she and Mr. Martinez are otherwise similarly situated.  *See* § III.D, *infra*; SOF ¶¶ 3–4, 11–16; 33–39.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

116, 127 (E.D.N.Y. 2017) ("The application of neutral company policies is 'by definition' a legitimate, non-discriminatory reason for a particular action").

That is exactly what occurred here. Following a change in ownership and leadership, SLP promulgated a Communications Policy that made certain executives the team's "designated spokespeople" for media communications, to promote the new leadership to the community. SOF ¶¶ 59–60, Ex. 16. All other employees had to receive approval from SLP's Communications Department before participating in interviews, podcasts, panels, and other public engagements. SOF ¶ 60. This policy led to the different public relations strategies between the ORIGINATIV and El Valle campaigns. *Id.* ¶ 62. This policy is why Plaintiff was not quoted in the El Valle press release. *Id.* ¶¶ 62–63, 86, Ex. 13 (Mitch Decl.) ¶ 7. Plaintiff cannot offer any (let alone sufficient) evidence that SLP's company-wide policy was a pretext to discriminate against her for being Latina.

**B.    Count 2:  Plaintiff's Section 1981 Retaliation Claim Fails.**

"To establish a prima facie case of retaliation, a plaintiff must prove (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two." *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). "Once established, the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for its actions; at that point, the plaintiff must produce evidence to show that the stated reasons were a pretext for retaliation." *Id.*  As with Plaintiff's race discrimination claim, her retaliation claim fails at every stage.

*1.    Plaintiff Did Not Engage in Protected Activity.*

For the purposes of § 1981, "[a]n employee engages in protected activity when [s]he opposes conduct that [s]he reasonably believes to be an unlawful employment practice . . . ***under section 1981***," in other words, "an unlawful practice of racial discrimination." *Hollis v. Randstad N. Am. Inc.*, No. CV-25-02144-PHX-JJT, 2025 WL 1754747, at *2 (D. Ariz. June 25, 2025) (emphasis added).  Protected activity "includes the filing of a charge or complaint," "providing testimony regarding an employer's alleged unlawful practices," or "other activity intended to oppose an employer's discriminatory practices." *Alfonso v. Cmty.*

*Bridges Inc.*, No. CV-21-01305-PHX-DWL, 2023 WL 4933193, at \*19 (D. Ariz. Aug. 2, 2023).  Plaintiff took no such action when she worked for SLP.

Plaintiff now claims that the voice notes she accidentally sent to Mr. Wincott—in which she yelled about not being quoted in the El Valle press release and called Mr. Wincott a "weak f\*\*\*ing leader," SOF ¶ 68, Ex. 19—constitute protected complaints of race discrimination.  Not so.  As courts in this district have repeatedly held, an employee's complaints are not protected activity where they do not specifically allege *race-based discrimination*.  In *Alfonso*, the court held that an email Plaintiff sent to her supervisor—in which she described "a 'hostile work environment'" and complained that "she did not 'feel that [she] [was] receiving equal treatment compared to those in similar situated positions'"— did not qualify as protected activity.  2023 WL 4933193, at \*3.  The court acknowledged that the email "contain[ed] some buzzwords associated with unlawful employment practices" but found that "the actual conduct Plaintiff described" was "unrelated to any 'unlawful employment practices.'"  *Id.* at \*19.  Thus, "[e]ven reading the email in the light most favorable to Plaintiff," it "could not have qualified as a protected activity."  *Id.*

Similarly, in *Bright v. Mercer Advisors*, this Court granted summary judgment for lack of protected activity.  No. 09-CV-2196-PHX-GMS, 2011 WL 1539677, at \*2 (D. Ariz. Apr. 20, 2011), *aff'd,* 502 F. App'x 710 (9th Cir. 2013).  There, the plaintiff had complained that his supervisor "was 'either singling [him] out or harassing [him] or something" and submitted a written complaint that his supervisor "engaged in a discriminatory act against him."  *Id.* at \*3.  But the plaintiff did not complain that the misconduct "had anything to do with Plaintiff's race."  *Id.*  As such, "Plaintiff's complaints" were "not based on unlawful employment practices" and were therefore "not 'protected activities.'"  *Id.*[3]

---

[3] *See also, e.g.*, *Ahuvia v. Wyndham Vacation Resorts, Inc.*, 988 F. Supp. 2d 1184, 1192 (D. Haw. 2013) (finding no protected activity where letter at issue "make[d] approximately half a dozen references to the managers' unfair 'favoritism' toward [co-worker], which is not the same as opposing discrimination against a protected class" and collecting cases); *Coleman v. Home Health Res. Inc.*, 269 F. Supp. 3d 935, 941 (D. Ariz. 2017) ("[E]ven an informal complaint must allege unlawful discrimination").

The same is true here.  In Plaintiff's recordings, which she did not even intend for anyone at SLP to hear, she complained that SLP "f\*\*\*ing did a whole ass article on Shawn who was basically playing my role of being like the cultural expert [on the ORIGINATIV campaign], but now that it's f\*\*\*ing me [on the El Valle campaign], you guys can't even f\*\*\*ing quote me in the article."  SOF ¶ 67, Ex. 18.  But like the plaintiffs in *Alfonso* and *Bright*, Plaintiff here did not "suggest that the differential treatment was due to her membership in any protected class."  *Alfonso*, 2023 WL 4933193, at \*3.  Nor could it have been, since Mr. Martinez and Plaintiff are both Latino/a and Hispanic.  *See* § IV.A.2, *supra*.  Plaintiff also complained that Mr. Wincott did not adequately support her bid to be quoted in the El Valle press release.  But once again, the recording did not attribute this behavior to race discrimination, but instead to Mr. Wincott being "a weak f\*\*\*ing leader" who "never stands up for his team."  SOF ¶ 68, Ex. 19.  As such, Plaintiff's voice notes were not protected activity, and her retaliation claim fails.

### 2. *Plaintiff Did Not Suffer an Adverse Employment Action.*

Plaintiff suffered no cognizable adverse employment action.  *See* § III.A.1, *supra*.[4]

### 3. *Plaintiff Cannot Demonstrate Causation or Pretext.*

Plaintiff's claim fails for a third, independent reason:  she cannot demonstrate the requisite "causal connection" between her alleged protected activity and any alleged adverse employment action.  *Surrell*, 518 F.3d at 1108.  It is Plaintiff's burden to "show 'by a preponderance of the evidence that engaging in the protected activity was one of the reasons for'" an adverse employment action.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064–65 (9th Cir. 2002) (citation omitted).  Here, the undisputed facts show that Plaintiff

---

[4] Although the test for an adverse employment action in a retaliation claim differs somewhat from the test in a race discrimination claim, *see Moore*, 2014 WL 5581046, at \*9, "only 'non-trivial' employment actions can ground a retaliation claim." *Bruner v. City of Phoenix*, No. CV-18-00664-PHX-DJH, 2020 WL 5258295, at \*3 (D. Ariz. Sept. 2, 2020).  This Court's order dismissing Plaintiff's IIED claim already found that being disciplined "for sending the inadvertent voice memo[s] to Wincott and sharing a social media post from her private account about The Campaign" is akin to a triviality.  Doc 73 at 13.

received a written warning, not because of protected activity, but because she violated two of SLP's policies. *See Naeim v. McDonough*, No. 2:19-CV-06126-DDP(AFMx), 2022 WL 743514, at *6 (C.D. Cal. Mar. 11, 2022) (collecting cases for the proposition that policy violations are a legitimate, nondiscriminatory reason for adverse employment actions up to termination). In October 2023, Plaintiff violated the Suns' Culture of Respect Policy by sending Mr. Wincott voice notes profanely demeaning him and other SLP employees and executives. SOF ¶¶ 24, 71, Ex. 7 (Culture of Respect Policy). A few days later, in November 2023, Plaintiff violated the Suns' Social Media Policy by posting Suns content—specifically, videos with audio components and edited content—to her personal Instagram. SOF ¶¶ 70–71. Plaintiff cannot provide any (let alone sufficient) evidence that she received the written warning not for violating these policies but as a pretext for retaliation.

### C.    Count 3:  Plaintiff's Constructive Discharge Claim Fails.

Plaintiff claims that she was constructively discharged in violation of § 1981. As this Court stated: "To succeed on her claim of constructive discharge, Plaintiff must ultimately prove (1) that she 'was discriminated against by [SLP] to the point where a reasonable person in [her] position would have felt compelled to resign' and (2) that she 'actually resigned.'" Doc. 73 at 7 (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)). Plaintiff did resign, but her constructive discharge claim fails for three, independently sufficient reasons.

***First***, the conduct that motivated Plaintiff's resignation was not race-based. As this Court has stated, constructive discharge claims under § 1981, like all § 1981 claims, require proof that race discrimination was a but-for cause of the adverse outcome. *See* Doc. 73 at 7 (citing *Comcast*, 589 U.S. at 341). Here, Plaintiff's own contemporaneous statements confirm that her decision to resign was based on perceived differences in the treatment of herself and Mr. Martinez. *See Rodriguez v. Target Corp.*, No. CV-12-874-TUC-JGZ, 2013 WL 6710343, at *7 (D. Ariz. Dec. 19, 2013) (noting that the court may consider "the employee's proffered reasons for terminating his/her employment" in analyzing constructive discharge). Shortly after resigning, Plaintiff emailed to Kyle Pottinger (still a friend, notwithstanding what she now claims was sexual harassment) explaining her decision:

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

> *I just don't want to be here anymore :)* I got no raise, promotion, or public credit for the El Valle campaign. Shawn got two articles, was allowed to do media, a video, company wide recognition and is now winning an award(s). Happy for him, sad for me.

SOF ¶ 87, Ex. 32 at SLP-MONT-00001783 (emphasis added). Plaintiff provided essentially the same information to SLP in her exit survey and also wrote that SLP could have retained her by treating her equally to Mr. Martinez. SOF ¶ 88, Ex. 33 at SLP-MONT-00001984–85. As explained above, however, any perceived differential treatment between Plaintiff and Mr. Martinez could not have been based on race because both are Latino/a. *See* § IV.A.2, *supra*.

   ***Second***, the conduct about which Plaintiff complains is nowhere near severe and pervasive enough to support a constructive discharge claim. Constructive discharge is an even "higher standard" than a hostile work environment claim and only "occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'" *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (citation omitted). The Ninth Circuit has deliberately "set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007).

   When dismissing Plaintiff's IIED claim, this Court found that, even if all of Plaintiff's allegations were true, she did not suffer any outrageous or extreme conduct. *See* Doc. 73 at 10–13. Likewise, even viewing all facts most favorably to Plaintiff, she did not experience the kind of "extraordinary and egregious" misconduct that would have forced a reasonable person to resign. *See Brooks*, 229 F.3d at 930. Courts have repeatedly held that much *more*

egregious misconduct is insufficient to meet the *lower* hostile work environment standard.[5] Plaintiff therefore cannot meet the *higher* constructive discharge standard. Furthermore, Plaintiff now claims that she consistently suffered discrimination throughout her multi-year tenure with SLP. SOF ¶ 17. As this Court explained when granting summary judgment in *Kunz*, the "fact that Plaintiff continued to work for" SLP for "several years after the discriminatory treatment [s]he complains of commenced, undermines the requirement that [her] working conditions were so sufficiently extraordinary and egregious as to force a reasonable person to quit." 2011 WL 995895, at *5 (internal quotations omitted).

***Third***, a constructive discharge claim will not lie when a plaintiff resigns to begin another position for similar or higher pay. *See Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1161 (D. Ariz. 2016) (no constructive discharge where plaintiff resigned "only after he received an offer for a higher-paying job"). Here, Plaintiff resigned only after she became engaged to a well-known radio personality, Tino Cochino, who offered her a "golden ticket" to financial freedom. SOF ¶ 80–81, Ex. 28 at MON0672. He offered to support Plaintiff if she did not want to work and also gave her the option to work for his radio company. SOF ¶ 81–82. Plaintiff opted for the latter, so Mr. Cochino created a new position for her and intentionally set her salary to be roughly equivalent to (actually higher than) her salary at SLP. *Id.* ¶ 8, 92. Plaintiff married Mr. Cochino on February 18, 2024; left SLP on or around February 19; and received her first paycheck from Mr. Cochino's radio show on February 20. *Id.* ¶¶ 90–91, 93, Ex. 34 (check stub). For this reason, too, SLP is entitled to summary

---

[5] *See, e.g.*, *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1036 (9th Cir. 1991) (no hostile work environment where Hispanic officers, *inter alia*, observed racially offensive cartoon, heard racially offensive slurs, received unsafe vehicles, and did not receive adequate police backup); *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 644 (9th Cir. 2003), *as amended* (Jan. 2, 2004) ("allegedly harassing incidents, which occurred over the course of more than one year and only two of which contained racially related epithets, did not create a hostile work environment"); *Mendoza v. Sysco Food Servs. of Arizona, Inc.*, 337 F. Supp. 2d 1172, 1185, 1190 (D. Ariz. 2004) (no hostile work environment where Plaintiff "was subjected to co-workers' statements derogatory to his national origin after he killed a rat in the warehouse" and "about Mexicans failing to return to work during the Holidays").

judgment on the constructive discharge claim.  *See Day*, 174 F. Supp. 3d at 1161; *see also Mead v. Bank of Am.*, No. 3:06CV00626-HDM-VPC, 2008 WL 706632, at *7 (D. Nev. Mar. 14, 2008) (in ADA case, granting summary judgment where "plaintiff had already secured" another job, which "clearly belies her claim of constructive discharge").

**D.    Count 4:  Plaintiff Cannot Establish an Equal Pay Act Claim.**

Plaintiff asserts an EPA claim because Mr. Martinez was paid more than she.  EPA claims "have just two steps: (1) the plaintiff bears the burden to establish a prima facie showing of a sex-based wage differential; (2) if the plaintiff is successful, the burden shifts to the employer to show an affirmative defense." *Rizo v. Yovino*, 950 F.3d 1217, 1223 (9th Cir. 2020).  This claim fails because she and Mr. Martinez had fundamentally different jobs.

An EPA claim can only succeed if "'the employer pays different wages to employees of the opposite sex for **substantially equal work**." *Stone v. Charles Schwab & Co. Inc.*, No. CV-24-03047-PHX-SMB, 2025 WL 2829563, at *4 (D. Ariz. Oct. 6, 2025) (emphasis added) (quoting *Rizo*, 950 F.3d at 1222).  The "crucial" issue "is whether the jobs to be compared have a 'common core' of tasks." *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1220 (9th Cir. 2021) (citation omitted).  "It is the overall job, not its individual segments, that must form the basis of comparison." *Gunther v. Washington Cnty.*, 623 F.2d 1303, 1309 (9th Cir. 1979), *aff'd,* 452 U.S. 161 (1981).  "As a result, no equal pay act claim lies where the two jobs in question have a significant difference in duties." *Thomson v. Mentor Graphics Corp.*, No. CV-03-1350-ST, 2004 WL 2584022, at *9 (D. Or. Nov. 12, 2004), *report and recommendation adopted as modified,* 2005 WL 8177018 (D. Or. May 18, 2005).

Here, Plaintiff admits that she never held the same position, or even worked in the same department (Live Presentation), as Mr. Martinez.  SOF ¶ 11; *see Arce v. Honeywell Int'l Inc.*, No. CV-21-00768-PHX-GMS, 2024 WL 405065, at *4 (D. Ariz. Feb. 2, 2024) (granting summary judgment on EPA claim where comparator had "a different position in a different department"), *aff'd,* No. 24-1220, 2025 WL 3564654 (9th Cir. Dec. 12, 2025).  Mr. Martinez also performs many job duties "that are dissimilar to the duties that Plaintiff perform[ed]," *Kob v. Cnty. of Marin*, No. C 07-2211 JL, 2009 WL 10680775, at *3 (N.D.

Cal. Nov. 25, 2009), *aff'd,* 425 F. App'x 634 (9th Cir. 2011), including planning the long-term strategy of the live presentation and entertainment department and attending, directing, and overseeing live entertainment at Suns and Mercury home games and other arena events. SOF ¶ 38, Ex. 11 (Martinez Decl.) ¶¶ 15–18, Ex 12 (Martinez job description). Plaintiff admits that this was not her role. SOF ¶¶ 14–16. In addition, Mr. Martinez heads an entire department with 10 employees and manages its approximately $1.4 million annual budget; Plaintiff never led any department and supervised only one other full time employee. SOF ¶¶ 12–13, 37; *see Kob,* 2009 WL 10680775, at *3 (granting summary judgment on EPA claim because of significant difference between budgetary and fiscal duties of plaintiff, a manager, and the leader of an entire department).

Nor did Plaintiff and Mr. Martinez have even remotely similar experience and skills. *See, e.g.*, *Rexroat v. Arizona Dep't of Educ.*, No. CIV. 11-1028-PHX-PGR, 2013 WL 85222, at *1–2 (D. Ariz. Jan. 8, 2013) (comparable jobs must "require substantially equal skill, effort, and responsibility," which "takes into account factors such as experience, training, and ability"); *see also Rizo*, 950 F.3d at 1222 (EPA allows "a differential based on any other factor other than sex" (emphasis omitted) (quoting 29 U.S.C. § 206(d)(1))). Plaintiff's position with SLP was her first time working for a professional sports team, and she had just three years of prior marketing experience out of college working for Wingstop (the chicken wing restaurant chain). SOF ¶¶ 2–4. Mr. Martinez, by contrast, became SLP's Senior Director of Live Presentation after more than 18 years working for professional sports teams, which provided him with substantial skills and experience in in-arena entertainment. *Id.* ¶ 33, Ex. 11 ¶¶ 3–8. Experience matters, and the Equal Pay Act does not require Plaintiff and Mr. Martinez to receive equal pay despite this significant gap in experience.

### E.    Count 8:  Plaintiff's ACRA Sex Harassment Claim Fails.

#### 1.    *Plaintiff Failed to Exhaust her Administrative Remedies.*

The Arizona Civil Rights Act ("ACRA") "requires an employee to file a charge with the Arizona Civil Rights Division ["ACRD"] within 180 days of an alleged violation, A.R.S. § 41–1481(A) (2018), and an employee who does not do so loses her right to sue." *Peterson*

-14-

*v. City of Surprise*, 244 Ariz. 247, 251 (Ct. App. 2018); *accord Cox v. Glob. Tool Supply LLC*, 629 F. Supp. 3d 963, 970 (D. Ariz. 2022) (Snow, J.) ("Failure to timely comply with § 41-1481 bars the claim."). "A 'non-timely complaint' is fatal to a court's jurisdiction over an ACRA claim." *Stone v. Charles Schwab & Co. Inc.*, No. CV-24-03047-PHX-SMB, 2025 WL 2829563, at *3 (D. Ariz. Oct. 6, 2025) (quoting *Ornelas v. Scoa Indus., Inc.*, 120 Ariz. 547, 548 (Ct. App. 1978)). Here, Plaintiff did not file her complaint with the ACRD until November 7, 2024, roughly 260 days after she quit SLP and more than a year after any alleged sex discrimination. SOF ¶ 94, Ex. 35 (ACRD complaint). The ACRD dismissed her entire complaint as untimely, *see* SOF ¶ 95, Ex. 36 (dismissal letter), meaning that Plaintiff has no right to sue under the ACRA. Plaintiff herself has implicitly conceded that her state law claims are barred, dismissing her other ACRA claims already. *See* Doc. 56. This alone is dispositive. *See, e.g.*, *Cox*, 629 F. Supp. 3d at 972 (granting "summary judgment in favor of Defendant" where "Plaintiff's ACRA charge was untimely filed").

### 2.      *Plaintiff's Sex Harassment Claim Fails on the Merits.*

Even if it had been exhausted, Plaintiff's sex harassment claim still fails for at least three reasons. ***First,*** Plaintiff's relationship with Mr. Pottinger cannot support a hostile work environment claim, as that relationship was not "unwelcome."[6] *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (hostile work environment claim requires that the "verbal or physical conduct of a sexual nature . . . was unwelcome").[7] A key inquiry is whether the plaintiff "***by her conduct***" indicated that the alleged sexual advances were

---

[6] To the extent that Plaintiff intends to state a *quid pro quo* claim based on her relationship with Mr. Pottinger, that claim also fails. Plaintiff "has not identified any tangible employment action that [Mr. Pottinger] allegedly took against her as a result of her rejection of his alleged sexual advances." *Leskinen v. Perdue*, 837 F. App'x 447, 449 (9th Cir. 2020) (interpreting Title VII). As explained above, Plaintiff did not experience any negative tangible employment actions, *see* § IV.A.1, *supra*, let alone any at the hand of Mr. Pottinger, who was never her supervisor. *See* SOF ¶¶ 5, 55–57.

[7] "[F]ederal Title VII case law," such as *Craig*, is "persuasive in the interpretation of [Arizona's] Civil Rights Act" because the ACRA "is modeled after and generally identical to . . . Title VII." *Higdon v. Evergreen Int'l Airlines, Inc.*, 138 Ariz. 163, 165 n.3 (1983).

-15-

unwelcome." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (emphasis added) (case cited with approval in *State, Dep't of Admin. v. Schallock*, 189 Ariz. 250, 259 (1997)).

Plaintiff's conduct shows the opposite. Plaintiff exchanged dozens of pages of eager, flirtatious text messages with Mr. Pottinger. SOF ¶ 51, Ex. 15; *see Carbajal v. Hayes Mgmt. Serv., Inc.*, 343 F.R.D. 192, 197 (D. Idaho 2022) (noting that text message exchanges could demonstrate that conduct was not unwelcome). To take just a few of the many examples, Plaintiff texted Mr. Pottinger that she "had [the] best time" during their first date, that she "loved hanging with [him]," that she "ha[d] a crush on [him] now," that she was "glad [he] kissed [her]" and "wanted [him] to kiss [her] again," and that she was "smil[ing] too much" after a date. SOF Ex. 15 at MON0156, -159, -172, -181. Plaintiff even reached out to Mr. Pottinger *months* after their last date, complaining about his "mixed signals" and stating that he should not "expect [her] to go chasing [him]." *Id.* at MON0227. Plaintiff also never reported anything related to Mr. Pottinger to SLP, as she acknowledged in testimony. SOF ¶ 53; *see Chesier v. On Q Fin. Inc.*, 382 F. Supp. 3d 918, 924 (D. Ariz. 2019) ("one factor for a court to consider in assessing unwelcomeness is '[w]hether and, if so, when, plaintiff reported or complained about any of the incidents at issue'").

***Second***, the two sex-based comments Plaintiff alleges she experienced in the workplace were not "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Israel v. U.S. Bank, NA*, 653 F. Supp. 3d 685, 697 (D. Ariz. 2023) (Snow, J.) (quoting *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1206 (9th Cir. 2016)). Plaintiff claims Mr. Martinez asked her if she was a lesbian, and a contractor, Ben Kirschner, discussed a sexually suggestive mural on a lowrider car. The facts surrounding both incidents are disputed—but even if Plaintiff's claims are credited, two such isolated comments "are not enough to create a hostile work environment." *Ohton v. City of Phoenix*, No. CV-06-360-PHX-MHM, 2007 WL 4405006, at *9 (D. Ariz. Dec. 13, 2007); *see also Sterrett v. Sierra Sw. Co-op Servs., Inc.*, No. 4:09-CV-531-TUC-CKJ, 2011 WL 3924861, at *12 (D. Ariz. Sept. 7, 2011) ("seven individual incidents over a one year period" did not create a hostile work environment); n.5, *supra*.

***Third***, SLP is not liable for any misconduct by its employees because it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [SLP] or to avoid harm otherwise." *Holly D. v. California Inst. of Tech.*, 339 F.3d 1158, 1177 (9th Cir. 2003) (describing *Faragher/Ellerth* doctrine). SLP's sexual harassment policy provides a range of reporting options. SOF ¶¶ 21, 23, Ex. 6 (employee handbook) at SLP-MONT-00000133, -143, Ex. 7 at SLP-MONT-00001804, -1808–10. Plaintiff never reported that Kyle Pottinger behaved inappropriately (presumably because their brief relationship was consensual); in fact, she took steps to keep their relationship secret. SOF ¶¶ 53–54. Likewise, she never reported Mr. Martinez's alleged comment before her lawsuit. *Id.* ¶ 98. Her claims fail as a result. *See, e.g.*, *Rios v. Arizona*, No. CIV-08-01246-PHX-MHB, 2010 WL 11515493, at *5 (D. Ariz. May 26, 2010) (granting summary judgment where defendant's "policy against sexual harassment" "provide[d] a procedure for making complaints" and the plaintiff failed to report the alleged harassment).

Finally, because Mr. Kirschner is *not* an SLP employee (SOF ¶ 74, Ex. 5 (Corbitt Decl.) ¶ 36), SLP could be liable only if it "either ratifie[d] or acquiesce[d] in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Gharadaghian-Riccio v. DMB Sports Clubs LP*, No. CV-20-00431-PHX-GMS, 2021 WL 3290454, at *2 (D. Ariz. Aug. 2, 2021) (quoting *Folkerson v. Circus Circus Enters, Inc.*, 107 F.3d 754, 755–56 (9th Cir. 1997)). SLP did the opposite. Once Plaintiff reported this incident to SLP's People & Culture Department, SLP contacted the third parties coordinating with Mr. Kirschner, who ensured that Mr. Kirschner understood and would abide by SLP's workplace standards. SOF ¶ 75, Ex. 5 ¶ 36, Ex. 24 (email re Mr. Kirschner) at SLP-MONT-00002433. In addition, SLP provided Mr. Wincott with coaching to ensure that he would report any misconduct in the future. SOF ¶ 76, Ex. 5 ¶ 35, Ex. 25 (email re coaching).

## IV.   CONCLUSION

For these reasons, SLP respectfully requests summary judgment in its favor.

DATED:  July 31, 2026                    MUNGER, TOLLES & OLSON LLP


By:  */s/ Malcolm A. Heinicke*
     Malcolm A. Heinicke (*pro hac vice*)
     560 Mission Street, Twenty-Seventh Floor
     San Francisco, California 94105-2907

     Attorneys for Defendant
     Suns Legacy Partners, L.L.C.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT