# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CHELSEA MONTES,                         )

                                        )

         PLAINTIFF,                     )

                                        )

     VS.                                )   NO. 2:25-CV-01295-

                                        )       PHX-GMS

SUNS LEGACY PARTNERS, L.L.C.,)

                                        )

         DEFENDANTS.                    )

_____)


VIDEOTAPED DEPOSITION OF CHELSEA MONTES

THURSDAY, APRIL 2, 2026


REPORTED BY:

S. SAMANTHA RAE, CSR 10627

JOB No. 7956809

Page 1

VIDEOTAPED DEPOSITION OF CHELSEA MONTES, TAKEN
ON BEHALF OF THE DEFENDANTS, AT 2415 E. CAMELBACK
ROAD, SUITE 800, COMMENCING AT 9:30 A.M., ON
THURSDAY, APRIL 2, 2026, BEFORE S. SAMANTHA
RAE, CSR 10627.


APPEARANCES OF COUNSEL:


    FOR THE PLAINTIFF:
            IBF LAW GROUP, PLLC
            BY:  SHEREE WRIGHT, ESQ.
                 CORTNEY WALTERS, ESQ.
                 CHLOE WOODS, ESQ.
            3815 EAST BELL ROAD
            SUITE 2100
            PHOENIX, ARIZONA 85032
            602-833-1110
            SHEREE@IBFLAW.COM
            CWALTERS@CEWLAWOFFICE.COM

    FOR THE DEFENDANTS:
            MUNGER TOLLES & OLSON LLP
            BY:  MALCOLM HEINICKE, ESQ.
                 TAYLOR BENNINGER, ESQ.
            350 S GRAND AVENUE
            50TH FLOOR
            LOS ANGELES CALIFORNIA  90071
            213.683.9224
            MALCOLM.HEINICKE@MTO.COM
            TAYLOR.BENNINGER@MTO.COM

    ALSO PRESENT:
            TOM GONZALEZ, VIDEOGRAPHER

Page 2

INDEX

WITNESS                    EXAMINATION                PAGE

CHELSEA MONTES

                          BY MR. HEINICKE          6


                QUESTIONS INSTRUCTED NOT TO ANSWER:

                          (NONE)



                     INFORMATION REQUESTED:

                          (NONE)

Page 3

if I get this wrong, previously your legal name was Chelsea Chaidez.

Am I saying that correctly?

A.   That's correct.

Q.   And your name on your social media account    09:40 is Chelsea Vega; is that correct?

A.   That's correct.

Q.   Has Chelsea Vega ever been your legal name?

A.   Not yet.

Q.   Not yet.                                        09:41

Are you planning to make it your legal name?

A.   Yes.

Q.   And when do you plan to do that?

A.   I haven't decided yet.                          09:41

Q.   Okay.  Is there a particular reason that you're planning to make that your legal name?

A.   It sounds better.

Q.   That's a good reason.

And why is it important to you that your     09:41 name sounds better?

A.   I am a marketer.

Q.   Okay.  And so when you go out into the world and market yourself and whomever you're working for, you want your name to sound good?    09:41

Page 16

A.   Correct.

Q.   So it is important to you how you're perceived in the public?

A.   Yes.

Q.   Okay.  And important enough to change your   09:41 name to make it sound good?

A.   Yes.

Q.   Okay.  So Chelsea -- was Chelsea Chaidez your name at birth?

A.   Yes.                                           09:42

Q.   And then Chelsea Montes was your name later.  Have you used any other names or aliases?

A.   No.

Q.   Okay.  Including Chelsea Vega.  I understand.                                         09:42

So other than Chelsea Montes, Chelsea Chaidez, and Chelsea Vega, you've never used any other names legally or as aliases?

A.   Correct.

Q.   Okay.  Thank you.                              09:42

Where were you born?

A.   California.

Q.   Where in California?

A.   Downey.

Q.   I'm a Southern Californian myself.            09:42

Page 17

When was that?

A.   As in what year?

Q.   Yes.  Sorry.  What year were you born?

A.   1994.

Q.   And if I'm understanding correctly, you   09:42
identify as Latina?

A.   Yes.

Q.   Okay.  Would you also identify as Hispanic?

A.   Yes.

Q.   And as Mexican American?   09:43

A.   Yes.

Q.   Do you identify as any other race or
ethnicity?

A.   Chicana.

Q.   Thank you.   09:43

Anything else?

A.   Can you repeat the question?

Q.   Sure.

You told us that you identify as Latina,
Hispanic, Mexican American and Chicana.  Is there   09:43
any other racial or ethnic identity that you claim?

A.   No.

Q.   And what is the highest level of education
you've received?

A.   I have a -- I have two bachelor degrees.   09:43

Page 18

Q. Okay. And those are from Arizona State; correct?

A. Correct.

Q. And when did you graduate and receive those degrees?                                        09:44

A. 2016.

Q. Thank you.

And your degrees are in marketing and psychology; correct?

A. Correct.                                                    09:44

Q. And after graduating, you did marketing work for Wing Stop.

Do I understand that correctly?

A. Correct.

Q. And you worked for Wing Stop from 2016        09:44 until you started with the Suns in 2019?

A. I started with Wing Stop in 2017.

Q. And then you worked with Wing Stop continuously until you started with the Suns in 2019; correct?                                          09:44

A. Correct.

Q. What was your salary and your marketing position at Wing Stop?

A. I was a marketing coordinator. And my salary, I don't recall exactly. Best estimate,        09:44

Page 19

45,000.

Q.   A year.

A.   Yes.

Q.   Thank you.

Okay.  And so you left Wing Stop in 2019.   09:45
Is that right?

A.   Yes.

Q.   And why did you leave Wing Stop?

A.   Because I got the position with the Suns.

Q.   Okay.  So your departure from Wing Stop was   09:45
voluntary.  It was your choice; right?

A.   Correct.

Q.   Did you ever complain about harassment or
discrimination at Wing Stop?

A.   No.                                           09:45

Q.   Did you ever receive any discipline,
warnings or, you know, admonitions --

A.   No.

Q.   -- of the like while you were at Wing Stop?

A.   No.                                           09:45

Q.   Did you hold any other full-time employment
between graduating from college and starting with
the Suns other than the Wing Stop job?

A.   No.

Q.   And are you currently married?              09:45

Page 20

A.  I am getting divorced.

Q.  I see.

So you're in the process of a divorce now?

A.  Yes.

Q.  And the reason you hesitated on the question is there's maybe some question as to whether the divorce is final or not at this point?                09:46

A.  I hesitated because legally I am married.

Q.  I see.  No, that's what I'm trying to understand.  I'm not questioning the hesitation.  I want to understand the reason.                09:46

So you're in a divorce proceeding now, but because the divorce proceeding is not final, at this point you are technically married?

A.  Technically, yes.                09:46

Q.  And have you been married before this current marriage, which is going through the divorce proceeding?

A.  Yes.

Q.  Okay.  How many times have you been married before?                09:46

A.  Once.

Q.  Okay.  And that's different than this marriage that is going through the divorce proceeding?                09:46

Page 21

A.    Correct.

Q.    Okay.  And to whom were you married in your first marriage?

A.    I believe it's irrelevant, to be honest. But I will answer your question.                    09:47

Q.    Okay.

A.    Do you want his name?

Q.    Yes, please.

A.    Andy Contreras.

Q.    C-O-N-T-R-E-R-A-S?                              09:47

A.    Yes.

Q.    Okay.  And when were you married to Mr. Contreras?

A.    2017 to 2018.

Q.    Okay.  And you obtained a divorce in 2018      09:47 from Mr. Contreras?

A.    That is my best estimate, yes.  It was a long time ago.

Q.    But you and Mr. Contreras are now divorced?

A.    Yes.                                           09:48

Q.    Where were you living when you were married to Mr. Contreras?

A.    As in the city?

Q.    Yes.

A.    Buckeye, Arizona.                              09:48

Page 22

Q.   Did Mr. Contreras have anything to do, employed with, connected with in any way with Wing Stop?

A.   No.

Q.   What did Mr. Contreras do for a living when  09:48 you were married to him?

A.   He worked at a retail store.

Q.   And can you just tell us briefly what was the reason you got divorced?

A.   Differences.                                     09:48

Q.   Second marriage, what was the name of the person to whom you were married in your second marriage?

A.   Guadalupe Montes.

Q.   And does Mr. Montes have any aliases?        09:49

A.   Yes.

Q.   Can you tell me what they are?

A.   Tino Cachino.

Q.   Are there any other names that Mr. Montes goes by, to your knowledge?                          09:49

A.   Not that I know of.

Q.   How did you meet Mr. Montes?

A.   Mutual friends.

Q.   Was it a professional connection?  Was the mutual friends who introduced you somehow connected  09:49

Page 23

with your work?

A.   Yes.

Q.   And your work at the Suns?

A.   No.

Q.   Okay.  So what was the work connection that   09:50
led you to meet Mr. Montes?

A.   My work within Wing Stop.

Q.   When did you meet Mr. Montes?

A.   2017.

Q.   Okay.  And you say it was through your work   09:50
at Wing Stop, meaning your marketing work at Wing
Stop and mutual friends brought you in contact with
Mr. Montes?

A.   Yes.

Q.   And when did your romantic relationship   09:50
with Mr. Montes begin?

A.   October of 2023.

Q.   Very good.

So you knew him for approximately six years
before you began a romantic relationship?   09:51

A.   Through social media.

Q.   When you met him in 2017, did you meet him
in person?

A.   I believe we connected through social media
first.   09:51

Page 24

Q.   Very good.

When is the first time that you met Mr. Montes in person?

A.   I don't remember.

Q.   Okay.  Presumably it was before October   09:51
2023, or is that the first time that you met him when your romantic relationship started?

A.   I met him years before that.

Q.   Okay.  So not in 2017, but years before 2023 was when you first met Mr. Montes in person?   09:52

A.   I met him somewhere in 2017.

Q.   Okay.  And got it.

And then the relationship continued on a friendly basis until October 2023 when you started dating; is that correct?   09:52

A.   Correct.

Q.   Okay.  Who pursued whom in the dating, if I can ask you just bluntly?  Were you the one who initiated with him or was he the one who initiated a romantic relationship after these years of   09:52
friendship with you?

A.   He did.

Q.   And how long did you two date exclusively before you got married?

A.   Four months.   09:52

Page 25

Q.   And when did you get engaged?

A.   November of 2023.

Q.   Okay.  And my notes say you got married on February 18th, 2024; is that correct?

A.   It sounds correct.                              09:53

Q.   Well, I'm just -- I can ask it this way: What was your wedding date?

A.   February 18th.

Q.   And you were married in Las Vegas; is that correct?                                            09:53

A.   Correct.

Q.   Okay.  And was news of your wedding posted on social media?

A.   Yes.

Q.   Okay.  So you met him in October of 20- --   09:53 excuse me.

You began your dating or romantic relationship in October of 2023 and you were married in February of 2024.

By some people's standards, that could be   09:53 considered a quick courtship.  But let me ask a question:  What was it about Mr. Montes that made you want to marry him after dating a few months?

MS. WALTERS:  Objection; relevance.

///                                              09:54

Page 26

BY MR. HEINICKE:

Q.   You can answer.

A.   He seemed like a good guy.

Q.   Anything else?

A.   There were many things.                          09:54

Q.   Okay.  Was there anything that attracted
you to him that had anything to do with your career?

A.   No.  He seemed like a good guy.

Q.   And after you got married, you changed your
name?                                                 09:54

A.   Correct.

Q.   And when did you first contemplate getting
a divorce from Mr. Montes?

A.   It's hard to say.

Q.   Okay.  When did the divorce proceeding        09:54
start?  When did you file for divorce?

A.   April 2025.

Q.   So presumably sometime before you filed for
the divorce, you and he discussed getting a divorce.
So my question to you is:  When did you start         09:55
contemplating getting a divorce?

A.   It's hard to say.

Q.   Okay.  What was -- did you want a divorce?

A.   That's difficult to answer with a "yes" or
"no."                                                 09:55

Page 27

Q.   Okay.  Answer it how you see fit.  Was a divorce something that you were looking to accomplish, or was he looking to accomplish, or was it a mutual decision?

A.   I think that's a really -- my answer to    09:55 that is that that's a difficult question to answer with "yes" or "no."

Q.   Again, I'm not asking you to answer it with a "yes" or "no."

Tell me -- let me ask you this:  What led    09:56 to your divorce?

A.   Problems.

Q.   Okay.  Was he unfaithful to you?

A.   I don't know.

Q.   And were any of the problems that led to    09:56 your divorce in any way related to your career?

A.   Can you repeat the question?

Q.   Sure.  You told us there were problems that led to your divorce.  Not a surprising answer.

And my question is:  Were any of the    09:56 problems that led to your divorce related to your career?

A.   No.  Not that I can think of at the moment.

Q.   Okay.  Gathering from this conversation, I will just ask it:  Is it fair to say that this    09:57

Page 28

when you reviewed it?

A. Yeah.

Q. Okay. And as we sit here today, do you stand by the accuracy of the contents of this complaint that was filed on your behalf?                    10:04

MS. WALTERS: Objection. Can she have a moment to read through the whole document before you...

THE WITNESS: Okay.

BY MR. HEINICKE:                                              10:04

Q. Let me try it this way to try to save time.

Do you have any reason to believe that the complaint that was filed on your behalf contains inaccurate allegations?

A. No. But I think I should read it.       10:04

Q. Well, you just testified that you read it before and reviewed it before it was filed. I'll say to you it hasn't changed since this was filed.

So my question to you is: When you read it and reviewed it the first time, did you then believe  10:04 its contents were accurate?

A. Yes. But I think I should review the document that you have in front of me that you are going to question on. Right?

Q. I will get to the questions, and you will    10:05

Page 34

absolutely have a chance to look at it when I ask the questions.  But my question is a simple one, which I think you already answered.

Which is:  When you reviewed this earlier, at that point in time you believed its contents and allegations were accurate; correct?                          10:05

A.   Well, when you presented this, you asked me if I recognized it, and I said no.  And so I would like to make sure that my testimony is accurate by first reading through the document, and then I can answer your question.                                      10:05

Q.   Okay.  And after I asked you if you recognized it, and you said no, I followed up and asked you if you reviewed this before it was filed on your behalf.  And you said you thought so.     10:05

So which is it?  Did you review this document before it was filed, or not?

A.   I don't remember.

Q.   Okay.  So as you sit here today, you can't tell me whether the contents of this document are      10:05 accurate or not?

A.   Presently at this moment in time, where I have not read the document, I cannot.

Q.   Very good.  Okay.  We can put this aside for now.                                                   10:06

Page 35

You started working for the Suns in May of 2019; correct?

A.    Yes.

Q.    Your original role was marketing coordinator, comma, media; is that correct?    10:06

A.    Correct.

Q.    What was your salary as a marketing coordinator, media?

A.    41,500.

Q.    Annually?    10:06

A.    Yes.

Q.    Okay.  And does that figure include bonuses?

A.    No.

Q.    Okay.  And when you first started in this    10:06 position, you reported to Ashley Austin; is that correct?

A.    Correct.

Q.    And Ashley was a marketing manager?

A.    Correct.    10:06

Q.    Okay.  And then you started in 2019. Obviously, in the spring of 2020, we had the COVID pandemic.

Can you just briefly tell me how the COVID pandemic affected the Suns' organization from your    10:07

Page 36

perspective.

A.   The league shifted to virtual games.

Q.   And were there reduced operations for the organization?

A.   It depends.                                          10:07

Q.   Okay.  Were people working from home?

A.   Yes.

Q.   And were employees let go?

A.   Yes.

Q.   Okay.  And was Ms. Austin let go during the   10:07 pandemic?

A.   Yes.

Q.   Okay.  And after Ms. Austin was let go, Graham Wincott became your sole direct supervisor; correct?                                                     10:07

A.   Correct.

Q.   And his title was senior -- excuse me.  His title was senior director of marketing?

A.   Correct.

Q.   And Mr. Wincott's supervisor at the time   10:07 was Brook Campbell?

A.   That's correct.

Q.   And she was the vice president of marketing?

A.   Correct.                                            10:08

Page 37

Q.   Okay.  So just to -- and I think you already testified to this earlier, but just to make sure I have it.

So during your time at the Suns, your only direct supervisors over the course of your tenure were Graham and Ashley; correct?     10:08

A.   Correct.

Q.   And during your entire tenure at the Suns, your only indirect supervisors were Brook Campbell, Dean Stoyer, and Jeff Chieng; is that correct?     10:08

A.   Can you define "indirect supervisor"?

Q.   Sure.  Thank you for asking.

Graham and Ashley were your two direct supervisors.  I'm trying to figure out who were their supervisors.     10:08

So if we call it your supervisors' supervisors, my understanding is your only three indirect supervisors using that definition at the Suns were Brook Campbell, Dean Stoyer, and Jeff Chieng; is that correct?     10:09

A.   No.

Q.   Okay.  Who else was Graham or Ashley's direct supervisor?

A.   I believe at some point Graham reported to Kim Corbitt.  And I believe at some point Graham     10:09

Page 38

reported to Josh.

Q. Very good. Okay.

And when you say "Josh," you mean Josh Bartelstein?

A. Correct.                                                    10:09

Q. So over the course of your entire tenure at the Suns, it's your understanding that your only indirect supervisors, as we have defined that term, were Brook Campbell, Dean Stoyer, Jeff Chieng, Kim Corbitt and Josh Bartelstein; is that correct?      10:10

A. What was the supervisor definition again?

Q. Sure. So you've told us your only direct supervisors were Ashley and Graham. And I asked you about your indirect supervisors, you said what does that mean? And I said that that the means people to   10:10 whom Ashley and Graham reported. The people supervised by Ashley and Graham.

So with that definition from what you've told us, my understanding is your only indirect supervisors over the course of your tenure were   10:10 Brook Campbell, Dean Stoyer, Jeff Chieng, Kim Corbitt, and Josh Bartelstein; is that correct?

A. By that definition, yes.

Q. And you were next promoted to senior marketing coordinator media; is that right?      10:11

Page 39

A.    Yes.

Q.    And you got that promotion in August of 2021?

A.    That sounds around the correct time.

Q.    Okay.  Within a month or so, that's when    10:11
you got that promotion?

A.    Yes.

Q.    Okay.  Who made the decision to give you that promotion?

A.    That's difficult to say.                    10:11

Q.    Okay.  Who communicated to you that you received the promotion?

A.    Brook Campbell and Graham Wincott.

Q.    And at the time, they were your supervisor and indirect supervisor; correct?                 10:12

A.    Yes.

Q.    Okay.  Do you have any reason to believe, given that they were your supervisors and that they communicated this decision to you, that they themselves did not make the decision to give you    10:12
that promotion?

A.    Can you repeat the question?

Q.    Sure.
      You've told us that Brook and Graham communicated the decision to promote you.  You told    10:12

Page 40

us that Brook and Graham were your indirect and direct supervisor at the time.

So logic would suggest that both of them either made the decision or played a part in the decision to give you this promotion.          10:12

My question to you is:  First, to your knowledge, did Graham and Brook make the decision to promote you?

A.   Yes.

Q.   What was your salary as a senior marketing   10:12 coordinator, media?

A.   45,000.

Q.   So you got a salary increase with this promotion?

A.   I got a 3,000 dollar raise, I believe.       10:13

Q.   And that was because your title increased?

A.   I would assume so.

Q.   Okay.  Well, your understanding is that at the Suns salary is tied to title; correct?

A.   I'm not sure.                                 10:13

Q.   You don't know one way or the other?

A.   No.

Q.   Okay.  Do you know who set this new salary for you?

A.   No.  Not that I can speculate.               10:13

Page 41

Q.   Well, you mean you could speculate, but you don't know for certain who set that salary for you?

A.   Correct.

Q.   Okay.  That's fine.

I mean, you've already told us you don't   10:14 know how salaries are set at the Suns.  So thank you for not speculating.

In that position, do you know who decided whether you got a bonus or not?

A.   I assume either Brook or Graham.   10:14

Q.   But you don't know?

A.   I'm not sure.  Not for certain.

Q.   And when you were in this position, did you receive bonuses?

A.   I don't remember.   10:14

Q.   Okay.  You were next promoted to marketing manager; is that correct?

A.   Correct.

Q.   And my note suggests you got that promotion in January of 2022.   10:14

Does that sound correct?

A.   Yes.

Q.   What was your salary in 2022 in your first year as a marketing manager?

A.   60,000.   10:14

Page 42

Q.   And again, you don't know how that salary was set or whether it was tied to your title?

A.   Correct.

Q.   Okay.  What was your salary in 2023, your second year as a marketing manager?          10:15

A.   I don't remember.

Q.   Okay.  Did it stay the same at 60,000 dollars or did it increase in 2023?

A.   I don't remember exactly.

Q.   I'm not -- I'm not asking you to remember    10:15 exactly.  So let me be clear:  My understanding is you complained about your compensation.  You feel your compensation was inadequate, other things like that.

I will just phrase this as a question.  I'm  10:15 not asking you to tell me whether what your exact salary was at the start of 2023.

I'm asking you whether you remember if your salary increased from the 60,000 dollars you were being paid in 2022 to a higher salary in 2023?      10:16

A.   I don't remember.

Q.   So I just want to make sure I'm clear on this, because it seems to me that one of the things you had issue with with the Suns was your level of compensation; correct?                          10:16

Page  43

A.   Correct.

Q.   Okay.  And 2023 is three years ago.  Not that long ago.  But you don't remember, one way or another, whether your salary increased in 2023?

A.   The reason why is Robert Sarver, because of  10:16 the discrimination claims, handed out a 20,000-dollar bonus --

Q.   Okay.

A.   -- to employees who had been there for -- I don't even remember.  But they gave out that bonus.  10:17 But that was not based off of my job.

Q.   Okay.

A.   So it's hard to separate.  I don't remember.

Q.   Okay.  So let me try it this way:  Putting  10:17 aside this one-time bonus, is it your best recollection that in 2023, given the fact that your title didn't change in 2023, that your salary remained 60,000 dollars exclusive of bonuses in 2023?                                                10:17

A.   I don't remember.

Q.   All right.  So during your entire time as marketing manager, you reported to Graham Winicott -- excuse me, Wincott; correct?

A.   Correct.                                       10:18

Page 44

Q.   And in December of 2022 --

A.   Well, officially I reported to Graham
Wincott.

Q.   Understood.

And in December of 2022, Matt Ishbia bought   10:18
the Suns; correct?

A.   I don't know exactly, but that sounds about
right.

Q.   Okay.  Very good.  I mean, obviously we can
document these facts.  I am just trying to set       10:18
context so we understand what we're asking about.

And in the spring of 2023, Josh Bartelstein
came on as the CEO.  Does that sound about right?

A.   It sounds about right.

Q.   Okay.  Thank you.                           10:19

And then in a question more germane to your
personal situation, in late October of 2023, you
accidentally sent profane voice notes intended for
your future husband to Graham Wincott; correct?

A.   I wouldn't categorize them that way.        10:19

Q.   How did I miscategorize them?

A.   I sent messages where I voiced
discrimination concerns and unfair treatment to my
supervisor that contained profane language.
However, it was in the context of discrimination.   10:19

Page 45

Q.   Okay.  And this was in late October of 2023; correct?

A.   That's correct.

Q.   Okay.  And you sent them accidentally to Graham Wincott; correct?                                    10:19

A.   That's correct.

Q.   And you sent them intending to send them to your future husband?

A.   That is correct.

Q.   And they contained profanity?                      10:20

A.   They contained profanity and claims of unfair and unequal treatment.

Q.   And so in late October of 2023, you accidentally sent profane voice notes intended for your future husband to Graham Wincott; correct?    10:20

A.   I would not categorize them that way.

Q.   Ms. Montes, it's a pretty simple question, and we are going to be here a very long time if you don't answer simple questions, but I'll ask it again.                                                   10:20

Given that you've explained what was some of the other intent of your message, given that context, is it fair to say that in late October of 2023, you accidentally sent profane voice notes intended for your future husband to Graham Wincott?   10:20

Page 46

A.    I would not say it's fair to categorize them that way, no.

Q.    In early November of 2023, the El Valle campaign publicly launched; correct?

A.    Correct.                                                10:21

Q.    Okay.  And also in early November of 2023, you made an Instagram post about El Valle; correct?

A.    What date did you say?  Sorry.

Q.    Early November of 2023.

A.    Yes.  November 5th.                                     10:21

Q.    So on November 5th of 2023, you made an Instagram post about El Valle?

A.    Yes.

Q.    Okay.  And you started experiencing health issues, as I understand it, in November of 2023?        10:21

A.    Yes.

Q.    Okay.  And I'm glad to see that you appear completely healthy here today.

But as I understand it, you experienced a bells palsy flare-up in early December 2023; is that    10:21 right?

A.    That sounds about right.

Q.    And you were on FMLA leave for the Suns for most of January 2024; correct?

A.    Yes.                                                   10:22

Page 47

Q.   And you returned to work at the end of January 2024; right?

A.   Yes.

Q.   And you received a written warning in early February 2024 related to the voice notes and Instagram post that we just discussed; correct?

10:22

A.   That is correct.  However, I will add that the post was dated for November.  Or I'm sorry, the write-up was dated for November.

Q.   Right.

10:22

A.   It was received in February.

Q.   Right.

And for much of the time in the interim between November and when you received this note, you were on leave because of your health situation; correct?

10:22

A.   I worked on and off from home in November and December.  And then I believe in January was my leave.  However, I would have to refer back to my medical notes to give you an exact date.

10:23

Q.   Very good.  Okay.  So subject to all of that and just to give the timing down, the written warning that you received related to the voice notes and the Instagram post you received in February of 2024?

10:23

Page 48

A.    Correct.

Q.    Okay.  And you sent your resignation e-mail on February 6, 2024; correct?

A.    It was a few days after I received the final written warning.                                          10:23

Q.    Okay.  And to the best of your recollection, was that February 6, 2024?

A.    Yes.

Q.    Okay.  And in that e-mail you provided two weeks' notice.  Am I remembering that correct?    10:23

A.    That is correct.

Q.    Okay.  Why did you provide two weeks' notice?

A.    Because I wanted to leave on the best terms because I feared further retaliation.              10:24

Q.    Did you feel you had a contractual obligation to provide two weeks' notice?

A.    I would say so.

Q.    And so you continued working for the Suns from February 6, 2024 until your last date two weeks    10:24 later; correct?

A.    Correct.

Q.    Okay.  And were you paid your full salary by the Suns during this period, meaning this two-week notice period?                                           10:24

Page 49

A.    Yes.

Q.    And did you go to the office during this period?

A.    Yes.

Q.    And did you do your work during this    10:24 period?

A.    Yes.

Q.    Okay.  And so your last working day was February 19th, 2024.

Does that sound correct?    10:24

A.    It sounds correct.

Q.    Okay.  And that was a Monday, do you recall?

A.    I don't remember.

Q.    Okay.  My understanding is that February    10:25 19th, 2024, was a Monday.

And my understanding is that you married Mr. Montes the day before, February 18th, 2024.

So let me just confirm that that's correct. You did marry Mr. Montes on February 18th, 2024?    10:25

A.    Yes.

Q.    And your last day with the Suns was February 19th, 2024?

A.    Yes.

Q.    So let's -- I want to -- I want to talk    10:25

Page 50

about the El Valle campaign.

And I'm doing my best to pronounce that correctly, but if I am not, please let me know.

I want to start by talking about City Edition Jersey campaign.  So can you just, for our edification, tell us what a City Edition Jersey campaign is?

A.    Every year the league has a --

Q.    I'm listening.

A.    Every year the league has a special jersey that they release based off the city.  And it's usually the biggest campaign of the marketing season.

Q.    Okay.  And the jersey is worn by the players for the Suns for a certain number of games throughout the season?

A.    That's correct.

Q.    Okay.  And as you've suggested, there's a marketing -- this isn't just the players wear the jerseys.  There is a marketing campaign surrounding the rollout of these jerseys.

A.    Yes.  It's a season-long campaign.

Q.    Very good.

And for the 2022 to '23 Suns season, the campaign was called ORIGINATIV.  Am I -- do I have

Page 51

that right?

A.    That is correct.

Q.    Okay.  And at a high level, this was a campaign that highlighted the Suns Native American fan base; correct?                                    10:27

A.    Yes.

Q.    And for the '23-'24 Suns season, the campaign was El Valle?

A.    Yes.

Q.    And the same high level that this was a    10:27 campaign that highlighted the Suns Mexican American fan base; correct?

A.    Correct.

Q.    Okay.  Who were the leaders of the ORIGINATIV campaign?                                 10:27

A.    Graham Wincott handled marketing strategy.

Q.    Yes.

A.    Shawn Martinez handled live presentation and the cultural connection of the campaign.

Q.    Uh-huh.                                      10:27

A.    And then Cahokia was an external agency that led branding.

Q.    Okay.  So Graham, Shawn, and this external agency played significant roles leading the ORIGINATIV campaign; correct?                     10:28

Page 52

A.   That is correct.  But I would say the main leaders were Shawn and Graham.

Q.   What was Mr. Martinez's position at the Suns?

A.   He was the senior live presentation director.

10:28

Q.   Okay.  And that's a more senior position than marketing manager; correct?

A.   That is correct.

Q.   Do you know how long Mr. Martinez had been working with the Suns when he was tasked with leading the ORIGINATIV campaign?

10:28

A.   Not exactly, but it was pretty early on.

Q.   Meaning he had been working there a long time?

10:28

A.   No.

Q.   Okay.  So had he been working with the Suns since you started there?

A.   No.

Q.   Okay.  So when did -- but you don't remember when he started?

10:28

A.   I don't remember when he started.

Q.   And you just told us the title that Shawn held.  You never held that title while you were at the Suns; correct?

10:29

Page 53

A.   That is correct.  However, I did share similar responsibilities to him.

Q.   Yeah.  My question is really just about the title.  So you told us what title Shawn held, and I'm just asking you:  Did you ever hold that title   10:29 at the Suns?

A.   Well, I think that's a nuanced answer because although I did not hold his title, we shared the same responsibilities throughout my tenure.

Q.   Okay.  And my point to you is -- you are   10:29 welcome to, you know, say whatever you are going to say to try to support your claims.

But when I ask a question about whether you held a title or not, I'm not asking did you deserve to hold that title.  I'm not asking you did you   10:29 resent not holding that title.  I'm simply asking you if you held the title.

So I think we established this, but you never held formally the title that Shawn held; correct?                                                10:30

A.   I did not formally hold the title that Shawn held.  However, I shared responsibilities with Shawn.

Q.   Very good.

Do you know what Shawn Martinez's salary   10:30

Page 54

was when he held this title that you just named?

A.   No.

Q.   And we talked about this a little bit before, but I think you said you are not sure, one way or another, whether salary is coordinated to title at the Suns; right?     10:30

A.   I would assume it is.  However, I don't know how it works.  I don't know their tiers or how that's decided.

Q.   Do you know what race or races Mr. Martinez identifies as?     10:30

A.   Navajo Native American.

Q.   Does Mr. Martinez identify as any other race or ethnicity in addition to Navajo Native American?     10:31

A.   Not that I know of.

Q.   But you don't know one way for sure.  I know you are not an expert on Shawn Martinez, so I'm not trying to put words in your mouth.

So let me ask it this way:  Can you say for sure, one way or another, whether Mr. Martinez identifies as Latino in addition to identifying as Native American?     10:31

A.   Externally he only identified as Native American in all of my conversations with him.     10:31

Page 55

Q.    Okay.  And I guess my question again to you is:  Can you say for sure, one way or another, whether he identifies as Latino or not?

A.    I cannot say for sure.

Q.    Thank you.                                    10:31

Did you have a role in the ORIGINATIV campaign?

A.    Yes.

Q.    What was that role?

A.    I executed the vast majority of it.      10:31

Q.    You executed the vast majority of the entire ORIGINATIV campaign?

A.    I would like to clarify.  The marketing elements of it, yes.

Q.    Okay.  And you said earlier that Graham     10:32 Wincott led the marketing efforts for this campaign.

Is that right?

A.    That is correct.  There is a difference between strategy and execution.

Q.    Okay.  And so your view is that for the     10:32 ORIGINATIV campaign, you executed all of the marketing elements?

A.    No.

Q.    Okay.  What did you do on the ORIGINATIV campaign?                                          10:32

Page 56

A.    I don't.

Q.    Same question for Chris Grasha.  Do you know how he identifies racially or ethnically?

A.    Yes.

Q.    Okay.  How so?                                        10:40

A.    He's told me he's Croatian, white.

Q.    And how about Luis Ortiz?

A.    Luis is Mexican.

Q.    Mexican American or Mexican Mexican?

A.    That's a difficult thing to answer.              10:40

Q.    Yeah.  Fair enough.

      You don't know one way or the other?

A.    I don't know.

Q.    Okay.  Thank you for helping me with that.

      Okay.  So in total, more than 60 Suns'          10:40
employees worked on the El Valle campaign; right?

A.    Yes.

Q.    Production teams?

A.    Yes.

Q.    Creative teams?                                       10:41

A.    Yes.

Q.    Graphics teams?

A.    That's part of creative.  Yes.

Q.    Marketing teams?

A.    Yes.                                                  10:41

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Q.   Live presentation teams?

A.   Yes.  However, I led the live presentation aspect, including halftimes.

Q.   My understanding was, from what you just told us, that you led the whole campaign.  So are there some of these teams that you did not lead?     10:41

A.   No.

Q.   Okay.  So why did you specify that you led the halftime teams?

A.   Because I wanted to share more details of that.     10:41

Q.   Very good.

Any other major categories of teams within the El Valle campaign that I haven't mentioned?

A.   Social responsibility and charities.     10:41

Q.   Anything else?

A.   Graphic design, videography, PR, social media, digital and website.

Q.   Okay.  I'm sorry.

A.   I'm trying to think what else is there.     10:42 The marketing team, like the brand team, the retail team.  I'm trying to think what else.  Partnerships I worked with as well.  Group sales.

Q.   So in the context of this campaign, you led all of those teams?     10:42

Page 64

A.   I led the campaign and vision of the campaign, which basically put me into a position of leadership to execute and guide vision for each of those departments.

Q.   Great.                                          10:42

You worked with external artists and designers as well; right?

A.   Yes.

Q.   Was Miguel Angel Godoy one of those people?

A.   Yes.                                            10:43

Q.   Okay.  And he's the person who designed the uniform; right?

A.   Him and Chris Grasha, that is where Grasha fits into it.  They worked on it together, and then me and Graham were part of that design team overall.  10:43 So where we aligned everything with the overall vision of the campaign.

Q.   So Graham participated in the design of the uniform?

A.   Yes.  At the same level that I did.          10:43

Q.   Another person involved with the campaign was -- if I'm saying this right -- Efrain Bugs Gonzales.

Do you know who that is?

A.   Yes.                                            10:43

Page 65

Q.    And he built the car; is that right?

A.    Yes.

Q.    Can you tell me a little bit about what kind of car it was?

A.    A '19 -- it was a Bel Air.  I don't      10:43 remember the year.  I think it was '58 or '57.

Q.    Bel Air Chevy?

A.    Uh-huh.

Q.    What -- can you tell me a little bit more about the car?                                     10:44

A.    Her name was Baya.

Q.    Any other external artists or designers you worked with who played a meaningful role on the campaign?

A.    There were several designers for           10:44 merchandise.  I can't recall at the moment.

Q.    Anyone else besides the designers of merchandise who played a meaningful role on the campaign, other than those that you've told us about?                                               10:44

A.    The ones you've covered are the main ones to my recollection right now.

Q.    Where did the name El Valle come from?

A.    So originally the jersey was actually going to be Los Solis, which is a direct translation of   10:45

Page 66

Suns.  The Suns.  However, that was trademarked by this team in Mexicali.

And so I remember Graham asked me what I thought the jersey should be, and the previous year was The Valley, and The Valley had -- The Valley jerseys were -- the city edition jersey at that time, they did really well.  So I came up with the idea of doing El Valle.

Q.   Okay.  So --

A.   Which is a direct translation of The Valley.

Q.   So The Valley name was already associated with jerseys.  But you're the one who came up with the idea of calling this jersey El Valle?

A.   That is correct.

Q.   Okay.  And did you have any involvement in getting that name trademarked?

A.   No.

Q.   Okay.  Do you know who did?

A.   Either Graham or -- I think it was Graham.

Q.   And when you joined the campaign, was it already focused on celebrating the Chicano fan base?

A.   Not the Chicano fan base, no.

Q.   Who was it focused on celebrating?

A.   The Hispanic fan base.

10:45

10:45

10:45

10:45

10:46

Page 67

Q.   Thank you.

So when you joined the campaign, it was already focused on the Hispanic fan base?

A.   Yes.  However, I taught them what the word "Chicano" meant, and ultimately the jersey became a   10:46 celebration of the Chicano fan base, which is the Mexican American fan base which they did not know the difference between Hispanic, Chicano, and Mexican American.

Q.   So whom was the campaign focused on?   10:46

A.   The Hispanic community.

Q.   Okay.  But you just told us then you had to refocus it on the Chicano community and explain to them what that meant.

A.   Correct.   10:46

Q.   So did it eventually change to be focused on the Chicano community?

A.   Yes.

Q.   And that was all your doing?

A.   Yes.   10:47

Q.   How did the idea to incorporate lowrider culture into the campaign come up?

A.   I came up with the story.

Q.   So that idea was not already in the works or in discussion before you got involved?   10:47

Page 68

BY MR. HEINICKE:

Q.   Ms. Montes, did anything occur during the break that would affect your ability to testify truthfully here today?

A.   No.                                                    10:55

Q.   And did you discuss the deposition with anyone other than your lawyers?

A.   No.

Q.   And is there anything that you've testified to thus far in the deposition that you now realize   10:55 is incorrect or that you would like to change?

A.   No.

Q.   Okay.  When we went on the -- just before we went to the break, we were talking about your vision for the El Valle campaign.  And you told us   10:55 that your original vision was a two-part campaign; is that correct?

A.   Yes.

Q.   Okay.  And was the eventual campaign that was launched, was it a two-part campaign?          10:55

A.   It was not because Matt Ishbia declined the second year.

Q.   It was not because Matt Ishbia declined the second year.

     So you wanted a two-year campaign; that was   10:56

Page 71

your vision?

A.   I did not want a two-year campaign.  It was already decided prior to my involvement that it would be a two-year campaign.  However, I developed the vision and story for the two-year campaign.      10:56

Q.   Okay.  And when -- a two-part campaign and a two-year campaign, is that the same thing or are those two different things?

A.   Two seasons.

Q.   Okay.  So your vision was a two-season      10:56 campaign?

A.   Yes.

Q.   And you were the leader of the campaign?

A.   Yes.

Q.   But the reason that there wasn't a second      10:56 part or second year -- even though you wanted it -- was, as you understand it, the owner of the team decided it would be a one-year campaign?

A.   There was a lot of, like, back and forth with the league that ultimately -- how can I say it?  10:56 The original vision of the campaign with the two-part series and the two stories that I shared with you did not come true because there was, like, a back and forth with the league that ended up making El Valle the lowrider campaign, a two-part      10:57

Page 72

series; like a two-year series.

And ultimately, Matt Ishbia declined doing El Valle the second year.

Q.   So as I understand it, it was your vision, your idea to incorporate lowrider culture into the campaign; is that right?        10:57

A.   Yes.  I guided the story.

Q.   And who made the decision to physically create a lowrider car as part of the campaign?

A.   I think it was Graham.        10:57

Q.   Who else was involved in that decision?

A.   That's it.

Q.   Okay.  You were the leader of the campaign. Did you approve the decision to create a lowrider car as part of the campaign?        10:58

A.   Well, Graham is my superior.  So I would not be approving his decisions.

Q.   Okay.  Did you approve of the decision?

A.   Yes.

Q.   Did the El Valle -- excuse me.        10:58

Did the El Valle campaign draw in any way on the ORIGINATIV campaign in terms of its execution, plan, structure, schedule, other elements?

A.   Well, Graham, basically, with the        10:58

Page 73

ORIGINATIV campaign took me to pretty much all of, like, his lead -- took me through his leadership of the campaign. And so from there, I was able to draw what I would improve on not only, but also what I would do.                                         10:59

Q.   Okay. And he gave you the opportunity to do all of that on the El Valle campaign?

A.   I mean, yeah. Who else would do it?

Q.   Okay. And who then created the plan for El Valle? Was that you?                                  10:59

A.   Me.

Q.   And do you remember the document title or file name of your plan for the El Valle campaign?

A.   We have it as an exhibit.

Q.   Okay. Do you remember the title or name of  10:59 it?

A.   '23-'24 City Edition Jersey El Valle.

Q.   Thank you.

     Did anyone help you with that plan?

A.   No.                                            10:59

Q.   Okay. Have you provided this plan to your attorneys so that they can produce it to us, to your knowledge?

A.   Yes.

     MR. HEINICKE:  Have you guys produced this?  10:59

Page 74

MS. WALTERS:  I have it today as an exhibit.  I don't know what has been produced prior.

MR. HEINICKE:  So, okay, obviously an important document to this matter.  If it hasn't been produced, we will have to take that up separately.                                                  11:00

BY MR. HEINICKE:

Q.   Did anyone review the plan that you created?

A.   Graham.                                                11:00

Q.   Okay.  Did anyone else?

A.   Review it?

Q.   Yeah.

A.    I presented this plan to part-time staff, full-time staff, executives, partners, creative team.                                                          11:00

Q.   Before it was -- before it was finalized, did anyone review it other than Graham?

A.   No.

Q.   Okay.  And was Graham the only person --     11:00
did Graham offer any edits or suggestions?

A.   The car.

Q.   Anything else?

A.   Not that I recall.  No.

Q.   Significant document; right?  Long plan?     11:00

Page 75

A.   No.

Q.   Okay.  And so given this number of times, I will ask:  Was showcasing these cars a significant and visible part of the campaign?

A.   Yes.                                                    11:06

Q.   And you have testified that you were the leader of the campaign; right?

A.   Yes.

Q.   Okay.  And as such, did you select which cars would be displayed at these important and          11:06 visible events?

A.   I didn't personally select them, no.

Q.   Okay.  Did you approve them?

A.   No.

Q.   So you were the leader of the campaign, and   11:06 we had these high visibility events with the cars, and you had no idea what cars would be showcased?

A.   Well, it depends.  So sometimes there was one or two cars shown.  And at that point I would, you know, know what car was coming.  However, on       11:06 Media Day, there was hundred.

Q.   Fair enough.

So on events where there was one or two cars shown, it would be a situation where you would approve those cars?                                           11:07

Page 81

A.   Possibly.

Q.   Okay.  Well, let's focus on a specific event.

We talked about the September '23 --
September 2023 Nuestro network event.                    11:07

Do you remember that event?

A.   Yes.

Q.   Okay.  Did you select the cars for that event in particular?

A.   Did I select them specifically?              11:07

Q.   Let me rephrase.

Did you approve the cars for display that were displayed at that event?

A.   I don't remember if I approved them.
However, I did invite a car club that brought          11:07
vehicles.

Q.   Okay.  And did you know in advance what vehicles they were going to display?

A.   No.

Q.   Did you take it upon yourself to review the  11:08
vehicles to make sure that there wasn't going to be
something inappropriate at the event?

A.   No.

Q.   And did you ever try to prevent the display
of the vehicles that were displayed at that event?    11:08

Page 82

A.    No.

Q.    Okay.  And at that event, did you view the cars that were displayed?

A.    Yes.

Q.    And did you do anything to have any of the    11:08 cars at that event removed?

A.    No.

Q.    As we sit here today, do you remember how many different cars were displayed at this event?

A.    No.                                            11:08

Q.    Okay.  And do you remember what the cars displayed at that event looked like?

A.    I don't remember.

Q.    Let's turn to some of the other El Valle campaign events you mentioned.                          11:09

There was a launch to explain the campaign to the Suns' players; correct?

A.    Yes.

Q.    Did you do that presentation?

A.    Yes.  However, Graham wanted me to find    11:09 someone else to do the presentation.

And I said, "Why can't I do the presentation?  Shawn did the presentation last year."

And Graham was very hesitant about that.    11:09

Page 83

And told me to find someone else.  And I ultimately
could not find someone else, and so he had no other
choice but to allow me to do it.

Q.   Did you make an honest effort to find
someone else, or were you confident that you could     11:10
actually do it?

A.   I made an honest effort.

Q.   To find someone else?

A.   Correct.

Q.   Okay.  So what happened was you wanted to     11:10
do the presentation.  Graham didn't want you to do
the presentation.  But in the end, you did the
presentation?

A.   That is correct.

Q.   And Graham allowed you to do the     11:10
presentation?

A.   He had no other choice.

Q.   Well, okay.  Whether he had a choice or
not, he allowed you to do the presentation; correct?

A.   Yes.  Because he had another choice -- no     11:10
other choice.

Q.   Okay.  How did you do in the presentation?

A.   I thought I did well.

Q.   Did Graham say anything to you about how
you did?     11:10

Page 84

A.   He said I did good.

Q.   There was another internal launch for the larger organization.  Right?

A.   There was a lot of events associated with El Valle, so I guess I would need more specifics.   11:11

Q.   Was there an internal -- was there an internal launch for -- beyond the players to the Suns organization?

A.   It was the Hispanic Heritage Event that I organized.   11:11

Q.   Okay.  And did you do a presentation there?

A.   I did.

Q.   And how large was that audience?

A.   It was full-time staff.  So a couple hundred people.   11:11

Q.   And Graham did not stop you from doing that presentation, I would imagine?

A.   He was not associated with it.  That was determined by the team member network.

Q.   Okay.   11:11

A.   And I worked with Kim Corbitt on that.

Q.   So Kim Corbitt allowed you to do this presentation?

A.   I wouldn't say she allowed it.  I would say that I organized it and led it myself, and she   11:11

Page 85

invited staff.

Q.   And she did nothing to stop you being the presenter?

A.   No.

Q.   The Suns also created a behind-the-scenes   11:12 video?

A.   That is correct.

Q.   Were you featured in the behind-the-scenes video?

A.   I was.  It was a very similar experience to   11:12 the player presentation where I inserted myself into that.

Q.   Okay.

A.   Because I felt it was important to have my voice since I led and created the vision for the   11:12 campaign.

Q.   So it was very important to you, given your role in leading the campaign, that you be featured in this video?

A.   That is correct.                              11:12

Q.   Okay.  And is that a publicly available video?

A.   Yes.  It's a behind-the-scenes video on the Suns YouTube channel.

Q.   Okay.  And so it's publicly available   11:12

Page 86

through YouTube?

A.   Yes.

Q.   Okay.  And so because you knew that this would be publicly available on YouTube and because you were the leader of this campaign, you thought it was important that you be featured in this video; right?     11:12

A.   Yes.  I did not ask for permission.

Q.   You just did it?

A.   That's correct.     11:13

Q.   Okay.  There was a Media Day as well?

A.   Yes.

Q.   Did you help plan that?

A.   Yes.

Q.   And did you attend that?     11:13

A.   Yes.

Q.   Okay.  And did you play a role, a public role, a public-facing role in the Media Day?

A.   Can you define "public-facing role"?

Q.   Sure.  What did you do at the Media Day?     11:13

A.   I -- well, there is a lot of elements to it so --

Q.   Okay.  So let me narrow it down.

So a Media Day is the day where you invite the media to explain to them what they are doing?     11:13

Page 87

A.   No.

Q.   Okay.  So what's a Media Day?  What is this Media Day?

A.   So this Media Day was dedicated to -- it's like a production day, where we have the players there and where we have like -- where we filmed the actual content and video for El Valle.  That would be used throughout the season.   11:13

Q.   And when I asked about a public-facing role, some of this filming, some of this content included you; correct?   11:14

A.   No.

Q.   Okay.  So this is not the day behind-the-scenes video was --

A.   No.   11:14

Q.   Okay.  So the people who were featured this day were essentially players?

A.   And influencers that I invited to be there.

Q.   Okay.

A.   And car clubs.   11:14

Q.   And it was important to you to invite the influencers because you wanted this campaign that you had created to get public attention?

A.   Well, it was part of the strategic plan to have influencers there so that when El Valle   11:14

Page 88

launched, those influencers could participate in

essentially promoting El Valle and having a

connection to the community.

Because those influencers chosen by me were

part of the Chicano community.                              11:14

Q.   Great.

Okay.  Based on your involvement in the

El Valle campaign, would you consider the campaign

to be a success?

A.   Yes.                                                 11:15

Q.   Okay.  Do you think you did a good job on

the campaign?

A.   Yes.

Q.   Do you think you did a great job on the

campaign?                                                  11:15

A.   Yes.

Q.   Okay.  Do you take pride in the work you

did on El Valle?

A.   Absolutely.

Q.   Okay.  And was that true throughout the      11:15

entire time you spent working on that campaign?

A.   Yes.

Q.   And if you would have had more media

opportunities or public recognition, as you say you

deserved, would that have affected your decision to   11:15

Page 89

resign?

A.   Can you repeat the question?

Q.   Sure.

My understanding is you feel you did not receive the media opportunities or the public                11:16 recognition you deserved for leading this campaign of which you are so proud; is that correct?

A.   Yes.

Q.   Okay.  If you had had, if had you been given more media opportunities or public                11:16 recognition, would that have affected your decision to resign?

A.   I would say it depends.

Q.   Okay.  And it depends how much?

A.   On the treatment that I would be facing.     11:16

Q.   Yeah.  No, I understand.

And I'm saying:  If you would have received media opportunities and public recognition that you deemed appropriate and worthy of your efforts leading this campaign, would that have affected your  11:16 decision to resign?

A.   Yes.

Q.   Okay.  So, again, framing this in your terms, do you think you would have stayed on at the Suns and not resigned if you had received the        11:17

Page 90

recognition, especially the public recognition that you felt you deserved?

A.   I don't know.

Q.   Excuse me for conferring with Ms. Benninger.  I'm just doing what I can to try to   11:17 expedite this.

MS. WRIGHT:  Do you think this will go all day?

MR. HEINICKE:  Well, if I keep getting essay-long answers to "yes" or "no" questions, it   11:17 might.

MS. WRIGHT:  I don't think she's answering essay-long questions, but...

MR. HEINICKE:  Well, you disagreed with me, but you did it very shortly, so I appreciate you on   11:17 that.

Sorry.  Sheree and I have fun when we see each other.

THE WITNESS:  I'm having fun, too.

MR. HEINICKE:  Okay.  Great.                 11:18

BY MR. HEINICKE:

Q.   In October 2023, the Suns held an All Employee Summit.

Do you recall that?

A.   What year?                             11:18

Page 91

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Q.   October 2023.  This is unrelated to the El Valle campaign.  This is an All Employee Summit.

A.   I don't recall that.

Q.   Let me help refresh your recollection. This was a summit, as I understand it, where the Suns rolled out new policies including a communications policy and some other policies.     11:18

A.   I don't remember that.

Q.   Okay.  Do you think it's possible that you missed this All Employee Summit?     11:18

A.   I don't remember that event.

Q.   Okay.  In October of 2023, you were an active employee of the Suns; correct?

A.   Yes.

Q.   And so had there been an All Employee Summit, one would expect that you would be there; correct?     11:19

A.   Yes.

Q.   But you can't remember, one way or another, whether you attended that summit?     11:19

A.   No.

Q.   Okay.  Let's try to refresh your recollection with some documents.

MR. HEINICKE:  Can I have Tab 10, please. Thank you.  And this is marked as exhibit next,     11:19

Page 92

A.   Yeah.  Vaguely.

Q.   Okay.  And is it your recollection that at this point, these five people were named as the five designated spokespeople for the team?

A.   What was your question again?                11:23

Q.   Sure.

Is it your understanding that as of October 2023, these five people were designated as the designated spokespeople for the team?

A.   I mean, based off this PowerPoint, that is   11:23 what this looks like.

Q.   Do you have any recollection of that?

A.   Was this a town hall?

Q.   Maybe.

A.   I feel it wasn't like in an employee summit  11:24 as you suggested, which is why it was vague.

Q.   Well, the cover of the document says "Team Member Summit."

A.   They might have changed the structure that year, because typically employee summits were like  11:24 outside of the arena at like a fancy event.  And so...

Q.   Yeah.  So let me try to focus you a little bit.  You are someone who is very concerned with public recognition, with your public presence.     11:24

Page 96

You've done a lot of public events.

You're a marketing expert.  And in October of 2023, the Suns put in a policy that says there is only five designated spokespeople to speak externally.                                                      11:24

I would imagine when that policy is enacted, it's something you would take notice of.

So my question is:  Do you remember in October of 2023 there being adopted a policy that only five spokespeople could speak publicly,    11:24 externally on behalf of the Suns, absent approval?

A.    Vaguely.

Q.    Okay.  And when this policy change, which you vaguely remember was put into place, was it explained to you why the organization had adopted    11:25 this policy?

A.    Explained when?

Q.    When it was adopted.

A.    To me specifically?

Q.    Yes.                                                   11:25

A.    Like individually?

Q.    No.

Did you ever come to understand why the Suns made this change to have designated spokespeople?                                                11:25

Page 97

A.   No.  I assume it was because there was new leadership.

Q.   Okay.  So meaning the Sarver administration was over.  The Ishbia administration was coming in and the new administration wanted to control their external communications the way they wanted to control them.

That was your understanding?

A.   No.

Q.   Okay.  What was your understanding as to why this change was made?

A.   Because Matt Ishbia had already bought the team, like, for a year at that point.

Q.   Okay.

A.   So I'm not really sure why they changed the communication policy.  I can't speculate.

Q.   Okay.  Great.

Were you involved in adopting this designated spokesperson policy?

A.   No.

Q.   Okay.  So you have no idea one way or another the reasoning behind it?

A.   No.

Q.   Okay.  Just to make sure I got a clear answer on that:  It would be correct to say that you

Page 98

don't know why the Suns changed this designated spokesperson policy; is that correct?

A.   That is correct.

Q.   Okay.  Page 9 discusses speaking engagements.                                            11:26

A.   Can I read it?

Q.   Yeah.  Please.

You are someone that enjoys speaking engagements.  You've put yourself out there for them.  So when this new policy came in, in October   11:27 of 2023, what was your reaction to it?

A.   I don't remember.

Q.   So the document says that, essentially, for external speaking engagements, everyone except for the designated spokespeople have to go through this   11:27 approval process.

A.   Okay.

Q.   You have no recollection of that policy being adopted?

A.   I didn't say that I have no recollection.   11:28

Q.   What is your recollection of the adoption of this policy?

A.   Well, what this document suggests.

Q.   Okay.  So you remember that in October of 2023, a speaking engagement policy was adopted along   11:28

Page 99

the lines of what appears on Page 9 of this document; correct?

A. Vaguely, yes.

Q. Okay. And this was a new process?

A. Yes.                                                    11:28

Q. Okay. And, in substance, it required approval from communications for people other than the designated spokespeople to participate in panels, chats, public forums, interviews, that sort of thing; correct?                                            11:28

A. In panels, fireside chats, period discussions, public forums, webinars. Yes.

Q. Okay. And once communication's granted approval, assuming they did, the speaker would work with communications on talking points.          11:29

That was your understanding of the new policy?

A. That's what this document says, yes.

Q. Was your understanding, your memory of your understanding of the new policy, is it consistent      11:29 with this document?

A. Well, I don't remember this document very well. So my memory was just that there was a new communications policy. I guess.

Q. Okay. And I'm not asking you to remember     11:29

Page 100

this page.  I'm asking you:  Is your memory of the new policy consistent with what is on this page?

A.  Vaguely, yes.

Q.  Okay.  And you say "vaguely."  I -- you know, we're talking about not that long ago, about a policy that one would assume would be very important to you given the importance of speaking engagements.

So let me --

A.  I would say it was a long time ago.

Q.  Okay.  And so you recall it, but the vagueness around this is because it was several years ago?

A.  Yes.

Q.  Okay.  But as best as you can recall, from several years ago, when this new policy was put in place, it was consistent with what we see on this page?

A.  I remember there was a new policy that you had to get approval from coms to participate in, media opportunities, podcasts -- that sort of thing.

Q.  Very good.

Okay.  And similar to the other policy, you had no role in adopting this policy; correct?

A.  Correct.

Q.  So you have no idea what the Suns'

Page 101

team was being targeted?

A.   Because the marketing team was the one that would, like, post on social media.  And, you know, participate in podcasts because everyone is a marketing person.                              11:32

Q.   Okay.  Do you think the marketing team was being targeted because you personally were a member of the marketing team?

A.   I don't know.

Q.   Again, my question isn't whether that   11:32 actually happened.  My question is:  What do you think?  And maybe what --

MS. WALTERS:  Objection; asked and answered.

BY MR. HEINICKE:                              11:32

Q.   And maybe what you're telling me is -- well, let me ask it this way:  Do you think it's possible that this policy was enacted to target you personally?

A.   I think it's possible.                  11:32

Q.   Page 11 discusses the social media policy. And I think earlier you said you have vague recollection or you have a recollection good enough as two or three years will allow to remember the adoption of a new social media policy; is that   11:33

Page 103

right?

A.   Can I read this?

Q.   You may.

But before we get to this document, I'm just asking you, you have a -- you have a two, two and a half years' memory of an adoption of a social media policy by the Suns in October of 2023; right?

A.   Yes.

Q.   So please go ahead and look at the document, and I'm just going to -- just to give you a fair warning, I'm going to ask if your memory of the new policy in October of 2023 is consistent with what is on this document.

A.   Okay.  I'm done.

Q.   Okay.  So is this, as I told you I would, does this page reflect the changes that you understood came about as a result of this change in the social media podcast policy?

A.   Yes.

Q.   Okay.  And these were new rules as of October 2023 about what content could and could not be posted on personal social media; correct?

A.   It doesn't tell you what you can and cannot post on here.  It just tells you what you can't do, and there is a difference with that.

Page 104

Q.   Okay.  Very good.

So October -- you understood from October 2023 going forward that this policy applied to you as a Suns employee?

A.   Yes.                                               11:35

Q.   Okay, great.

The next page is page -- well, let's see. Flip to Page 14, please.  It's the beginning of the Culture of Respect Policy section.

Do you see this?                                        11:35

A.   Yes.

Q.   Okay.  And then the next page is Page 15.

A.   Yes.

Q.   Is this the basic Culture of Respect Policy, as you recall it?                                    11:35

A.   Yes.

Q.   Okay.  And under this policy, each individual has a right to work in a professional atmosphere?

A.   And an environment that prohibits               11:36 discriminatory practices, yes.

Q.   Okay.  And you understood from this point in October 2023 forward, that this policy applied to you as an employee of the Suns?

A.   Yes.                                               11:36

Page 105

Q. Okay. The next page, 16, lists examples of disrespectful behaviors covered by the policy.

Do you see that?

A. Can I read it?

Q. Sure.                                                          11:36

A. Yes.

Q. Okay. And you understood that this policy describing what disrespect looked like -- looks like applied to you as of October 2023 and going forward; correct?                                                        11:37

A. Yes.

Q. And some of the things that it tells you not to do include yelling at team members.

A. Retaliation, harassment, singling people out.                                                             11:37

Q. Yeah. So let's go through these one by one.

It includes yelling at team members; correct?

A. Yes.                                                          11:37

Q. It includes personal insults; correct?

A. Yes.

Q. And it includes being unduly or arbitrarily critical; correct?

A. Yes.                                                          11:37

Page 106

Q.    And it precludes exhibiting rude or crass behavior; correct?

A.    Yes.

Q.    Can we go to Page 28 on this, please.

A.    Page 17 also talks about discrimination.    11:38 That's also in there.

Q.    It is.  And you're very eager to answer and talk about discrimination even when you haven't been asked a question.

Why is that?    11:38

A.    Well, I think it just covers my entire experience.

Q.    Because you were discriminated against at the Suns over the entire course of your tenure there; right?    11:38

A.    I wouldn't characterize it that way.

Q.    We'll get to that.

In 28, on 28, this lists the reporting resources, if available, for someone who experiences employee misconduct.    11:38

Do you see that?

A.    I'm reading it.  Sorry.

Q.    Yeah.

A.    Yes.

Q.    And at this time in October of 2023, you    11:39

Page 107

were familiar as a Suns employee that these resources were available to you; correct?

A.   I would say I was familiar, but I wasn't exactly sure how to enact some of these.

Q.   Okay.  Well, for example, it was pretty   11:39 clear how to enact the Suns Mercury hotline because the number is listed right there; right?

A.   Sure.  But I wouldn't say it was like, you know, readily available.

Q.   Okay.  But as of October 2023, you knew   11:39 these -- putting aside how you would initiate them, you knew that these various reporting resources were available; correct?

A.   I knew that there were resources available.

Q.   Okay.  And you -- if we look at this list,   11:40 the resources available, include talking to people in culture, you were aware of what the people in culture department was; correct?

A.   Yes.

Q.   And you knew you could talk to the people   11:40 in culture department if you had a problem with employee misconduct or something else to do with your job?

A.   Yeah.  I could talk to my manager.  My manager's manager.  HR.  Senior leaders.   11:40

Page 108

Q.   Okay.  And you could also call the hotline?

A.   Yes.  But I was unfamiliar with it.

Q.   Okay.  Were you familiar that you could call an NBA hotline?

A.   Vaguely.                                          11:40

Q.   Okay.  And did you have an understanding that the NBA hotline was anonymous?

A.   No.

Q.   Okay.  Did you know that the NBA hotline was affiliated with the NBA and not the Suns       11:41 specifically?

A.   No.  But I would assume so because it's the NBA hotline.

Q.   Great.

Did you ever call the NBA hotline to raise       11:41 any of the issues that you're claiming concerning your employment?

A.   No.

Q.   Did you ever call the Suns hotline?

A.   No.                                               11:41

Q.   Let's go to --

A.   Can we pause so I can go to the restroom?

Q.   Yes, we may.  Five-minute break, please. And I should have said this at the beginning, and I apologize.  Whenever you need a break for the       11:41

Page 109

restroom or water, whatever, let me know.

A.   Okay.

Q.   Thank you.

THE VIDEOGRAPHER:   We're off the record. The time is 11:41 A.M.                                    11:42

(Whereupon, a recess was held

from 11:41 A.M. to 11:49 A.M.)

THE VIDEOGRAPHER:   We're back on the record.   The time is 11:49 A.M.

BY MR. HEINICKE:                                            11:50

Q.   All right.   Ms. Montes, you understand that you are still under oath?

A.   Yes.

Q.   Did anything happen during the break that would affect your ability to testify?                   11:50

A.   No.

Q.   And are there any answers that you've previously given that you think were inaccurate or incomplete?

A.   I remember somewhat this summit.                    11:50

Q.   So at first you told us you didn't have any recollection of this summit and now you are telling us you remember it somewhat?

A.   Yes.   Because as I mentioned before, the team members in it was typically, like, outside of     11:51

Page 110

the Día de los Muertos theme night.

Do you see that?

A.   That's correct.

Q.   Okay.  And each of these three quotes suggest adding something to the press release.  And yet none of them suggest adding a quote from you or anyone else.

Is that correct?

A.   Well, this doesn't reflect the entirety of my complaints.  So while I included these complaints in there, and that is true, I also voiced these concerns in person.  And actually the voice messages that I sent Graham narrates the entire story of what happened.

Q.   You are talking about the voice messages that you sent to Graham accidentally?

A.   That is correct.

Q.   Okay.  So just to be clear:  In your written comments on this press release, you do not make any suggestions about additional quoted personnel?

A.   In this document, that is correct. However, I did voice concerns about being treated unfairly.

And the thing is that when you are a woman,

Page 122

you are placed in a position -- and you are leading

a campaign, and now those campaign contributions are

being minimized because you are not being given the

same opportunities and credit as men the previous

year, you are now in a position where you have to          12:07

advocate for yourself.

        And where you are getting put into this

position where you are like, man, I did all of this

work, how do I tell them I need to be compensated

and credited for this?                                     12:07

        And so it puts you in a really weird spot

because as a woman, you don't want to be the one

that is like oh, hey, guys, this should be about me.

And so it was a very difficult thing to navigate.

        However, I still voiced my concerns several        12:07

times.  I voiced my concerns to Janelle in the

meeting.  I voiced my concerns to Jeff and Graham

prior to those voice messages.  Because in those

voice messages, I am literally narrating the fact

that I told Jeff and Graham that I should be quoted        12:07

in there.

        And you have those voice messages in your

possession, so you can refer back to those.

        So I did; I did voice my concerns.

    Q.   Why didn't you raise it in this written           12:08

Page 123

context?

A.   Because I was internally battling with the fact that now I have to stand up for myself and say, Hey, give me credit.

And that is a very difficult position to                    12:08
put yourself in because you want your leader to do that for you, and that was supposed to be Graham.

Q.   Okay.  And so was Graham the leader, then, of the El Valle campaign?

A.   No.  Graham was my direct supervisor.              12:08

Q.   After this press release came out in October of 2023, as you just mentioned, you recorded a series of three voicemails; correct?

A.   That is correct.

Q.   And you intended to send these voice notes            12:08
to your future husband, Mr. Montes; correct?

A.   That is correct.

Q.   Were you and Mr. Montes engaged at the point when you send -- when you intended to send him these three voice notes?                                          12:09

A.   No.

Q.   But instead of sending them to Mr. Montes, you sent them to Graham Wincott by accident; correct?

A.   Correct.                                            12:09

Page 124

MR. HEINICKE:  So let's -- if we can listen to Voice Note 1.

MS. BENNINGER:  This will be Exhibit 6, and it's audio only.  So I'm going to play it from this laptop.                                                    12:09

(Whereupon, Defendant's Exhibit 6 was marked for identification by the Court Reporter.)

(Voice Note 1 played and not reported.)

THE WITNESS:  We should hear all three of  12:11 them.

MR. HEINICKE:  We will.

BY MR. HEINICKE:

Q.  Is that the first voice note that you sent to Graham Wincott by accident instead of sending it  12:11 to Mr. Montes?

A.  Yes.

Q.  Okay.  And in there, you say Josh Bartelstein is obviously a white guy.

What does that mean?                      12:11

A.  Well, he's obviously a white guy.

Q.  Did Mr. Montes know Josh Bartelstein?

A.  No.

Q.  Okay.  So you said Josh Bartelstein, who is obviously a white guy.  This is a message intended   12:12

Page 125

for Mr. Montes, why would it be obvious to Mr. Montes that Josh was a white guy?

A.    Because his name is Josh Bartelstein.

Q.    The voice note references the press release we were just talking about and looking at; correct?    12:12

A.    Yes.

Q.    And you had a meeting after this voice note -- I'm sorry.  You had a meeting after --

A.    Before.

Q.    Correct.  You had a meeting after the --    12:12
you saw the draft press release?

A.    I don't know if it was before or after.

Q.    Let me focus on the voice note.  In the voice note, you said -- you communicated that it looked bad that Josh, the CEO, was the only one    12:12
quoted.

A.    The only one, yes.

Q.    And in what form did you communicate that concern?

A.    I communicated it in several ways.  So in    12:12
the meeting, I said it.  And then I also told Graham and Jeff about it.

Q.    Okay.  And the response that you received was that Josh was the designated spokesperson;
correct?    12:13

Page 126

A.    Yes.

Q.    Okay.  And that is, as we've discussed, a term from the new communications policy; right?

A.    Yes.

Q.    And that policy was not in place during the    12:13 ORIGINATIV campaign; correct?

A.    Correct.  However, the new policy did allow others to be spotlighted outside of me during that same communication policy.

Q.    Okay.  But again, the policy that we just    12:13 referenced was not in place during the ORIGINATIV campaign?

A.    Correct.  However, the same policy that you are referencing allowed other people to be spotlighted that was not me.    12:13

Q.    Okay.

A.    So it did give room for that.

Q.    Right.  I understand that it gave room, but just to be clear -- and I think you've answered this already -- the policy that was in place, regardless    12:14 of its terms in 2023, was not in place during the ORIGINATIV campaign; correct?

A.    Correct.

Q.    Okay.  When you say, quote, Now that it's me, you can't even quote me in the fucking article,    12:14

Page 127

unquote, are you saying that you think that change in the communications policy was because you became a leader of the campaign?

A.   It was because I am a woman and I am Latina.  And I was the leader of the campaign, yes.   12:14

Q.   Okay.  And so your view is that the communications policy for the Phoenix Suns was changed because the organization did not want you as a woman and a Latina being the public voice of the team?   12:14

A.   Possibly.

Q.   And you were upset because this new general policy was an obstacle to you being quoted personally in the release; correct?

A.   It was an obstacle to me receiving the same   12:14 treatment as the previous people who handled the campaign, which were non-Latino men.

Q.   And that same treatment that you want was you being quoted personally; correct?

A.   It was one of the ways that I wanted -- I   12:15 was seeking equal opportunity.

Q.   Okay.  And as we discussed, you used profanity several times in this voice note; right?

A.   In the context of discrimination, I did.

Q.   And towards the end of it, you were   12:15

Page 128

yelling?

A.   Yes.

Q.   And that's because you were upset because you felt you had been discriminated against once again at the Suns; right?                          12:15

A.   Yes.

MR. HEINICKE:  Voice Note 2, please. Before you play that, how are you doing?  Okay?

THE WITNESS:  Yeah.

MR. HEINICKE:  Great.  All right.  Let's          12:15 keep going.

(Whereupon, Defendant's Exhibit 7

was marked for identification by

the Court Reporter.)

(Voice Note 2 played and not reported.)    12:15

BY MR. HEINICKE:

Q.   Okay.  Is that the second voice note that you accidentally sent to Graham Wincott instead of sending to Mr. Montes?

A.   Yes.                                          12:18

Q.   Okay.  And in it you say you are going to go over people's heads to Josh Bartelstein, and he's going to allow you to be in the press release; correct?

A.   Well, at that point --                        12:18

Page 129

Q.   I'm just asking what you said on the thing. Not the context.

Am I correctly summarizing what you said about Josh Bartelstein in that voice note?

A.   No.                                                    12:18

Q.   Okay.  At this point, did you think if you went to Josh Bartelstein, he would allow you to be in the press release?

A.   At this point?

Q.   Yes.                                                   12:19

A.   No.

Q.   Okay.  So would you agree that's inconsistent with what you said in the voice note?

A.   It is inconsistent because my understanding of Josh at the time is different than what      12:19 transpired later.

Q.   So at this point in time, in the fall of 2023, you thought that had you gone to Josh Bartelstein, he would approve it?

A.   Yes.                                                  12:19

Q.   So at that point in time, you did not believe Josh Bartelstein was a racist or a sexist; is that correct?

A.   Can you repeat the question?

Q.   Sure.                                                 12:19

Page 130

You told us that at that point in time you thought if Josh Bartelstein -- if you had gone to Josh Bartelstein to get his approval for you to be in a press release, he would have said yes.  So I will ask you a more specific question.                    12:19

So at that point in time, you did not think that Josh Bartelstein was in any way biased against you personally; correct?

A.   In any way?  No.

Q.   Because of your race.                              12:19

A.   In any way, no.  I mean, like, that's a very specific question.

Q.   I'm asking you.  At that point in time, did you think that Josh Bartelstein was biased against you because of your race?                              12:20

A.   No.

Q.   At that point in time, did you think Josh Bartelstein was biased against you because you're a woman?

A.   Possibly.                                          12:20

Q.   But you still thought he would approve you in the press release?

A.   At that point in time, yes.

Q.   At the beginning of this note you acknowledge that you had been yelling earlier;      12:20

Page 131

correct?

A.   Yes.

Q.   And shortly into the recording you refer to Mr. Wincott as a weak fucking leader; correct?

A.   Yes.                                                    12:20

Q.   Would you agree that it's unprofessional to call someone a weak fucking leader?

A.   I would agree that it's unprofessional to do it directly and with ill-intent.  However, this was in a different context.  It was in the context   12:20 of discrimination, retaliation.  And I feel like this is a very gray area that can't be black and white.

Q.   Would you agree that it's disrespectful to call someone a weak fucking leader?                         12:21

A.   I would say it's disrespectful if you do it to their face, yes.  And I mean that, like, directly and intentionally.

Q.   And would you agree that someone who is called a weak fucking leader could reasonably be       12:21 offended by that comment?

A.   Yes.

Q.   Okay.  And in this case, you referred to your boss Graham as a weak fucking leader?

A.   I did.  But again, it was in the context of   12:21

Page 132

discrimination and frustration that I was not receiving equal opportunity to men and non-Latino men.

Q.   You were the leader of the El Valle campaign; right?                                    12:21

A.   Yes.

Q.   If at this time Graham had called you a weak fucking leader, would you have presumed that he was doing it because he was racist and/or sexist and discriminating against you?                          12:21

A.   Possibly.

Q.   Well, would you?

A.   If he called -- could you repeat the question?

Q.   Sure.  You get a voice note, whether       12:22 intended for you or not, but you hear Graham in the fall of 2023 call you a weak fucking leader after everything you've done on the El Valle campaign, would your assumption be that he's reached that conclusion because he's racist and sexist and       12:22 discriminating against you?

A.   Possibly.

Q.   If you had received such a voice note and possibly concluded that this was the result of discrimination, would you have complained about it   12:22

Page 133

to the team?

A.   I don't understand your question.

Q.   Sure.  If you had received a voice note from Graham that called you a weak fucking leader and you viewed that as possibly an instance of discrimination, would you have complained about it to the team?

12:22

A.   It depends.

Q.   Depends on what?

A.   On his reasoning why.

12:22

Q.   Okay.  So if he had called you a weak fucking leader and you thought it was possible that this was discrimination and that was the reason, would you have complained about it to the team?

A.   Possibly.

12:23

Q.   Yeah.  And would you have expected the team to take action against Graham for insulting you in this way?

A.   Depends.

Q.   If Graham Wincott, in the fall of 2023, called you a weak fucking leader, would you expect the Suns to do anything about it?

12:23

A.   It depends on the context.

Q.   Okay.  If Graham Wincott, speaking to someone else, not to you, in a recorded message --

12:23

Page 134

(Voice Note 3 played and not reported.)

BY MR. HEINICKE:

Q.   Is that the third voice note you intended for Mr. Montes but mistakenly sent to Graham Wincott in October of 2023?                                    12:26

A.   Yes.

Q.   And you in that say that you were going to go to Josh Bartelstein.

Did you do that?

A.   I don't remember.                                   12:27

Q.   So Josh Bartelstein is the CEO of the company.  You're outraged about something that you feel has been a discriminatory slight against you, and you don't remember whether you met with him or not?                                                      12:27

A.   No.  Because -- I don't think I did.

Q.   Okay.  So why didn't you go to him?

A.   Because these voice messages were sent to Graham, and that created friction.

Q.   I see.                                             12:27

So the reason you didn't go to Josh was while you may have done so before you mistakenly sent these notes, after you had mistakenly sent these notes, the situation was so turbulent that you thought it unwise to go to Josh at that point?    12:27

Page 136

A.   Yes.  Because then it would just be more retaliation.

Q.   Retaliation for you sending voice notes calling Graham a weak fucking leader?

A.   Well, and I had already been speaking up    12:28 about the discriminatory behavior.  So now I'm just this problematic person with a target on my back. Why would I do that?

MR. HEINICKE:  Can we have Tab 17?  And just for programming notes, so it's 12:30.
12:28

right now.  Can you tell me what our on-the-record

time is so far?

THE VIDEOGRAPHER:  3 hours 43 minutes.

MR. HEINICKE:  Great.  So I'm going to try

to get through this to 12:45 so then we can break    12:28

for lunch; okay?  Is everybody good?  Another 15

minutes.

MS. WALTER:  Yeah.

MR. HEINICKE:  Thank you, Counsel.

Okay with you?                               12:28

THE WITNESS:  I don't have a copy.

MR. HEINICKE:  Oh, no.  I meant the timing.

THE WITNESS:  Yeah.

MR. HEINICKE:  Okay.  So what exhibit is

this?                                        12:28

Page 137

MS. BENNINGER: This is Exhibit 9.

(Whereupon, Defendant's Exhibit 9 was marked for identification by the Court Reporter.)

BY MR. HEINICKE:                                    12:29

Q.   I'm showing you what we'll mark as Exhibit 9.  I suspect this is something you will recognize, but let me just ask:  Do you recognize this?

A.   Yes.                                           12:29

Q.   This is a printout of your November 5th, 2023, Instagram post; correct?

A.   Correct.

Q.   And the first screen is a short video of you; correct?                                         12:29

A.   That is correct.

Q.   And was this video that you posted published on any official Suns social media channels?

A.   No.                                            12:29

Q.   The next several pages of this post you are explaining your role on the El Valle campaign.

A.   That video was sent to me by the videographer who shot it.  His name was Ovit (phonetic) Gonzales.                                 12:30

Page 138

Q.   Okay.  But that video is the one you posted in this Instagram post; correct?

A.   Correct.

Q.   And it was not posted on any official Suns social media channels; correct?                    12:30

A.   Correct.  Ovit sent it to me.

Q.   Okay.  The next several pages of this post are you explaining your role on the El Valle campaign.

A.   Yes.                                              12:30

Q.   On Page 2, you talk about how it was the most meaningful project you've ever worked on.

     Do you see that?

A.   I do.

Q.   Is that true?                                     12:30

A.   Yes.

Q.   And it was a project that would instill pride rather than shame; correct?

A.   Yes.

Q.   And on Page 3, you acknowledge that it took   12:30 a 60-plus person team to execute El Valle; correct?

A.   Absolutely.

Q.   And in other words, as you've said already, you don't contend that you did this alone; correct?

A.   That is correct, but I did lead them.          12:30

Page 139

Q.   And anticipating my question, in your opinion it was your vision, a vision created by Chelsea Montes, that this 60-plus person team executed; right?

A.   Under my leadership, yes.                    12:31

Q.   But it was your vision?

A.   Yes.

Q.   Okay.  Was it Miguel Godoy's vision, too, or exclusively yours?

A.   Well, vision in a marketing lens is more       12:31
holistic.  I think Miguel had a piece of the puzzle.
A piece of the vision in terms of the actual uniform design.

But El Valle was bigger than that.  It was a season-long initiative and the jersey was just a       12:31
piece of it.

There were other components.  You know what I mean?  There was the car.  There was the branding.
There was the halftime entertain.

Should I stop?                                  12:31

Q.   So --

A.   So to answer your question, I believe that Miguel had a piece of the puzzle.  However, I was the one who guided the entirety of the vision.

Q.   Okay.  And you say -- would you say Graham    12:32

Page 140

Wincott had a piece of the vision on this campaign?

A.   Of the vision, possibly.  I mean, he had a piece of the puzzle.  But I wouldn't say he guided vision, no.  That was me.

Q.   Okay.  And you write that this campaign was   12:32 entirely -- was led entirely by a woman.

A.   Led, yes.

Q.   And that's because it's your belief that you were the sole leader of this campaign?

A.   I would say I was the main leader.   12:32

Q.   Okay.  So when it said "led entirely by a woman," that woman that you're referencing is yourself?

A.   That is correct.

Q.   And so it's your view at this time that you   12:32 entirely led the campaign?

A.   I would say that I led the campaign and that there was other people who contributed to it.

Q.   Were some of those people men?

A.   Yes.   12:33

Q.   But --

A.   But this was led by a woman.  Me, yes.

MR. HEINICKE:  Let's go to, if you agree, we go to Tab 19.

So this is exhibit what?   12:33

Page 141

MS. WALTERS:  We're holding 9 so it should be 10.  Trying to help her out.

MS.  BENNINGER:  Appreciate the help.

(Whereupon, Defendant's Exhibit 10 was marked for identification by                       12:33 the Court Reporter.)

BY MR. HEINICKE:

Q.  Are you able to see the screen here on the laptop?

A.  I am.                                                    12:33

Q.  Okay.  And as you look at start of this, do you recognize this video?

A.  I do.

Q.  Okay.  And is this the -- a video that you posted on your Instagram -- your personal Instagram   12:33 account on November 5th, 2023?

A.  Yes.

Q.  And the earlier post that we were talking about, that was also on your personal Instagram account; correct?                                             12:34

A.  I think these are the same posts.

Q.  Yes.

A.  Yes.

Q.  So all of this material that we are looking at was posted on your personal Instagram account?      12:34

Page 142

A.   Yes.

MR. HEINICKE:   Would you play the video, please.

(Video played and not reported.)

BY MR. HEINICKE:                                              12:34

Q.   Now that we've watched the whole video, is that the video you posted on your Instagram account on --

A.   Yes.

Q.   -- November 5th, 2023?                               12:34

A.   Yes.

Q.   And that clip is part of the behind-the-scenes video put out publicly by the Suns; right?

A.   Yes.                                                 12:34

Q.   Okay.  But it's not the whole behind-the-scenes video that was put out by the Suns; correct?

A.   Well, it's impossible to include the entirety of the video because Instagram has a time   12:35 limit on how much you can upload.

Q.   But no one was compelling you to make this Instagram post; correct?

A.   I -- I wanted to make that post.

Q.   I understand.  I mean, obviously you wanted   12:35

Page 143

to make it.  You made it.  I'm telling you no one
was compelling you to do this.  You did this of your
own volition?

A.   Correct.

Q.   Okay.  And in this post that you made of          12:35
your own volition, you posted an excerpt of the
behind-the-scenes video but not the whole video;
correct?

A.   Correct.  Because I can't post the whole
video.                                                 12:35

Q.   But you also have the choice not to post
anything.  So it's really a simple question.

When you posted this on Instagram, you
posted it with an excerpt of the behind-the-scenes
video, not the whole thing; right?                     12:35

A.   Well, it was impossible to do so, so I
couldn't.

Q.   Okay.  But you did post it with an excerpt?

A.   I did post an excerpt of the video because
I could not post the video in its entirety because     12:36
Instagram has limits to how long you can make an
upload.

Q.   And the video also has audio; correct?

A.   Yeah.

Q.   And the video had audio when you posted it     12:36

Page 144

in your Instagram post?

A.    Yes.

Q.    Okay.  So this excerpt from the Suns' behind-the-scenes video that you posted on Instagram had audio in it when you posted it on your personal account on Instagram?

A.    Yes.

Q.    Okay.  I don't know why you are reading the communications policy right now, but we don't have a question related to that right now.

MR. HEINICKE:  So there is a third video. Can we look at that?

BY MR. HEINICKE:

Q.    So I'll ask you again --

MR. HEINICKE:  Well, I want her to see it.

THE WITNESS:  I can see it.

MR. HEINICKE:  Okay.  Great.

MS.  BENNINGER:  Do you want me to play it?

(Whereupon, Defendant's Exhibit 11 was marked for identification by the Court Reporter.)

(Video played and not reported.)

BY MR. HEINICKE:

Q.    All right.  Is that the third video that you posted in your November 5th, 2023, post on your

Page 145

personal Instagram account?

A.    Yes.

Q.    And where does this video come from?

A.    The same.  Behind-the-scenes video.

Q.    Okay.  So it's also an excerpt from the    12:38
behind-the-scenes video?

A.    Correct.

Q.    And, in fact, it cuts off a little bit
there at the end.  Was that because you could only
post so much on Instagram?    12:38

A.    Uh-huh, yes.

Q.    And once again, this video obviously has
audio.  Did it have the audio when you posted it on
your personal Instagram account?

A.    Yes.    12:38

Q.    And then there is a photo -- so if we go
back to Exhibit 9, which is your Instagram post.
The photo I'm looking at is the photo of what
appears to be a jersey draped over the seat of a
lowrider car.    12:38

Do you see that?

A.    Yes.

Q.    Did you take that photo?

A.    No.

Q.    Did you -- do you know who took the photo?    12:39

Page 146

A.    No.

Q.    Did you get the permission of the person who took the photo to post it on Instagram?

A.    It was posted on Instagram by the Suns.

Q.    Okay.  Did you get the permission of the                    12:39
Suns to post this on Instagram, your personal account?

A.    No.

Q.    Was this photo that you said was posted by the Suns, was it posted on one of the Suns' official    12:39
media channels?

A.    Yes.

Q.    What channel?

A.    I don't remember.

Q.    Okay.  But one of -- one of the official                    12:39
channels?

A.    Correct.

Q.    Do you know when it was posted?

A.    I don't.

Q.    Did you edit this photo in any way before                   12:39
putting it on your personal social media account?

A.    No.

Q.    Did you crop it, add a filter -- anything like that?

A.    No.                                                         12:39

Page 147

Q.    And so when you posted this Instagram post, you pulled together these various sources, these excerpts that we've seen in this photo and posted it yourself; right?

A.    Yes.                                                    12:40

Q.    You were not sharing someone else's post. This was your original post?

A.    I wouldn't characterize it that way.

Q.    Okay.  Did you put all these items together for this post that you made?                             12:40

A.    Yes.

Q.    Okay.  And so this is a post that you created independently yourself?

A.    Yes.

          MR. HEINICKE:  So let's go off the record.    12:41

          THE VIDEOGRAPHER:  We are off the record. The time is 12:40 P.M.

          (Whereupon, a luncheon recess was

          held from 12:40 P.M. to 1:13 P.M.)

///

///

///

Page 148

Q.    And would you agree with me that for all the things that we went over, had this policy been effective, your post would have violated it?

A.    I would say it depends because it can only be effective when it's, you know, presented to me    13:21 and that I am, you know, acknowledging and signing for it.

Q.    Yeah.  You're not answering my question.

So had this policy been in effect as the effective date would suggest, when you made your    13:21 post, your post would have violated it because, for example, it had a video with sound or music; is that correct?

A.    No.

Q.    Okay.    13:22

A.    Because this policy was not rolled out, to our knowledge, as employees until late November.

Q.    Please listen to my question.

MS. WRIGHT:  I'm going to object to the question because it calls for speculation.  If it    13:22 wasn't out so she doesn't know whether or not it would have violated it.

MR. HEINICKE:  She doesn't know whether it was out or not actually is what she testified to.

///    13:22

Page 155

BY MR. HEINICKE:

Q.   So I think the policy speaks for itself, and you've already confirmed what your post contained.

So -- but to go back:  Your feeling is you 13:22 became aware of this policy, but only after you made your Instagram post?

A.   That is correct.

Q.   Okay.  And did you communicate that to anyone at the time you were written up for the 13:22 Instagram post?

A.   Communicate what exactly?

Q.   That you felt that the policy was not communicated to you until after you made your post.

A.   Yes. 13:23

Q.   Okay.  What did you say?

A.   I told HR that I did not violate the social media policy repeatedly.

Q.   Okay.  But did you tell them that was because you hadn't learned of it until after your 13:23 post?

A.   I told them it was because I hadn't violated the social media policy.

Q.   But you didn't explain to them that even though the effective date was October 27th, 2023, 13:23

Page 156

you were not aware of it until after your post?

Did you tell them that?

A.   No.   I told them I did not violate the social media policy given the understanding that I had at the moment.                                                    13:23

MR. HEINICKE:   Okay.   Let's go to Tab 21, please.

I will show you what we're marking as exhibit -- what exhibit is this?

MS.   BENNINGER:   13.                                   13:24

MR. HEINICKE:   13.

(Whereupon, Defendant's Exhibit 13 was marked for identification by the Court Reporter.)

BY MR. HEINICKE:                                              13:24

Q.   Do you recognize this e-mail exchange?

A.   Yes.

Q.   This relates to an interview -- well, this is an interview request from someone named Aileen Carrasco at Telemundo; is that correct?               13:24

A.   Yes.

Q.   Had you met Aileen Carrasco before?

A.   Yes.

Q.   When did you meet her?

A.   Years ago.                                             13:24

Page 157

Q.   Years before this e-mail?

A.   Yes.

Q.   Okay.  And had you talked to Ms. Carrasco about an interview before you received this e-mail?

A.   I don't remember.                              13:24

Q.   Did you source the interview that is at -- in question in this e-mail?

A.   I don't remember.

Q.   So you don't know, one way or another, whether you sourced this interview with Telemundo?     13:25

A.   I don't.

Q.   Okay.  After you got this e-mail, it looks like you looped in the communications department; is that correct?

A.   Yes.                                           13:25

Q.   And that was the protocol under the new communications policy we just discussed; right?

A.   That is correct.

Q.   Interview requests had to go through the communications department?                            13:25

A.   That is correct.

Q.   Okay.  So on November 7th, 2023, you were well aware of the new communications policy; correct?

A.   I was well aware of this communications       13:25

Page 158

policy.  The '23-'24 team member summit policy.

Q.  Very good.

And the communications department ultimately approved you to do this interview; right?

A.  They ultimately approved and boxed me into this Telemundo interview while I was also approached by Dana Cortez, that is an English radio show, and she also requested to have me be part of her radio show, and that opportunity was also forwarded to the communications department.  And that opportunity was declined.

So I was boxed into this Spanish-Speaking one because I'm Latina and I speak Spanish.

Q.  Did you not want to do this interview?

A.  I did want to do this interview.  However, I am more well spoken in English than I am in Spanish, and I voiced concerns repeatedly about being boxed into Spanish media.

Q.  Okay.  So back to the question, which is a simple question.  The communications department approved you to do this interview; right?

A.  The communications department approved me to do solely this Spanish-speaking interview even though I had opportunities to speak to English press as well.  And I am more well spoken in English than

Page 159

I am in Spanish.

And that was based off the fact that I speak Spanish and that I was good enough for the Spanish media, but I was not good enough for the English media.                                      13:27

I think, like, the whispering between you guys is a little distracting.  So I don't know.  I just feel like I would like to get my answer out and not be interrupted by it, if that's okay.

Q.   I feel you've gotten your answer out.  Do     13:27
you feel you've gotten your answer out?

A.   I did, but it's just a little distracting.

Q.   Well, it would be more distracting if we spoke without whispering.  So I will submit to you that this is the way these depositions go.        13:27

A.   I would just appreciate if I could finish speaking before the whispering happens, because I get, like, distracted by it, and I can't fully give you, you know, my entire answer with that distraction.                                         13:27

Q.   Okay.  Are you ready for the next question?

A.   I am.

Q.   Did you source the Dana Cortez interview?

A.   No.  Dana reached out to me.

Q.   Okay.  We talked a little bit earlier about   13:27

Page 160

the medical issue that you dealt with and
fortunately passed.

Can you remind me:  At what point did you
first begin experiencing the medical issues when you
were with the Suns?                                    13:28

A.   It was mid-November.

Q.   Of 2023?

A.   Correct.

MR. HEINICKE:  Okay.  Can I show you
Exhibit 14.                                            13:28

(Whereupon, Defendant's Exhibit 14
was marked for identification by
the Court Reporter.)

BY MR. HEINICKE:

Q.   Do you recognize this e-mail chain?        13:28

A.   Yes.

Q.   Okay.  And this appears to be an e-mail
chain in which you are notifying Mr. Wincott and
Mr. Chieng that you were sick; correct?

A.   Correct.                                     13:29

Q.   And on November 26, 2023, you said you were
running a fever; is that right?

A.   That sounds about right.

Q.   And the next day, Monday, November 27th,
you said you were still running a very high fever;    13:29

Page 161

is that correct?

A.    Yes.

Q.    Had you been sick before November 26, 2023, that month?

A.    I don't recall.  My best recollection was    13:29 what I've shared, which was that I got sick in that, like, mid-November point.  So this is consistent.

Q.    Okay.  And was this sickness, this fever related in any way to the bells palsy issue?

A.    I don't know.    13:30

MR. HEINICKE:  Can we go to the next exhibit, please, 27-1.  Is that okay with you?

MS. BENNINGER:  Exhibit 15.

(Whereupon, Defendant's Exhibit 15

was marked for identification by    13:30

the Court Reporter.)

BY MR. HEINICKE:

Q.    So the cover is an e-mail from Michael Hertel to you on January 10th, 2024, and then beyond the slip sheet is a form which it would appear --    13:30

MS.  BENNINGER:  I passed you the wrong form.

MR. HEINICKE:  Yes, you sure have.  I'll take that one back if I may.

MS. WRIGHT:  What exhibit is this?    13:31

Page 162

MR. HEINICKE:  It's still going to be the right number but we'll --

MS. BENNINGER:  Yes.  I marked it correctly on line, but I gave the incorrect physical version. So apologies.                                             13:31

MR. HEINICKE:  Sorry about that.

MS. BENNINGER:  My apologies.

MS. WRIGHT:  15.

BY MR. HEINICKE:

Q.  So January 2nd, 2024, e-mail from you to      13:31
Michael Hertel.

Do you recognize this document?

A.  Yes.

Q.  And behind the slip sheet is a form that it appears you filled out and signed.                    13:31

Do you see that?

A.  Yes.

Q.  Okay.  Do you recall filling out this form?

A.  Vaguely.

Q.  Okay.  On the first page here it says that    13:31
the date of the disability was January 3rd, 2023.

Is that -- that's a typo, the disability -- your disability leave began on January 3rd, 2024; right?

A.  I don't remember exactly.                       13:32

Page 163

Q.   But it didn't begin in January of 2023;
right?

A.   I don't remember exactly.

Q.   Well, you just said you got sick in the
middle of November 2023.                                    13:32

A.   Yes.

Q.   So would you agree with me that it's far
more likely that your leave began in January of '24
than it did in January of '23?

A.   January of '24 than January of '23?       13:32

Q.   When did you take your FMLA leave from the
Suns?

A.   I think it was like late December, early
January.

Q.   So late December 2023 to early January      13:32
2024; correct?

A.   Correct.

Q.   Okay.  And so when this chart -- when it
says your estimated return to work date is
January 28th, 2023, that is likely a typo and your     13:33
estimated work date as you -- return to work date,
as you remember it, was January 28th, 2024.

A.   Oh, I see.  I see what you mean.  Yes.

Q.   And it says date first treated April 23rd,
2022.  Was that the first time that you saw this       13:33

Page 164

provider, this medical provider?

A.   That sounds correct.

Q.   And the medical provider is Marie Paulene Jean-Baptiste; is that correct?

A.   That's correct.                              13:33

Q.   And she's a psychiatric nurse practitioner?

A.   Yes.

Q.   What facility does she work for?

A.   She used to work for Serenity Mental Health Centers and now she has her own practice and she     13:33 works at Pouring Hope Services.

Q.   And why did you begin seeing her in 2022?

A.   ADHD.

Q.   Okay.  Is this form correct that you had an onset of depression and anxiety -- excuse me,     13:34 symptoms in early November?

A.   Well, it says flare-up of depression and anxiety due to stress causing bells palsy.  Initial onset of depression and anxiety symptoms occurred early November.  Bells palsy occurred on December     13:34 7th.

Q.   So did you have an onset of depression and anxiety symptoms in November 2023?

A.   Yeah.  It was directly tied to the discrimination.  I mean, that is consistent with the     13:34

Page 165

voice messages.  With the, you know, being denied

the opportunities to speak to press; to the launch

of El Valle.

Q.   Okay.  So the denial of press opportunities

was a cause of your depression and anxiety?          13:34

A.   It was a piece of it.  I would say that

the -- it was a bigger, like, macrolevel issue of

just not receiving equal opportunity to the

predecessors that handled the City Edition uniform

campaign the previous year.                          13:35

Q.   Okay.  And you began with this therapist in

2022?

A.   It looks like it.  It sounds about right.

Q.   And were you suffering issues caused by

work then as well?                                   13:35

A.   Yeah.  I would say, like, it would

fluctuate.

Q.   Okay.  So from April of 2022 forward, Marie

Paulene Jean-Baptiste, who is a psychiatric nurse

practitioner, was helping you when you would have    13:35

these time-to-time flare-ups because you were being

discriminated against at the Suns?

A.   I wouldn't characterize it like that.

Because I received ADHD diagnosis during my, you

know, when I started visiting.                       13:35

Page 166

Q.   I understand.

But you told us that she was helping you with the issues -- well, let me just ask:  Was she helping you with some of the trauma caused by your work going back to April of 2022?                    13:36

A.   I would say a portion of her help was to that.

Q.   Okay.  And the form says bells palsy occurred on December 7th.  As I understand it, bells palsy is a form of facial paralysis; is that right?    13:36

A.   Yes.

Q.   And other than your medical records, do you have any documentation of this condition?

A.   I mean, medical records are strong.

Q.   Okay.  How long did the bells palsy last?    13:36

A.   A month, month and a half.

Q.   Okay.  And obviously meeting you here today, everything looks fine.  Was your face back to normal in about a month then?

A.   A month.  Month and a half.  But, I mean, I    13:36 would say that there is -- I mean, I know you can't tell.  But, like, my face never 100 percent recovered.  This side on this side isn't exactly like symmetrical as it used to be on this end.

Q.   Okay.  And do you think some of the issues    13:37

Page 167

that you had suffered over the years -- from the years of discrimination with the Suns played a part in causing this bells palsy?

A.    Yes.

Q.    Okay.  On this form that you filled out,    13:37 the short-term disability form, there is a box at the top that says:  "Was the disability work-related?"  And you checked "no."

Do you see that?

A.    Yes.                                          13:37

Q.    Okay.  Was that an honest statement at the time?

A.    I would say I didn't want to be discriminated against.  Retaliated against, I should say.                                              13:37

Q.    So you felt the disability was work-related, but you checked no because you didn't want to be retaliated against for checking yes.

A.    Well, if you look at -- on top of that, I said:                                                 13:37

"Flare-up of depression, anxiety due to stress causing bells palsy.

Initial onset of depression and anxiety symptoms occurred early November."

So that is really consistent with, like,    13:38

the time line of events that I was -- and the

distress that I was experiencing.

Q.   Right.

So this was a work-related flare-up?

A.   Well, I think, like, you have to like have     13:38

a -- like you have to prove that and I wasn't sure

how to do that.  And I also didn't want to be

retaliated against.

Q.   So what is the reason you checked "no" on

the "was this disability work-related?"              13:38

Was it because you couldn't prove it or you

didn't want to be retaliated against?

A.   I think it was a combination of factors.

Q.   So you would suggest here that this form

that says the disability was not work-related is     13:38

actually not accurate?

A.   I'm not sure.

Q.   You're not sure whether work-related

discrimination over the years caused the bells palsy

or not?                                              13:38

A.   I mean, I can only speak to my experience,

and I think the symptoms that I'm describing are

consistent with the timeline of the discrimination

and the unequal treatment.

Q.   Very good.  Thank you.                         13:39

Page 169

MR. HEINICKE:  Okay.  Is this the same form?

MS. BENNINGER:  Yes.

BY MR. HEINICKE:

Q.   So if we go to the last page.  It's actually on the back, like that.        13:39

A.   Same thing?

Q.   Yeah.  So the back page.  It's basically Page 8 of 8, and the Bates label at the bottom is 1536.                                              13:39

This says that there is a change in medications to regulate moods and control symptoms targeting depression and anxiety.

Do you see that?

A.   Yes.                                           13:39

Q.   Okay.  Prior to this symptom flare-up and bells palsy, had you been taking medication for depression?

A.   Yes.

Q.   What medication --                             13:40

A.   Was it for depression?  I don't know.  I take Propanolol, and that helps with my anxiety.

Q.   Can you say the name of the drug again, please.

A.   Propanolol.                                    13:40

Page 170

A.   Yes.

MR. HEINICKE:   We go to Tab 28.
Exhibit what?  16.

(Whereupon, Defendant's Exhibit 16
was marked for identification by          13:45
the Court Reporter.)

BY MR. HEINICKE:

Q.   So this is a February 2nd, '24, e-mail from
Jeff Chieng to you as well as the write-up that
we've been discussing.                            13:45

Do you recognize these documents?

A.   Yes.

Q.   Okay.  And have I described them correctly,
that this is an e-mail from Jeff Chieng to you that
you received and also the disciplinary form that you   13:45
received?

A.   Yes.

Q.   Mr. Chieng at the time was chief marketing
officer; correct?

A.   Yes.                                         13:46

Q.   And as we discussed before, he was Graham
Wincott's supervisor; right?

A.   Correct.

Q.   And the e-mail attaches the written warning
you were given for the voice notes and the Instagram   13:46

Page 175

post; right?

A.   It wasn't just a warning.  It was a final written warning, and it was my first warning ever.  And so I found it egregious.

Q.   Okay.  So the e-mail attaches the warning that you just described; correct?                        13:46

A.   That is correct.

Q.   Okay.  And was this e-mail the first time you received this document?

A.   I believe so.  Jeff gave this to me in person.                                                       13:46

Q.   And this e-mail is from Friday, February 2nd; correct?

A.   It looks like it.

Q.   And is that the Friday of the week when you returned from leave?                                      13:47

A.   Yes.

Q.   Okay.  And if we could look at the warning itself, which is the document behind the colored sheet of paper.  As we noted before, it's dated November 22, 2023.                                          13:47

A.   Yes.

Q.   And you said before that you were sort of experiencing health issues and sick in mid-November of 2023.                                            13:47

Page 176

So this e-mail, this form is dated around the same time that you began experiencing health issues; correct?

A.    Around the same time, yeah.

Q.    Okay.  And between the time that you were          13:47
getting sick and between the time that you received this warning, you went on leave; right?

A.    Yeah.  I was, like, on and off.  Yeah.

Q.    And do you think the reason why Mr. Chang didn't talk to you about this form dated November          13:48
2023 until you returned in February was because he wanted to respect your leave time and allow you to recuperate?

A.    Possibly.

Q.    Okay.  On the first page, the box for final          13:48
written warning is checked; right?

A.    That is correct.  And this was my first warning ever.

Q.    This wasn't a suspension without pay; correct?                                                        13:48

A.    No.  But it was also the first written warning I have ever gotten, in the five years; and stellar performance over the past five years.

Q.    Yeah.  You said that several times.

So this was the first warning you ever got;          13:48

Page 177

right?

A.   That is correct.

Q.   Okay.  This wasn't a suspension without pay; right?

A.   That is correct.                              13:49

Q.   It did not affect your pay at all, in fact; correct?

A.   No.

Q.   It did not change your title either; correct?                                          13:49

A.   Correct.

Q.   And it was not a termination; correct?

A.   Correct.  However, it was a setup to terminate me.

Q.   And you maintained the same title that you   13:49 had before you received this warning; correct?

A.   Yes.  But I was also, like, performing way above that title.

Q.   My question wasn't about your performance.

My question was:  Before you received this   13:49 warning and after you received this warning, you maintained the same title; correct?

A.   That is correct.  However, it was a final written warning, which means that they were setting me up to fire me.                             13:49

Page 178

Q.    How do you know that?

A.    Because it's the first warning I've ever gotten that has been a final written warning.  And I've had years of great performance and this is where they escalated to.                                13:50

Q.    So in your mind, you were about to be fired?

A.    Oh, yeah.

Q.    And so did you resign to avoid being fired?

A.    I resigned because I could not believe how    13:50 egregious they were being, like, with their treatment of me with their discrimination.

After me making them millions of dollars with this campaign, spending two and a half years doing it, always working above my pay grade, always    13:50 picking up the work of everybody else, always getting positive performance reviews, always getting such great feedback from other peers.

Like, they loved my work.  They allowed me to lead this campaign and make them millions of    13:50 dollars, and then they give me a final written warning that would ultimately set me up to be fired.

And I believed that there was no pathway for me.  There was -- I mean, it was just so many years of discrimination.  And then now there was    13:51

Page 179

retaliation.

I just did not believe that I could -- and then on top of that, like I had just came back from medical leave.  I had bells palsy.  That was like -- like, you know, it was caused by them in my mind.    13:51 It was caused by them.  It was caused by the stress.

So this was an environment that I literally could not, from a health perspective and a mental perspective, stand.

I was documenting these concerns with my    13:51 psychiatrist.  Like I was depressed.  I was anxious.

Q.    So on the form, there is a description of events or behaviors.

Do you see that?

A.    Yes.    13:52

Q.    Okay.  And with respect to the voice notes, do you dispute that they were, in fact, insulting to Graham?

A.    Well, I have already testified to this, and I want to reiterate that those voice messages -- and    13:52 you have already said this too -- were inadvertently sent to him.

And on top of that, it was in the context of me complaining about discrimination several times over the years in that moment.    13:52

Page 180

career and opportunities in the future.

Q.   And that public presence that Shawn got and you didn't get is something that would have advanced your career had it been given to you?

A.   Absolutely.                                             14:08

Q.   You think the reason that you were denied this opportunity that Shawn got was because you are a Latina?

A.   Absolutely.  There is no other reason why I received only a Telemundo interview other than my     14:08 Spanish-speaking abilities and because I'm a Latina.

Q.   But you believe that you didn't receive the overall public acknowledgment and presence that Shawn did because you're a Latina?

A.   Because I'm a Latina woman.                             14:09

Q.   Are you a shy person?

A.   It depends on the situation.

Q.   Okay.  Are you the type of person who would discuss intimate aspects of your life on social media?                                                       14:09

A.   It depends on what aspect of my life I want to talk about.

Q.   Okay.  But are you, in the right circumstances, willing to talk about intimate aspects of your life on social media?              14:09

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

A.   I would say some aspects, but not all.

Q.   Okay.  And when you were at the Suns and at the time you were leaving, did you want to be on television?

A.   I wanted to -- I wanted to have press opportunities around El Valle.          14:10

Q.   Yeah.  On television?

A.   Television, radio, online.

Q.   Okay.  And did you want to be known publicly to the community, you yourself?          14:10

A.   I wanted to be known to the community for my work.

Q.   Okay.  So would you consider yourself a public attention seeker?

A.   No.          14:10

Q.   Would you consider yourself a fame seeker?

A.   No.

MR. HEINICKE:  Can we go to Tab 30, please.

(Whereupon, Defendant's Exhibit 17 was marked for identification by          14:10 the Court Reporter.)

MR. HEINICKE:  Thank you.  This is Exhibit 17.

MS. WALTERS:  You got to get quicker than that.          14:11

Page 196

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

BY MR. HEINICKE:

Q.   February 6 e-mail from you to Jeff.  Do you recognize this document?

A.   Yes.

Q.   Okay.  And you sent this to Jeff four days   14:11 after you received your written warning; correct?

A.   Yes.

Q.   When did you actually decide you were going to resign?  Was it as soon as you received the warning?                                                  14:11

A.   Yes.

Q.   Okay.  So as soon as you received the warning, you said I'm resigning, but you notified Jeff four days later; is that correct?

A.   I believe Jeff handed me the write-up on a   14:11 Friday, and I took till Monday or Tuesday to give him that warning.  But -- so I took the weekend to kind of think about it.  And I didn't tell Jeff that, obviously.

But I was just shocked by it.  I remember   14:12 being -- I remember going home crying after that Friday.

Q.   And we talked about this earlier, but you provided the two weeks' notice.  So you were working through February 19th?                                   14:12

Page 197

A.    Yes.

Q.    And can you read for me the first sentence of the e-mail?

A.    "I appreciate the opportunities that were given to me during the past five years here, and I wish nothing but the best in the years ahead to the talented team we have here."

Q.    Okay.  Did you mean that when you wrote that?

A.    I would say this was the politically correct thing to send.  I didn't want to be retaliated against.

Q.    You didn't want to be retaliated against after you resigned?

A.    Correct.

Q.    So were you not being honest when you sent this e-mail?

A.    I would say that I was being courteous professionally.

Q.    When you sent this e-mail, did you have new work lined up?  Did you know what you would be doing after the Suns?

A.    At this moment, no.

Q.    As of February 6, 2024, you didn't know

14:12

14:12

14:12

14:12

14:13

Page 198

what your next position would be?

A.   Correct.

Q.   Okay.  When did you find out what your next position and work would be?

A.   I don't recall the exact date, but it was a discussion.    14:13

Q.   Okay.  And it was soon thereafter, meaning within February you knew you had a new job?

A.   Yes.

Q.   Okay.    14:13

MR. HEINICKE:  Do you want to do this one?

Okay.  Can I see Tab 29, please?

MS. BENNINGER:  32.

(Whereupon, Defendant's Exhibit 18 was marked for identification by the Court Reporter.)    14:14

MS. WALTERS:  Are we going to go the whole seven hours?

MR. HEINICKE:  Yep.  I mean, if there's a way to avoid that.  We are going to have to have a second day.  And I promise that Chloe and I will talk about that at the break.    14:14

BY MR. HEINICKE:

Q.   Do you recognize this e-mail, Ms. Montes?

A.   Yes.    14:14

Page 199

afraid to have a conversation with Stacy Mitch about this because I'm afraid she's going to retaliate against me."

And Kim as a friend said, "You know, I could see your point with that."          14:29

Q.   You were afraid you would get retaliated against even after you resigned?

A.   Yes.

Q.   When you received this e-mail on February 8th from Joy Harper, did you respond in any way or          14:29 send an e-mail to say this is an inaccurate summary?

A.   I don't remember.

Q.   Okay.  Do you think that had you felt this was inaccurate at the time, that you would have sent an e-mail protesting its inaccuracy?          14:30

A.   That's difficult because I had already resigned, and I was, like, overwhelmed with the stress of dealing with this situation.  Where I continued to complain about unfair treatment, unequal treatment, and I continue to be gaslit about          14:30 it.

And so you just go in your head, you are over it.  You are tired of fighting a system that continues to discriminate against you and continues to protect white people essentially.          14:30

Page 211

Q.    Okay.  Other than what you told us, is there anything missing from this summary to be accurate as to what you and Joy and Kim discussed?

A.    I also told her that Stacy Mitch followed me on Instagram, like a couple days before my                14:30
Telemundo interview, which I perceived as, like, monitoring on her end.

Q.    Okay.  Anything else needed to make this conversation summary accurate?

A.    I also told her, and Graham admitted to                14:31
this, in one of the meetings, either in this one or one in November, I don't remember because there was like a lot of HR meetings about these -- like what was going on.

But when I told Graham about the Ben                14:31
Krishner incident, he told me not to report it to HR because it would make working with Devon hard.  And so in this, there is a summary that says:

"While unfortunate that the
situation with Ben happened and the                14:31
response from your manager impacted you
negatively, we believe we demonstrated
our commitment to a culture of respect."

But they never addressed my issues.  Like
they never actually addressed the discrimination.        14:32

Page 212

Addressed the fact that Graham told me not to report something to HR.  Instead they literally focused on me repairing the relationship with Graham.

Q.    Okay.  Anything else necessary to make this summary of the conversation complete and accurate as you recall it?                                          14:32

A.    I mean, that's all I can recall at the moment.

Q.    Okay.  The conversation recapped doesn't mention Kyle Pottinger, does it?                          14:32

A.    It does not.

Q.    Did you ever tell anyone in the people in culture department that you thought Kyle had been inappropriate with you?

A.    No.                                                  14:32

Q.    You forwarded this e-mail to your personal e-mail account.  Why did you do that?

A.    Because I was contemplating pursuing legal action.

Q.    So as of the time you resigned, you were    14:32 contemplating suing?

A.    I believe I started thinking that.  Like I was contemplating it, but, like, definitely after, like, the bells palsy stuff.  And I think really when I saw the write-up was like a big kind of          14:33

Page 213

trigger point because I very much perceived that as retaliation.

MR. HEINICKE:  We can take a break.  How about five minutes.

THE VIDEOGRAPHER:  We are off the record.    14:33
The time is 2:32 P.M.

(Whereupon, a recess was held

from 2:32 P.M. to 2:41 P.M.)

THE VIDEOGRAPHER:  Back on the record.  The
time is 2:41 P.M.                                          14:42

BY MR. HEINICKE:

Q.   Anything happen during the break,
Ms. Montes, that would prevent you from testifying
truthfully and accurately here today?

A.   No.                                              14:42

MR. HEINICKE:  Can I have Tab 47, please.

(Whereupon, Defendant's Exhibit 21

was marked for identification by

the Court Reporter.)

BY MR. HEINICKE:                                           14:42

Q.   Showing you what we will mark as
Exhibit 21.  This, from our records, appears to be
the exit interview that you filled out or completed
when you left the Suns.

Do you recognize this document?            14:43

Page 214

A.   I'm reading the document.

Q.   Is this the exit interview that you completed shortly before your last day?

A.   This was a portion of the exit interview.

Q.   Is this the written portion of the exit interview?

14:44

A.   I believe so.

Q.   Okay.  And are these answers that are reflected on this exit interview, are they the answers that you provided?

14:44

A.   Yes.  They are a summary.

Q.   So did you write these responses yourself?

A.   Yes.  My -- this is a summary of my overall complaints.  And in the oral portion of the exit interview, I voiced more complaints and kind of gave more detail.  But this, I would say, is a summary.

14:44

Q.   Did you write yourself the answers that appear in this exit interview survey?

A.   Yes.

Q.   And did you submit this document to the Suns?

14:45

A.   Yes.

Q.   There is a question that asks why you are leaving?  Do you see that?  "Why are you leaving the organization?"

14:45

Page 215

Q. Okay. So does this document as a whole reflect your true feelings at the time?

A. I would say a portion of my feelings, yes. And a summary of my feelings.

Q. It's a summary of the most important aspects of your feelings?

A. It's a summary of my feelings.

Q. Okay. And it obviously talks about what we've talked about before. That one of the primary upsets you had was that you did not feel you had received appropriate public recognition, credit for the El Valle campaign; right?

A. Well, under the back page, it says:

"What, if anything, could have been done to retain you?"

And my response was:

"Treated me equally for the work that I put into the campaign."

Q. And the equal treatment that you wanted was to get the same public credit and appreciation that Shawn got; right?

A. Including the authority, which is to be recognized for my leadership.

Q. Very good.

You wanted the public credit and the

Page 218

authority that Shawn got?

A.   That is correct.

Q.   This summary of your feelings at the time doesn't mention that you felt the difference between your treatment and Shawn's treatment was race-based; correct?

A.   Well, I think -- I mean, the difference between me and Shawn is both racial and gender-based.

And so I don't think I needed to say with the exact words, I was being discriminated against when every single time I complained in all of these exhibits that you have presented to me, I continued to compare myself to Shawn Martinez.

And so clearly, I am saying that I am being treated unequally and unfairly repeatedly.

Q.   And you're convinced that the difference for the treatment between you and Shawn was race- and gender-based discrimination?

A.   Absolutely.

Q.   Do you think it's possible that maybe the Suns just had a different communications approach where they wanted to place more credit on the team generally and the new executives?

A.   Well, the Suns have, like, a historical

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

pattern that I observed throughout my five years

there where I came up with that reasoning.  It's not

just based out of nowhere.

I observed discrimination several times

over the years.  I mean, it happened to me.          14:49

I experienced people saying comments that

were micro-aggressions that were tied to like race,

to tied to gender.  And so I feel like me saying

that this was racially motivated and

gender-motivated is not poof coming out of thin air.   14:49

It's based off of an observed and systemic

pattern that they had and that I observed over my

five-year tenure.

Q.    Okay.  And you said you're convinced that

the differential treatment between you and Shawn was    14:50

based on race and gender.

Do you think it's at least possible that

the differential treatment was the change in the

communications policy?

A.    No.  Because it -- and I will tell you why,    14:50

because the campaigns were literally copy-paste

except different cultures.  And the difference is

that he is a man.  I am a woman.  He is Native

American.  Native American culture was highly

respected.  Mexican culture was always sidelined.       14:50

Page 220

Q.    By whom?

A.    Well, by all of the patterns that I observed.  Do you want me to give you examples?

Q.    So it's your view that the Phoenix Suns placed Native American culture at a higher level than they did with the Hispanic culture that was being celebrated by El Valle?                                    14:51

A.    Yes.  And I voiced those concerns.  When we were creating -- early October when we were still -- before El Valle launched, the way El Valle was treated compared to ORIGINATIV was very different, and I participated in both of those campaigns.                                    14:51

In the ORIGINATIV campaign, Shawn and Graham, who are two men, led the campaign, and they had the authority to be able to basically call on everyone and have them respect the campaign and respect their work.                                    14:51

When I was the leader of the campaign, I was not respected or given that authority in the same way.                                    14:51

And I voiced those concerns in probably early October, if not before that, in a meeting. Like, in front of people, I said the care and sensitivity that you guys are giving to El Valle is not the same as ORIGINATIV.                                    14:51

Page 221

Q.   Okay.  And you think the only possible explanation for the difference in communication plan, and particularly celebration of campaign leader between ORIGINATIV and Shawn and El Valle and you, is race/gender discrimination?                14:52

A.   There are biases that exist within people, where because I am a woman, and especially because I sit at an intersection of being a Latina and a woman, that impacts the way people perceive my leadership.  There are literal studies on this where   14:52 men take the credit for the contributions of women.

And that is a very well-documented thing in research, and that is exactly what happened to me. Because when I led this campaign, El Valle, okay, a very clear example of this is how I was not given     14:52 the Emmy nomination credit.  When El Valle was nominated for an Emmy, my name was not credited in that nomination, and Shawn and Graham's were the year before.

And both of -- both campaigns were             14:53 nominated for the exact same award.  And I, for El Valle, did not only the work of Shawn but the work of Graham and the work of Cahokia, the external agency all put together, and I was not credited in that Emmy nomination.                            14:53

Page 222

A.    That someone who is racist can go both ways.  Are they overtly racist or are they racist implicitly?

Q.    Okay.

A.    And so I think that there is a difference    15:03 between that.  And so -- but a lot of people when they think of the word "racist" jump to an overt racist.  And so that is why I want to clarify that. Because it's entirely possible for Kim to have a bias implicitly.    15:03

Q.    Is Kim Corbitt an overt racist?

A.    An overt racist, no.

Q.    Let me ask you a few questions about your employment actions.

Well, actually, before we do that.    15:03 Following your departure from the Suns, you said you did communicate with Graham in March and in April.

Do you recall what you talked about with Graham?

A.    So I mentioned previously that an    15:04 additional role that I took on outside of my job responsibilities and scope was taking the lead on halftime performances with all Latino initiatives including El Valle.  So that was not my job, but I led booking halftimes.    15:04

Page 232

So I booked these really big artists that were literally featured in, like, the Top 10 of Apple Music for the Latino community, including Santa Fe Klan and Gabito Ballesteros.  Huge names. Bigger than anybody the Suns have ever really booked, because the Suns usually book people who, you know, were famous years ago.  These people are relevant now, which is a really big deal.

I mention all of that because -- because of that, Graham told me that he would offer tickets to both of the games for those performances.

And so the first game was where Gabito Ballesteros was featured, and it was a Lakers game in February.  And so he sent me tickets for that. At the game, I believe it was either Natalia or TJ who took me backstage so I could meet Gabito.

Now, after that, Stacy Mitch complained that I was backstage, although I was backstage with employees.  I was not there just wandering around.

And taking people backstage is something we always do.  Like, it's not a big deal.  But because it was me and they were further retaliating against me, Stacy Mitch made it a big deal that I was backstage.

And then Graham ultimately never gave me

15:04

15:05

15:05

15:05

15:05

Page 233

the tickets to the Santa Fe Klan game, I believe it was in March.

So I don't think I talked to him in March, but I don't recall exactly.  But that is the context to which I talked to Graham in February.          15:06

Q.   Okay.  So you don't recall having any communications other than that with Graham in March or April?

A.   I don't recall.

Q.   While you were at the Suns, was your pay      15:06 ever reduced?

A.   No.

Q.   While you were at the Suns, were you ever demoted?  Meaning, was your title ever reduced?

A.   No.                                           15:06

Q.   While you were at the Suns, was your employment ever suspended?

A.   No.

Q.   And did you receive -- how many promotions did you receive while you were at the Suns?        15:06

A.   I received two promotions.

Q.   Did you ever formally apply for a promotion that was listed and that you didn't receive?

A.   Yes.

Q.   Okay.  How many times?                        15:06

Page 234

A.   I applied for the director of brand and activation.  Brand strategy and activation.  Director of brand strategy and activation.

Q.   When did you do that?

A.   I believe it was September or October of 2023 right before El Valle launched.                    15:07

And that was another consequence to everything that happened, is they failed to promote me even though I was already performing the duties of director.                                               15:07

Q.   Other than this -- and this was a formal application.  The job was posted and you turned in a written application?

A.   That is correct.  And I interviewed for it as well during -- I interviewed for it during my   15:07 FMLA.

Q.   So you applied in September 2023.

A.   I believe around that timeline.  I don't know exactly.  But I'm sure you guys can find it.

Q.   And interviewed while you were on leave?    15:07

A.   Yes.

Q.   Okay.  And would that promotion been a one-level promotion?  Would it have been a skip-level promotion?  How -- how many levels up would you have gone if you received that promotion?   15:08

Page 235

A.   Well, in terms of job work, I was already doing director-level responsibilities.

Q.   I'm asking about the title.

A.   So the title would have been two levels above me.  However, that has been done before.   15:08 Like, that's not something the Suns haven't done. Michael Ramirez was promoted, who was in the PR department from coordinator to manager which is two levels up.  So being promoted two levels was not something that the Suns didn't do.   15:08

Q.   Okay.  And when did you learn that you did not get this promotion?

A.   They never got back to me.

Q.   So it was someone else promoted into the spot?   15:08

A.   By the time that I left, they still hadn't filled the position.

Q.   So you don't know, one way or the other, who got the spot or at least you didn't know, one way or another, who got the spot by the time you   15:08 resigned; correct?

A.   Yes.

Q.   Okay.

A.   Correct.

Q.   So you don't know for sure, one way or   15:09

Page 236

another, whether you would have received the spot?

A.   I mean, as I've already mentioned, I was already doing the job responsibilities.  And so I feel like I would have had an extremely good shot if it would have -- if they would have treated me fairly.

Q.   Okay.  Were you ever notified that you did not receive the promotion for which you applied?

A.   I don't recall.  I don't think so.

Q.   Okay.  So other than the -- your claim that the Suns forced you to resign, and this promotion that you sought and never got a response to one way or another, did the Suns ever take any action against you that affirmatively reduced your position or compensation, or otherwise materially affected the terms of your employment, other than those two things?

A.   Well, they also denied me credit with the Emmy nomination after I had already resigned.  And I think that's a big deal.

Q.   Okay.  So other than denying you credit for the Emmy nomination after you resigned and causing you to quit and not getting back to you one way or another on this promotion that you sought, were there any other material negative actions taken

Page 237

towards your employment?

A.   Can you repeat the question?  Sorry.  I'm thinking about it.

Q.   The question isn't about a small thing. You know, like a comment that you didn't like or something like that.  This is about stuff that -- material effects -- materially effects your position or your compensation or the terms and conditions of your employment.

And you have told us you felt compelled to quit.

A.   Uh-huh.

Q.   So putting that aside.

A.   Uh-huh.

Q.   And you told us you applied for a skip-level promotion.  And you never heard back one way or another by the time you resigned.

And you've told us that after you resigned you were not nominated along with the rest of the team for the Emmy.

Other than those things, have there been any other instances along the lines that I described?

A.   Well, I think a big piece is like the way that I was going to be treated moving forward.  I

15:10

15:10

15:11

15:11

15:11

Page 238

mean, if you look at the e-mail that Jeff sent me where he said, you know, like I needed to rebuild my trust with the team, and especially with Graham, that basically shows you that I was going to be treated different moving forward.                    15:11

And so I was basically put into this position where it was like, hey, you need to fix things with Graham, but then everything that I've complained about over the discrimination was largely ignored.                                          15:12

And -- well, ignored completely. And so it puts me into this position where I'm no longer going to be given any opportunities for growth because now I have to pander to Graham, essentially, and hope that one day, you know, he can get passed his ego    15:12 being bruised.

And the entire time I'm, like, being treated unfairly and unequally. And so I feel like that's a big impact.

Q.   No, I understand. And that's a culmination    15:12 of years of discrimination that led you to quit; right?

A.   Yes.

Q.   Okay. So other than the fact that you felt compelled to quit and other than the skip-level    15:12

Page 239

promotion that you did not hear back about, and other than the fact that you weren't nominated for the Emmys, were there any other actions that reduced your position or compensation or otherwise materially affected the terms and conditions of your actual employment?

15:13

A.   Well, on top of that, I didn't have executive backing any more with Kyle.

Q.   Okay.  But the Kyle situation didn't change your position or your pay, or anything like that; correct?

15:13

A.   Well, it didn't change, like, my position. But he controlled, like, informal opportunities. And so it's really -- like, within the organization having an executive backing is super important to getting ahead.  For example, Robin -- what is her last name?

15:13

Brown, I believe it was.  Robin Brown got nominated for the top 30 under 30 because she had Vince Kozar backing as an executive.

15:14

Kyle Pottinger promised me that.  And when you lose that, you lose the visibility amongst other executives; the stamp of approval that is super important to get a promotion and to get opportunities whether they are informal or not, and

15:14

Page 240

he controlled that.

Q.  I have mis-asked the question, and I'm sorry.  Let me be more specific.  I'm not talking about things that didn't happen.  I'm talking about --                                                        15:14

A.  But that's important.

Q.  I'm not saying it's not.  I'm talking about things that did happen.

So you did apply for a skip-level promotion, and you never heard back.                           15:14

A.  Well, you keep calling it like a skip-level promotion, and I understand what you are trying to get at.  What I'm saying is that I had observed other people receive those skip-level promotions and it was not uncommon for that to happen.            15:14

Q.  Okay.  So you applied to be the director of brand activation; correct?

A.  Yes.

Q.  Okay.  And you never heard back, one way or another, whether you got that job by the time you    15:15 quit.  You also told us that you felt you were compelled to quit.  And you also told us you weren't nominated for an Emmy.  Those things actually happened.  You applied for this position, and we never heard back one way or another.                   15:15

Page 241

this discrimination?

A.   Sex and race?

Q.   This particular sex and race discrimination that you were not being uplifted on the El Valle campaign?  Was it for the course of the whole campaign?

15:38

A.   I mean, even after my employment, I wasn't given credit for the Emmy nomination.  So I would argue that it even expands past the time that I was employed at the Suns.

15:39

Q.   Okay.  Focusing on when you were employed, were you suffering this discrimination during the entire course of the campaign?

A.   Yeah.  Because it was always treated different than ORIGINATIV.

15:39

Q.   Okay.  And you testified that Graham, in the marketing department, discriminated against you by making you a, quote, workhorse, quote, and not fairly paying you.

A.   Yes.

15:39

Q.   When did, during your time at the Suns, did this occur to you?

A.   Well, according to my exit interview, the entire time.  Because I said no, I never felt appreciated.  Every promotion I got was never given

15:39

Page 263

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

out of sheer appreciation.

I always had to go out of my way to prove that I deserved it because I was doing the work two levels above me.

As a coordinator, I was doing manager-level 15:39 work only to be given a senior coordinator title. As a senior coordinator --

(Court reporter clarification.)

THE WITNESS:  -- work to get a manager title and now as a manager, I am doing 15:40 director-level work only to be given nothing in exchange for it.

BY MR. HEINICKE:

Q.   Okay.  That's a lot of instances.

A.   Yes.                                       15:40

Q.   And we're going to get to the issue of memory and how your memory is so clear going back all these years as opposed to there is a vague memory about stuff that happened more recently.

In front of your water bottle there,      15:40 Ms. Montes, is the complaint in this matter that we looked at before.

Could you open it up to Paragraph 127, please?

A.   Well, I think I should be able to read this   15:40

Page 264

prior to answering any questions about it, because I testified previously that I don't remember reviewing it.

Q.   I'm going to point you to the one part I want to ask you about.                                    15:40

So at Paragraph 127 in your complaint you, or your lawyers on your behalf, state that the Suns subjected you to, quote, repeated and pervasive discrimination, harassment, retaliation and mistreatments in the workplace.                        15:41

Is that correct?

A.   That's correct.

Q.   And that was pretty much true over the course of your tenure?

A.   Yes.                                                15:41

Q.   Okay.  And you have provided a lot of specific details about these instances even years later.  Some dating back as far as five or six years from today.

So like I warned you, I want to explore how   15:41 you can be sure you remember this well -- so well.

A.   Well, some things stick out to me more than others.

Q.   Okay.  So I appreciate that.  You answered the question before I could ask it.                      15:41

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

So that is why you are sure you can remember this so well today, because these things were really offensive and they stick out to you?

A.   Well, it was also, like, repeated over and over and over again throughout years.  And it was                15:41 very, like, similar stuff.

Q.   Okay.  But that's what I'm trying to get at.  Whether these were one-time instances that maybe you misremember or you have embellished out of your anger over what you perceive as mistreatment,       15:42 or whether you can testify under oath today that conduct that happened over a course of years actually did happen.

So let me ask you this, just trying to summarize it:  In light of all of this, and given       15:42 that you are under oath, is it your testimony that you encountered multiple instances of blatant discriminatory conduct over your years with the Suns even dating back to 2019 and 2020, and then continuing throughout your entire tenure?             15:42

A.   Yes.

Q.   Okay.  And let me be specific to Graham.

Is it your testimony with respect to him, that you clearly remember and can testify as such to his acts of discrimination and can say for sure that   15:42

Veritext Legal Solutions
866-299-5127            calendar-ca@veritext.com            www.veritext.com

his discriminatory treatment commenced years ago and ran through the end of your time with the Suns?

A.   Yes.

Q.   Okay.  Just give me one moment.

A.   Can we take a break?                              15:43

MR. HEINICKE:  Let's go off the record.

THE VIDEOGRAPHER:  We're off record.  The time is 3:42 P.M.

(Whereupon, a recess was held from 3:42 P.M. to 3:52 P.M.)                        15:53

THE VIDEOGRAPHER:  We're back on the record.  The time is 3:52 P.M.

BY MR. HEINICKE:

Q.   Okay.  Ms. Montes, anything happen during the break that would affect your ability to testify   15:53 here today?

A.   No.

Q.   If we could go back to the first amended complaint, which is Exhibit 1.  And I promise again I will direct you to the specific part that I want   15:53 to focus on.

And that is at paragraph -- it's in the back of the document.  It starts at Paragraph 132, and you will see there it says Count Roman Numeral VIII, Sexual Harassment.                             15:54

Page 267

Q.   Okay.  And there was also sexual imagery as part of this one, which was the picture on the mural that was going to go on the car.  That was part of issue; right?

A.   Yeah.  So that was related to Media Day specifically.  And on Media Day, that's when there was, like, a mural of like a woman who had, like, really large breasts and a huge butt, and it was like -- she's, like, in a bikini and posed super sexy in like the mural.

And that is when Ben called me over and was like, "Chelsea, come here."  And he's like, "Would you look at that?"  He said, "Isn't it beautiful?  And he's like, "It's culture."

And I remember being, like, very upset over that and offended because it almost felt like -- I mean, I was uncomfortable.  And, like, I couldn't believe that he still was holding that against me.

And he wanted to, like, basically prove to me that it was, like, a piece of the culture in his mind, and that they should have moved forward with doing a mural of, you know, a cheerleader -- whatever.

And so I felt that he was, like, under -- not only like undermining my authority, but also,

Page 271

like, reducing me down to my femininity as a woman and, like, it felt very objectifying.  And, I mean, I felt uncomfortable.

And then I reported it to Graham.  And that is when Graham said well, if you report that to H -- because I was like, "Well, I feel like I should report that to HR.  Like, it made me uncomfortable."   16:00

And he was like -- he was like:  "If you report that to HR, then you're going to make working with Devon hard."   16:00

And so I just kept it to myself because, again, it was like Graham just never protected me.

So it was, like, even when things -- it was just, like, a constant thing of like not protecting me.  Not backing me.  Undermining my leadership, my authority, my -- all of that.   16:00

Q.   So putting aside the Ben Krishner incident, this incident with the mural, which we will talk about a little bit more, and then all of your many allegations against Kyle Pottinger, do you remember any other instances in which you claim you were harassed on a sexual basis while at the Suns?   16:01

A.   Well, I also feel like the times that Shawn made like -- like the comment, like the homophobic content or the homophobic comment, did have, like, a   16:01

Page 272

sexual nature because he accused me of essentially being a lesbian, which has to do with sexuality.

And I felt uncomfortable at the time because I was not open about being bisexual.  And so it was something that I was, you know, hiding.    16:01

And I think that that -- like, I remember being, like, really uncomfortable with that in the moment that he was questioning my sexuality.

Q.   Okay.  So other than those three things, and we'll talk about each of them, do you -- were    16:01 there any other instances you remember in which you were harassed on a sexual basis at the Suns?

A.   Not that I could recall.

Q.   The Ben Krishner incident, we talked about it a little bit.  Can you just remind me who    16:02 Mr. Krishner is?

A.   He was a male contractor that was hired for, like, being the liaison between us and Devon Booker.  He was, like, Devon's friend, and I found it odd that we were working with Ben because    16:02 typically we work with Devon's agent.  Her name is Jessica Holtz.

And in this case, I know Graham worked with her a little bit, but it was, like, a large handoff to Ben.    16:02

Page 273

I don't know if Jessica, you know, pointed us to Ben, or whatever. But Graham definitely gate kept that piece of the puzzle I guess you could say.

Q. Okay. And when did you first start interacting with Mr. Krishner as part of your work with the Suns?

A. I believe it was in that meeting.

Q. What -- give me --

A. The meeting that I just described where I was like --

Q. Date, please.

A. I don't remember the date.

Q. Year?

A. August, August 2023 maybe.

Q. Okay. And when was the last time you interacted with Mr. Krishner as part of your work with the Suns?

A. I believe it was Media Day.

Q. Which was when?

A. October 14th.

Q. Okay. So your interactions with Mr. Krishner were essentially August to October of 2023?

A. Around that time, yeah.

Q. How many times did you interact with him?

Page 274

A.    I'm not sure.  There was instances where he just, like, wouldn't respond to me.

Again, it was based off of that meeting where, you know, Graham and Grasha kind of like undermined my authority.                                        16:04

Q.    How much time in total -- in person in total would you say you spent with Ben Krishner?  Hours?  Tens of hours?

A.    Hours.

Q.    Okay.  So more than one hour, but fewer        16:04 than ten hours in total?

A.    I mean, Media Day was a really long day.  So that was a whole day in itself.  So...

Q.    Were you with him the whole time?

A.    I mean, he was around the set, so I don't     16:04 know if you would count that or not but...

Q.    Sure.

Okay.  Other than Media Day, how much time did you spend personally interacting with Ben Krishner?                                                16:04

A.    I would say it was limited.

Q.    Okay.  Limited to just a few hours at the absolute most?

A.    Sure.

Q.    And the demeaning conversation that we were   16:04

Page 275

Q.    Okay.  You testified previously that this discussion took place in Mr. Wincott's office; right?

A.    Yes.

Q.    Okay.  When did that discussion occur?    16:10

A.    July 2023.

Q.    And how long --

A.    Because it was -- wait, it was probably June because Pride is in June.  So probably June of 2023.    16:10

Q.    And how long did the conversation last?

A.    I don't remember.

Q.    Okay.  Let me see if I understand this based on your prior testimony.  At some point during the conversation, Mr. Martinez made comments that he    16:10 didn't like it when gay men flirted with him or touched him.  Is that correct?

A.    Yes.

Q.    And you asked him why would you say that?

A.    Yeah.  Because I think that there is this,    16:11 like -- the way he was implying it was like if they liked him, and he was like assuming that they liked him.  And I think that that's a very common, like -- how can I say it?

Q.    Misconception?    16:11

Page 279

A.   Misconception is a good word of, like, just because you are gay, like, it means that you're immediately attracted to the other person when you could have types and you may not be that person's type.                                              16:11

And so he was kind of like assuming that, yeah, misconception about the community.  And so I felt that -- you know, I just wanted to, like, essentially, like, challenge that assumption to maybe broaden his horizons.  I don't know.       16:11

Q.   Okay.  So you challenged that assumption. And then as you testified before, Shawn asked you if you are a lesbian?

A.   Yes.

Q.   Other than the comment that he didn't like    16:11 it when gay men flirted with him or touched him and his responsive question to you about whether you were a lesbian, did Mr. Martinez make any other comments in that meeting that you considered homophobic or inappropriate?                              16:12

A.   No.  But it made me really uncomfortable.

Q.   Okay.  Did Mr. Martinez express opposition to the idea of having a Pride night halftime show itself?

A.   I don't remember.  I think, like, that      16:12

Page 280

continues to be a big back and forth, like,

discussion internally within the culture just

because there has been a lot of homophobia on the

NBA side, but the WNBA has so many, you know, gay

players.                                                  16:12

And so I believe it was, like, discussing,

like, the Mercury.  I'm not sure.  I don't really --

well, yeah, that would make sense because I think it

was discussing the Mercury.  So I think that they

ended up approving it.                                    16:13

But I know in the Suns side, they are a lot

more conservative about, like, the Pride stuff.

Q.   Okay.  You previously testified that after

Mr. Martinez left the room, Mr. Wincott said

something to the effect of, quote:  Shawn doesn't       16:13

mean that.  He's from a different generation,

unquote.

Is that right?

A.   Yes.

Q.   Did Mr. Wincott say anything else to you       16:13

about that exchange?

A.   Not that I recall.  But it was very much

like a -- trying to, like, pacify me or trying to,

like, you know, like make me not make it a big deal.

Q.   Okay.  Did you tell Mr. Wincott that the       16:13

Page 281

exchange made you uncomfortable?

A.   I think it was very visible that I was uncomfortable.

Q.   Did you tell Mr. Wincott that the exchange made you uncomfortable?                                16:13

A.   No.

Q.   Did you consider this incident to be an incident in which Shawn was being insensitive to the gay community?

A.   Yes.                                                16:14

Q.   And are you an ally of the gay community?

A.   I mean, I'm bisexual.  So that would make me part of it.  Right?

Q.   So I will take that as a yes?

A.   Yes.                                                16:14

Q.   Okay.  So you did not consider this to be an incident in which you were being harassed because of your race or sex; correct?

A.   No.

Q.   No, that's not correct; or no -- let me      16:14
re-ask the question.

A.   Okay.

Q.   So you did not consider this to be an incident in which you were being harassed because of your race or sex; correct?                              16:14

Page 282

A.   I consider it an incident where I was being harassed.

Q.   I understand.  And it made you uncomfortable.  You've made that clear, too.

A.   I -- I -- yeah.                                              16:14

Q.   But you did not consider this to be an incident in which you were being harassed because of your race or sex; correct?

A.   I mean, if you think about it, it could be because it's, like, my comfort level in that            16:15 situation was not taken into consideration.

So I mean, I don't know.  I can't -- like I said, I can only share my experience, but possibly. Because it's like, well, how would that change if I was an older man?                                          16:15

And let's say I was Vince Kozar who was openly gay and would Shawn have made those comments in front of him?  I don't think so.

And so I think being a woman could be a piece of it.  Possibly.  But I'm unsure.  I can only   16:15 share my experience.

Q.   And at this point, what was Shawn working on when he made this comment with you?

A.   I don't remember.  I think he was working on Pride, like, with TJ, probably.  I don't know.  I   16:15

Page 283

think he might have been discussing whether they have like -- like what sort of entertainment would be had on Pride night.

Q.   Yeah.  Okay.

But at this point, Shawn was not in your supervision line; correct?                                  16:16

A.   No.

Q.   I will ask it again because it gets confusing.

Was Shawn in your supervision line at this point?                                                        16:16

A.   No.

Q.   Okay.  And did you ever report Shawn's comment to people in culture?

A.   No.  I was discouraged based off of Graham's behavior to dismiss, you know, like the wrongness of it.                                              16:16

Q.   But you earlier testified that you did not communicate verbally to Graham that you were offended.                                                  16:16

And so you are saying that Graham's comment that Shawn is of another generation, you took as discouragement against reporting it?

A.   Literally when he made that comment, I remember, like, it was very visible that I was          16:16

Page 284

uncomfortable.  Like I remember I tensed up.  I, like, my face got all red.  And I was, like, visible -- like I remember stuttering.  Like I remember, like, because I wasn't open about it.  And so I was uncomfortable.                                          16:17

And so it was very obvious I was uncomfortable.  And I think Graham knew that, and that's why he, you know, tried to pacify the situation by saying, like, oh, you know, he's just from another time.  He didn't really mean that.     16:17

And, you know, another time that Graham just failed to support me, and so I felt discouraged to take that to HR.

Q.    Okay.  And so --

A.    It was very much a boys' club.             16:17

Q.    At the end of the day, you did not report Shawn's comment in this instance?

A.    That's correct.

MR. HEINICKE:  Let's just take a brief pause here.  And so -- so my friends on the other      16:17
side of the table and for the record, it's been made clear that we need to be done by 5:30 for the very noble goal of keeping Sheree comfortable and for childcare reasons, which we're happy to accommodate.

It's also been suggested that the             16:18

Page 285

plaintiff's side has questions for Ms. Montes, so I think it's pretty clear that we're going to need a second day of this deposition.

Is that fair?

MS. WRIGHT:  That's fair.                              16:18

MR. HEINICKE:  Okay.  So what I am going to do is get as much covered as we can up until 5:30. And then may I understand you will allow us to finish -- I can't imagine it's going to be more than an hour more after that at the second session?        16:18

MS. WRIGHT:  Correct.

MR. HEINICKE:  Okay.  And then at the second session -- and we'll have to figure out who pays for the reporters and all this stuff.  But at the second session, if you want to ask questions,    16:18 you will do that as well.

That's good by you.

MS. WRIGHT:  That's good.

MR. HEINICKE:  Okay.  So given that we are going to 5:30 and then stopping, the question really    16:18 for everybody is, would you like to take a break now or keep going?

THE VIDEOGRAPHER:  We are off the record. The time is 4:18 P.M.

///                                                     16:19

Page 286

(Whereupon, a recess was held

from 4:18 P.M. to 4:23 P.M.)

THE VIDEOGRAPHER:  We are back on the

record.  The time is 4:23 P.M.

BY MR. HEINICKE:                                16:24

Q.   Ms. Montes, you understand you're still

under oath?

A.   Yes.

Q.   Nothing happened during the break that

would affect your ability to testify?              16:24

A.   Yes, correct.

Q.   And all the testimony you've given so far

today has been accurate and complete?

A.   Yes.

Q.   Okay.  I want to talk now about Kyle          16:25

Pottinger.

At the Suns, he was the senior vice

president of sales; correct?

A.   Correct.

Q.   In the first two or three years while you     16:25

worked at the Suns, how often did you interact with

Mr. Pottinger?

A.   Pretty limited.

Q.   And you never worked in the ticket sales

department; right?                                 16:25

Page 287

A.   Correct.

Q.   And Mr. Pottinger never worked in marketing; correct?

A.   Correct.  But departments would frequently interact.                                                       16:25

Q.   Understood.

But Mr. Pottinger never worked in marketing?

A.   Correct.

Q.   Okay.  You never received performance        16:25 reviews from Mr. Pottinger; correct?

A.   Formal performance reviews, no.  But he did, like, report to Kim, you know, like how I was doing within Nuestro work.

Q.   Yeah.  So he might compliment you, but he      16:26 was not responsible for your formal performance reviews; correct?

A.   I wouldn't characterize it like that.

Q.   Okay.  Did he give you formal performance reviews?                                                           16:26

A.   No.

MR. HEINICKE:  Can we see --

MS.  BENNINGER:  Exhibit 22.

MR. HEINICKE:  Tab 1.

///                                                                16:26

Page 288

(Whereupon, Defendant's Exhibit 22

was marked for identification by

the Court Reporter.)

BY MR. HEINICKE:

Q.   This is a voluminous document, which is      16:26

text messages -- I will --

MR. HEINICKE:  What exhibit is this?

MS. BENNINGER:  22.

BY MR. HEINICKE:

Q.   I will represent to you that Exhibit 22 is     16:27

a copy of text messages between you and Kyle

Pottinger that we have obtained and produced.

I will note that the Bates number at the

bottom right and the page number at the bottom left

had been added by us.                                16:27

Oh, excuse me, the Bates number at the

bottom was added by your lawyers because they

produced this document to us and the page number at

the bottom left was added by us for ease of use here

today.                                               16:27

MR. HEINICKE:  Are you good with that,

Counsel?

MS. WALTERS:  Yes.

MR. HEINICKE:  Great.

///                                                  16:27

Page 289

BY MR. HEINICKE:

Q.   Okay.  Do you recognize this as the text exchanges, text messages you had with Kyle Pottinger?

A.   Yes.                                          16:28

Q.   Okay.  And are you confident that these are all of the text messages you have ever exchanged with Mr. Pottinger?

A.   Yes.

Q.   You provided your lawyers with all the text   16:28 exchanges you ever had with Mr. Pottinger?

A.   Yes.

Q.   Just for clarity of record -- well, we've already sort of gone over that.

So let me ask this:  On the first page of   16:28 this exhibit, this shows that you only exchanged a handful, small number of text messages with Mr. Pottinger between September 2019 and March 2021; right?

A.   Yeah.                                         16:28

Q.   Okay.  So that's consistent with your notion of your communications being limited early on.

And then you start communicating with him a little bit more frequently after that.            16:28

Page 290

A.   Correct.

Q.   Okay.  And we already went over this, but ERG stands for Employee Resource Group.  The same thing as the TMN, Team Member Network; right?

A.   Yes.                                              16:30

Q.   Is this around the time when you found out that Kyle would be leading the Nuestro network, October 5th, 2022?

A.   I don't remember exactly when I found out. I would have to read through these text messages to    16:30 tell you an accurate, you know, statement.

Q.   Okay.  Do you recall when you found out that Kyle would be leading the Nuestro network?

A.   I don't recall the exact date.  But it was -- when did they start these?  It was right when    16:31 Andrea got hired.  So I don't know when she got hired, but right around that time line.

Q.   Does the fall of 2022 sound correct?

A.   Is that when Andrea was hired?  Then, yes. I see her shaking her head, so yes.                     16:31

Q.   So can you look at Page 36, please?

There it appears that Mr. Pottinger is saying that he wants to help you get on a, quote, new voices under 30, quote, list.

Is that correct?                                  16:31

Page 292

A.    Yes.

Q.    And looking through the next couple pages, it appears that Kyle is telling you he will help get the Suns to nominate you for such an award; is that correct?                                                      16:31

A.    Can I read through it?

Q.    Sure.

A.    Yes.

Q.    And this exchange is going on before you and Mr. Pottinger went on any dates or had any        16:32 intimate interactions; correct?

A.    Yeah.  I feel like this was him trying to, like, butter me up.

Q.    Okay.  So again, as far as the timing goes, this exchange is taking place before you and he went    16:32 on any dates or had any intimate interactions; correct?

A.    Yeah, that's correct.  And what I'm saying is, like, he essentially, like, started offering me things that he could do for me.                              16:32

        And this was one of them.

Q.    Would you look at Page 40 of the text exchange, please.  This is dated November 18th, 2022; right?

A.    Yes.                                                      16:33

Page 293

Q.   And if you flip through to Page 44, would you agree with me that these texts are all from November 18th, 2022?

A.   Through what page, did you say?

Q.   34.                                                    16:34

A.   Yes.  And I would like to get on the record that this text message says:

"Graham told me I get to write the plan for El Valle."

Q.   My next question was:  You text Kyle that    16:34 Graham told you you got to write the plan for El Valle; is that correct?

A.   Yes.

Q.   Okay.  What is that plan?

A.   It's the strategy document that we are      16:34 going to present as an exhibit.

Q.   Why were you so excited to write this?

A.   Because this was, like, the biggest initiative of the year that I get to plan.

Q.   Okay.  And so Graham told you you would get  16:35 to write it in November of 2022?

A.   Sounds about right.

Q.   Sounds like Graham is doing okay by you here?

A.   Well, I would say that Graham was flawed in  16:35

Page 294

some ways and trusted me in other ways.  One of the things that I wrote in my exit interview in that document was that he never micromanaged me.  Because, you know, he trusted that I could do the work.                                                          16:35

And so I think, you know, this supports the fact that I wrote the plan, and I led the campaign.

Q.   And in your mind, does writing the plan equate with leading the project?

A.   I would say writing the plan is a portion    16:35 of it.  And then on top of that, you know, presenting it and being the face of it is another thing, which I also did.

So, you know, presenting the plan was presenting it to all departments.  Leading the    16:36 vision of it.  Checking in with each of the departments and making sure that, you know, they continued to align themselves with the overall vision.

Q.   And did Graham micromanage you when you    16:36 were the face of the project?

A.   No.

Q.   He allowed you to do that per your own expertise; correct?

A.   Yes.                                             16:36

Page 295

Q.   Look at Page 49, please.

You describe Mr. Pottinger as, quote, culturally Mexican, unquote.

Does Mr. Pottinger, to your knowledge, have a Mexican heritage?                                    16:36

A.   He does not.

Q.   Is he Latino or Hispanic, to your knowledge?

A.   No.

Q.   What did you mean when you described him as   16:36 culturally Mexican?

A.   He's -- he was born and raised in a border town near Mexico.

Q.   Okay.

A.   So he --                                      16:36

Q.   Some of these texts reference Nogales.  Is that what you're talking about?

A.   Yes.

Q.   And so was he in Nogales, Arizona; or Nogales, Mexico?                                      16:37

A.   Arizona, I think.

Q.   You're not sure one way or another?

A.   I'm pretty certain it was the United States side.

Q.   Are you certain he's not Mexican American?    16:37

Page 296

planning on leaving the Suns because of a lack of promotion.  Let me rephrase that.

In May of 2023, you were already thinking about leaving the Suns because of a lack of promotion?                                              16:43

A.   I would say that is, like, one of the reasons.

Q.   Okay.  So in May of 2023, you were already thinking about leaving the Suns because of a lack of promotion.                                          16:43

Was one of the other reasons you were thinking about leaving the Suns at that time was because you felt you had been subjected to discrimination?

A.   Yes.                                              16:44

Q.   Was one of the other reasons that you felt you had been subjected to retaliation?

A.   Yes.

Q.   And was one of the reasons you thought about leaving at that time, May of 2023, because you   16:44 wanted a higher salary?

A.   Yes.

Q.   Let's go to Page 150 of the text messages, please.  This is in July of 2023.

Was this the point in time when things       16:44

Page 301

started to escalate romantically between you and

Mr. Pottinger?

A.   It looks like it, yes.  I feel like it was
a little prior to this.

Q.   Okay.  So when did things start to escalate   16:45
romantically between you and Mr. Pottinger?  When
did it move from a relationship that wasn't romantic
to one that was?

A.   It's hard to date the exact date because I
feel like it was like a very, like, slow, like,   16:45
process.  I remember one time he called me, and he
was drunk.

And he was, like, in Nogales and, that is
when he told me that he was, like, getting a
divorce.  And from there, it kind of just blurred a   16:45
lot of boundaries.  And then...

Q.   Okay.

A.   Yeah.

Q.   Prior to July 2023, you had not gone out on
any dates; correct?   16:46

A.   Dates, no.  But like I said, it was kind
of -- it was confusing, because it was like -- there
was like lunch meetings.  So I don't know --

Q.   Just the two of you?

A.   Yeah.   16:46

Page 302

Q.   Okay.  And did you perceive those lunch meetings to be romantic in nature?

A.   I thought they were flirty.

Q.   Flirty.  And when we get to July 2023 and were those -- sorry, let me back up.                16:46

Were those lunch meetings always in the context of work or were they also lunch meetings away from work?

A.   I feel it was mixed.

Q.   Mixed.  So sometimes you would go out to      16:46 lunch with him outside of work?

A.   No.  It was -- what do you mean by that? Like outside of the arena?

Q.   No.  I mean outside of the context of work.

A.   No.  That only happened here.                16:47

Q.   Okay.  So the first time that you were having any romantic interaction with him outside of the context of work started in July of 2023; and what we see in these text messages starting at Page 150; is that correct?                                  16:47

A.   Can you repeat the question?  Like, the romantic interactions started like -- because it was like -- these outside of work, yes.

But the romantic interactions and, like, the blurring of the boundaries happened, like,      16:47

Page 303

before that.  And I feel like in the context of work.

Q.   Yeah.  And I'm asking about outside the context of work.

Was this the first time in July of 2023    16:47 that you two planned to be together romantically outside the context of work?

A.   Yes.

Q.   Am I right in these texts you were looking for potential spots to attend a Happy Hour; is that    16:48 right?

A.   Yeah.  I remember he, like, suggested that we go get drinks.

Q.   Okay.  And did you understand that suggestion to be an invitation for a date?    16:48

A.   Yeah.  Well, it was hard to, like, understand what was going on.  Because it was like --

MS. WALTER:  Can I pause?  I'm sorry.  But the lady upfront leaves at 5:00, and she wants to    16:48 know if anyone has any tickets to validate.

MR. HEINICKE:  So we can go off the record.

THE VIDEOGRAPHER:  We're off the record. The time is 4:48.

///    16:48

Page 304

(Whereupon, a recess was held

from 4:48 P.M. to 4:51 P.M.)

THE VIDEOGRAPHER:  We're back on the

record.  The time is 4:51 P.M.

BY MR. HEINICKE:                                    16:52

Q.  Ms. Montes, did anything happen during the

break that affects your ability to testify here

today?

A.  No.

MR. HEINICKE:  Okay.  So as we stated        16:52

before, we will go through 5:30.  I will not be able

to finish by then.

But with an hour or two in the next

session, I will be able to finish.  And then your

counsel will be able to ask you questions.          16:52

So that's a programming way of saying that

will be our last break until we break for the

evening.

All good by you?

MS. WRIGHT:  Yes.                            16:52

BY MR. HEINICKE:

Q.  Okay.  Please -- okay.  I was asking you:

Did you consider this effort to find a place to go

to happy hour with Kyle to be a date?

A.  No.  I wasn't sure what it was.          16:53

Page 305

Q.   Okay.  Can you turn to Page 152, please. And in these text messages, it appears that you are asking Mr. Pottinger who can see his calendar; right?

A.   Yes.                                                16:53

Q.   And you want him to remove the happy hour that you had planned; correct?

A.   Yes.

Q.   Because you didn't want Sam to see that you and Kyle were going out to a bar; right?        16:53

A.   Yeah.  I remember thinking -- well, like I said, it was confusing because, I mean, I have gone to happy hour with coworkers.

So I wasn't sure what it was going to be. But because Kyle is a man, I didn't want Sam to see    16:54 the calendar invite, because she was really good friends with Eva DeBord, who is in our marketing team.  And I didn't want there to be gossiping about it.

Q.   Why did you think people would gossip about    16:54 you and Kyle going out for drinks?

A.   Because he's a man and I'm a woman.

Q.   Okay.  And did you think people would assume there was a romantic relationship going on if they heard about that?                                  16:55

Page 306

A.    Possibly.

Q.    So fair to say, you didn't want -- you didn't want this on Kyle's calendar because you feared that people might think you were going on a date with Kyle?                                    16:55

A.    Yeah.

Q.    Okay.  On 156, Page 156, this is Mr. Pottinger texting you that he's picking you up for your date, or excuse me, for that evening.

      Do you see that?                                16:55

A.    Yes.

Q.    Okay.  And when you went out to happy hours with other coworkers, did they come pick you up and take you, or did you get yourself there yourself?

A.    I got myself there.                             16:55

Q.    And so would you agree that him coming to pick you up gives this the elements of a date?

A.    Here I think it -- again, it was like the boundaries started to blur.  So...

Q.    Okay.  And this is on July 18th; right?     16:56

A.    Yes.

Q.    And this is when you and Mr. Pottinger had your first, how shall we say, romantic event together?

A.    Yes.                                           16:56

Page 307

Q.   Okay.  You testified about this in your last deposition.  So to save time, do you stand by all of your testimony concerning your interactions with Mr. Pottinger from your last deposition?

A.   Yes.                                                    16:56

Q.   Okay.  You said that you did not remember much about this first date or night together, or whatever you call it; right?

A.   There was drinking.

Q.   And you had a few drinks?                               16:56

A.   Yes.

Q.   How many?

A.   I don't remember.

Q.   Okay.  And given that you don't remember, is it fair to say you're not sure whether the drinks   16:57 impaired your memory or whether you simply don't remember?

A.   Yeah.

Q.   Do you remember being drunk that night?

A.   I don't remember.                                       16:57

Q.   Okay.  And aside from alcohol, did you use any other substance during this date?

A.   No.

Q.   Okay.  What about before the date, did you use any substance other than alcohol?           16:57

Page 308

A.   No.

Q.   You testified that there was a lot of kissing on this first night out, this date.

Correct?

A.   Yeah.  I remember I left his car very quickly.

Q.   But I'm going back to your testimony from your last deposition.  You testified that there was a lot of kissing on this date; is that correct?

A.   Yes.

Q.   But you also testified that you kissed for only a few seconds.  So as we sit here today, do you have a clear recollection of whether there was a lot of kissing or whether you only kissed for a few seconds?

A.   I mean, a few seconds is still a lot of kissing.

Q.   So this kissing, this lot of kissing over a few seconds occurred in Mr. Pottinger's car after the date; is that right?

A.   Yeah.

Q.   Did you kiss at all at the bar?

A.   No.

Q.   Okay.  So earlier you said you don't really remember much about the date, and maybe you had a

16:57

16:57

16:58

16:58

16:58

Page 309

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.